Jennifer R. Schwartz, (OSB #072978)
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
Email: jenniferroseschwartz@gmail.com

Lauren M. Rule (OSB #015174)
ADVOCATES FOR THE WEST
3115 NE Sandy Blvd., Ste. 223
Portland, OR 97232
Tel: 503-914-6388
Email: lrule@advocateswest.org

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR DISTRICT OF OREGON

PENDLETON  DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL,** an Oregon nonprofit corporation, | Case Number: |
| Plaintiff, | |
| v. | **COMPLAINT FOR VACATUR OF UNLAWFUL AGENCY ACTION AND DECLARATORY RELIEF** |
| **KRIS STEIN,** District Ranger for the HCNRA, Wallowa-Whitman National Forest, in her official capacity; and **UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture, | (National Forest Management Act, National Environmental Policy Act, Hells Canyon National Recreation Area Act, Administrative Procedure Act) |
| Defendants. | |

**INTRODUCTION**

1.  Plaintiff, Greater Hells Canyon Council ("GHCC"),[1] challenges the U.S. Forest Service's decision to reauthorize livestock grazing on approximately 44,000 acres of the congressionally designated Hells Canyon National Recreation Area ("HCNRA") within the Wallowa-Whitman National Forest ("WWNF"), which threatens to impair the viability and recovery of the Spalding's catchfly – a federally threatened plant endemic to the HCNRA.  The Forest Service's failure to adequately analyze the harmful effects of livestock grazing on this rare plant, and failure to impose sufficient measures to protect the plant from trampling and habitat degradation, results in this decision violating the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), the Hells Canyon National Recreation Area Act (HCNRA Act) and those statutes' implementing regulations.

2.  As Congress recognized, one of the primary reasons the HCNRA is such an ecologically important area is its high rates of biologically unique, rare and endemic botanical species.  The Spalding's catchfly is among the area's most rare; occurring only in a few Pacific Northwest environments, including the HCNRA's canyon grasslands.  Less than 1,000 individual catchfly plants are known to exist in vulnerably small patches scattered across thousands of acres of the HCNRA's lower Imnaha River corridor.  Adverse impacts from livestock grazing and displacement by aggressive, exotic weeds are the greatest threats to this species' ability to persist in its native habitat.

3.  This action seeks: (1) a declaration that the Forest Service violated NEPA, 42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations by a) failing to develop and analyze an adequate range of grazing alternatives, and b) by failing to take the requisite 'hard look' at the

---

[1] Formerly Hells Canyon Preservation Council.

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                                    2

potential environmental impacts of reauthorizing cattle grazing in the Lower Imnaha Rangeland

Analysis ("LIRA") area; (2) a declaration that the Forest Service violated NFMA, 16 U.S.C.

§§1600 *et seq.* and its implementing regulations by failing to ensure the protection and recovery

of the HCNRA's biologically unique, rare and endemic plants and habitat, particularly the

threatened Spalding's catchfly, as required by the applicable Forest Plan; (3) a declaration that

the Forest Service violated the HCNRA Act, 16 U.S.C. §§ 460gg(1)-(13) and its implementing

regulations by failing to manage HCNRA lands in a manner compatible with the Act's objective

to preserve biologically unique, rare, and endemic plant species and habitats; and (4) an order

vacating the LIRA Environmental Impact Statement ("EIS")/Record of Decision ("ROD") and

remanding the matter to the Forest Service until this Court determines that the violations of law

set forth herein have been corrected.

    4.  In the event that Plaintiff is the prevailing party in this action, it will seek an award of

fees and costs pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

    5.  This Court has jurisdiction over this action pursuant to the Administrative Procedure

Act (APA), 5 U.S.C. §§ 701-706; 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief),

2412 (costs and fees) and 1346 (United States as a defendant). This cause of action arises under

the laws of the United States, including the APA, NEPA, NFMA, the HCNRA Act, and these

statutes' implementing regulations. Plaintiff has challenged final agency action as defined by the

APA, 5 U.S.C. § 704.  Plaintiff has exhausted all administrative remedies and is seeking judicial

review of a final administrative action of the Forest Service which was subject to pre-decisional

administrative review pursuant to 36 C.F.R. § 218, Subpart A & B (objection process). An

actual, justiciable controversy exists between Plaintiff and Defendants.  The requested relief is

proper under 28 U.S.C. § 2201, 5 U.S.C. § 706.

6.  Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Defendants reside in this district, and the public lands, natural resources and agency records in question are located in this district.

7.  This case is filed properly in Pendleton, Oregon pursuant to Local Rules 3.3 and 3.4 because the LIRA area is located within Wallowa County, Oregon.

## PARTIES

8.  Plaintiff **GREATER HELLS CANYON COUNCIL** is a regional nonprofit organization based in La Grande, Oregon with approximately 1,000 members. GHCC'S mission is to connect, protect, and restore the wild lands, waters, native species and habitats of the greater Hells Canyon region, ensuring a legacy of healthy ecosystems for future generations. GHCC has been actively involved in working to prevent and restore resource degradation from adverse livestock grazing on federal public lands throughout the greater Hells Canyon region for many years.  GHCC's staff and members regularly visit the HCNRA, including the lands within the LIRA area.  GHCC's staff and members seek to ensure that the Forest Service faithfully and fully implements and complies with federal law in managing the natural resources of the LIRA area as a means of protecting their interests.

9.  GHCC's staff and members hike, hunt, camp, birdwatch, photograph scenery, botany and wildlife, use, and engage in other vocational, scientific, and recreational activities within the LIRA area. GHCC's staff and members derive recreational, inspirational, scientific, and aesthetic benefit from their activities within the LIRA area. GHCC's staff and members intend to continue to use and enjoy the LIRA area and surrounding HCNRA lands, waters, and canyons frequently and on an ongoing basis in the future.

10.    Defendant **FOREST SERVICE** is an agency of the United States and is a division of the Department of Agriculture, and is charged with managing the public lands and resources of the Wallowa-Whitman National Forest, in accordance and compliance with NEPA, NFMA, and their implementing regulations.

11.    Defendant **KRIS STEIN**, HCNRA District Ranger, is sued solely in her official capacity as the decisionmaker who signed the LIRA Record of Decision on September 3, 2015. The Final EIS/ROD and 2015-2017 AOIs addressed herein are the final agency actions challenged in this case.

12.    Defendants Forest Service and Ranger Stein are collectively referred to as the "Forest Service."

13.    An actual, justiciable controversy exists between Plaintiff and Defendants.

14.    The aesthetic, recreational, scientific, educational, and other interests of Plaintiff and its members have been and will continue to be adversely affected and irreparably injured if Defendants continue to act and fail to act as alleged in implementing the actions that Plaintiff challenges with this litigation.

15.    These are actual, concrete, and particularized injuries caused by Defendants' failure to comply with mandatory duties under NEPA, NFMA, the HCNRA Act and the APA.  The relief sought in this Complaint would redress Plaintiff's injuries.

## LEGAL FRAMEWORK

### National Environmental Policy Act (42 U.S.C. § 4321-4370(h))

16.    As our nation's basic environmental charter, NEPA requires federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including preparing a detailed Environmental Impact Statement ("EIS") for all major Federal actions that may significantly affect the quality of the human environment. 42 U.S.C. §

4332(2)(C).  NEPA's goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to ensure that the public has sufficient information to participate in the decision-making process.

17.  An EIS must consider a range of reasonable alternative actions and thoroughly assess the site-specific and cumulative impacts of these actions. 42 U.S.C. § 4332(2)(C); 40 C.F.R. Parts 1502 and 1508.

18.  The issuance or renewal of a federal livestock grazing permit is a major federal action that triggers NEPA review. *See, e.g., Natural Res. Def. Council v. Morton*, 388 F. Supp. 829 (D.D.C. 1974), *aff'd without opinion*, 527 F.2d 1386 (D.C. Cir. 1976); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815 (9th Cir. 2002).

19.  Agency actions taken pursuant to NEPA are reviewable by this Court under the Administrative Procedure Act.  5 U.S.C. §§ 702, 704, 706.

### National Forest Management Act (16 U.S.C. §§ 1600-1614)

20.  The National Forest Management Act (NFMA), 16 U.S.C. §1600-1614, is the primary statute governing the administration of national forests.

21.  NFMA establishes a two-step process for forest planning. *Id*. § 1604(a); *see also* 36 C.F.R. § 219.10(a), (b).  First, it requires the Forest Service to develop and implement a land and resource management plans ("Forest Plan") for each unit of the National Forest System.  16 U.S.C. §1604(a). The Forest Plan guides natural resource management activities forest-wide, setting standards, management goals and objectives, and monitoring and evaluation requirements.

22.  Second, once a Forest Plan is in place, site-specific actions, including the issuance of livestock grazing permits and annual use authorizations, are developed and implemented.  These

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    6

actions must comply with NFMA and be consistent with the governing Forest Plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.

23.  The Forest Plan governing the entire Wallowa-Whitman National Forest was adopted in 1990. In 2003, the WWNF Forest Plan was amended by the adoption of the Hells Canyon National Recreation Area Comprehensive Management Plan ("CMP"). The HCNRA CMP was adopted to carry out the objectives of the HCNRA Act and includes, among others, the following management directives that apply to biologically unique, rare, federally listed, and endemic plants and habitat:

- Manage habitat and populations of federally listed plant species to ensure their continued existence and recovery in the HCNRA;
- Implement recovery plans for federally listed plant species, including carrying out recommended recovery actions;
- Implement restoration and recovery activities that would facilitate removal of species from the federal threatened and endangered species list;
- Manage habitat and populations of all Forest Service sensitive plant species to ensure their continued existence and viability in the HCNRA;
- Mitigate potential conflicts or modify the project to ensure the protection of rare and endemic plants and their associated habitat;
- Monitor population trends and habitat conditions for federally listed plant species;
- Consider modifications to activities such as exclusion of domestic livestock grazing, where conflicts with the protection of rare plant species are identified.

**Hells Canyon National Recreation Area Act (16 U.S.C. §§ 460gg(1)-(13))**

24.  In 1975, Congress established the HCNRA, providing that the lands in the HCNRA shall be administered to preserve the natural beauty, and historic and archeological values of the Hells Canyon region for this and future generations, and to enhance the recreational and ecological values and public enjoyment of the area. 16 U.S.C. § 460gg(a).

25.  The HCNRA Act provides the principal legislation that guides management of the HCNRA. Section 7 of the HCNRA Act requires the Forest Service to administer the HCNRA in a manner compatible with certain objectives, including the following: "conservation of scenic, wilderness, cultural, scientific, and other values contributing to the public benefit" as well as

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF          7

"preservation, especially in the area generally known as Hells Canyon, of all features and peculiarities believed to be biologically unique including, [] rare and endemic plant species, [] and the rare combinations of outstanding and diverse ecosystems and parts of ecosystems associated therewith[.] " *Id*. § 460gg-4. The Act allows for continued use of natural resources on these lands, including grazing, but only to the extent those uses "**are compatible with** the provisions of" the Act, including the above-mentioned preservation mandate. *Id*. (emphasis added).  The WWNF interprets Section 7 as the primary objectives for which the HCNRA should be managed.

26.  Section 8 of the HCNRA Act directed the development of a comprehensive management plan.  In 2003, the Forest Service adopted Alternative E-modified as the new management direction under the current HCNRA CMP described in the NFMA section above. This Forest Plan management alternative was selected to carry out the objectives in Section 7 of the HCNRA Act.

27. The regulations implementing the HCNRA Act establish standards and guidelines for managing the area in order to "prescribe the scope and extent of certain activities that may occur in the HCNRA. These standards and guidelines are consistent with the overall objective of administering the HCNRA to preserve its natural beauty, historical and archaeological values and enhance its recreational and ecological values and the public's enjoyment." 36 C.F.R. § 292.42.

28.  The standards and guidelines that apply to livestock grazing provide that: (a) Grazing may be authorized only on rangeland determined by the authorized officer to be suitable for grazing and meeting or moving towards satisfactory condition and meeting the conditions described in paragraph (b) of this section. (b) Where domestic livestock grazing is incompatible with the protection, restoration, or maintenance of fish and wildlife or their habitats; public

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    8

outdoor recreation; conservation of scenic, wilderness, and scientific values; rare combinations of outstanding ecosystems, . . . , the livestock use shall be modified as necessary to eliminate or avoid the incompatibility. In the event an incompatibility persists after the modification or modification is not feasible, the livestock use shall be terminated. (c) Range improvements must be designed and located to minimize their impact on scenic, cultural, fish and wildlife, and other resources in the HCNRA.  *Id.* § 292.48.

## Administrative Procedure Act (5 U.S.C. §§ 701-706)

29.  The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, authorizes courts to review final agency actions and hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The APA provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. 5 U.S.C. § 704.

## STATEMENT OF FACTS

### The Hells Canyon National Recreation Area

30.  The 2.3 million-acre Wallowa-Whitman National Forest extends from the Blue Mountains and rugged Wallowa Mountains down to the deepest canyon country in North America, encompassing the Hells Canyon National Recreation Area ("HCNRA").[2] Created by an act of Congress in 1975, the 652,488-acre HCNRA straddles the Snake River, forming the boundary between Idaho and Oregon.  Pub.L. No. 94-199, 89 Stat. 1117 (1975) (codified at 16 U.S.C. §§ 460gg(1)-(13)) (HCNRA Act).  The HCNRA Act also established the Hells Canyon

_____

[2] Although the HCNRA includes portions of the Nez Perce, Payette, and Wallowa-Whitman National Forests, it is managed by the WWNF.

Wilderness, now totaling approximately 217,000 acres of high mountain peaks, rimrock canyon, and breathtaking vistas, as well as three Wild and Scenic Rivers: the Snake, the Rapid River in Idaho, and the Imnaha River in Oregon.

31.   Hells Canyon has long been recognized for its unique, rare and endemic botanical resources resulting from a combination of dramatic changes in topography, geology, climate and elevation. The HCNRA serves as a botanical bridge, linking interior Rocky Mountain plant species and communities with those of the Blue Mountains and further west. Indeed, Congress mandated that the area be managed in a manner that preserves its biologically unique, rare and endemic plants.

32.   Grassland habitats composed of native perennials like Bluebunch wheatgrass and Idaho fescue are the dominant plant community type at moderate to low canyon elevations. Steep gradient riparian areas, cliffs and bluffs also contain many of the HCNRA's sensitive, endemic and otherwise unusual plant species.

33.   Biological soil crusts are another ecologically important component of the HCNRA's grassland, shrub-steppe and sub-alpine habitats.  Communities of mosses, lichens, liverworts, cyanobacteria, and microfungi bind together, developing slowly over decades, to form living crusts that grow in spaces between plants. These biological soil crusts increase soil stability, thereby reducing wind and water erosion, fixing nitrogen, and increasing fertility.

34.   The HCNRA's grasslands, steep slopes, and soil crust communities face a high risk of impact from livestock grazing induced disturbance (such as by trampling, hoof shear, soil compaction, erosion and the spread of aggressive, nonnative plants or noxious weeds).  Today, many of these areas are dominated by invasive grasses, particularly cheatgrass, with infestations of aggressive weeds that inhibit recovery of the HCNRA's native plant communities.

35.  The LIRA project area is at the heart of the HCNRA and includes over 16,800 acres of the congressionally designated Hells Canyon Wilderness. The principal physical feature of the lower Imnaha Canyon is the exceptionally diverse topography. This feature contributes greatly to the high level of plant diversity found in the LIRA area. The canyon walls within the project area rise from the Imnaha River at around 1000 ft. in elevation up to nearly 5500 ft. along the northern end of Summit Ridge. Columbia River basalt flows define the geologic setting.

36.  Precipitation passing through the complex geologic structure of these basalt formations results in many seeps, moist cliff faces, and springs, and feeds an extensive network of seasonal and perennial drainages, and riparian areas.  Soils are derived from weathering of these parent materials and inputs of Mt. Mazama ash deposits and wind-blown loess from central Washington. Soil development and erosion along with aspect changes have led to an exceptional richness, diversity, and productivity of vegetation.

**The Threatened Spalding's Catchfly**

37.  The Spalding's catchfly (*Silene spaldingii*) is one of the HCNRA's most imperiled native plants.  A member of the pink or carnation family, this herbaceous perennial plant withers to the ground every fall and emerges again in spring.  Spalding's catchfly is considered a "regional endemic" because it is found only in eastern Washington, northeastern Oregon, west-central Idaho, western Montana, and a small sliver of British Columbia, inhabiting bunchgrass grasslands and sagebrush-steppe, and occasionally open pine communities. Catchfly plants typically range from 8 to 24 inches in height, with all green portions of the plant covered in dense sticky hairs that trap insects, hence the common name "catchfly."  The plant's cream-colored flowers bloom from mid-July through August.

38.  Due to its declining populations, the U.S. Fish & Wildlife Service ("FWS") listed the Spalding's catchfly as a threatened species under the federal Endangered Species Act (ESA) in

2001.  FWS also determined that the designation of critical habitat for the species was "prudent," however, such designation has yet to occur.  FWS finalized a Spalding's catchfly Recovery Plan in 2007.  According to the Recovery Plan, Wallowa County is the *only* county within the state of Oregon where Spalding's catchfly is known to occur.  The approximately 21 populations known within Wallowa County vary significantly in size, ranging from the many small populations of less than 100 individual plants (often just a few individuals) up to the several thousand plant population documented on the Zumwalt Prairie, a private land preserve managed by The Nature Conservancy.  More than half of known catchfly populations range-wide occur on unprotected private land.

39.  At the time of the Recovery Plan, there were 99 known populations of *Silene spaldingii* throughout the species' entire range.  Two thirds of these (66 populations) were composed of fewer than 100 individual plants each.  The Recovery Plan splits occupied catchfly habitat into five physiographic (physical geographic) regions that are characterized by distinctive physical features:

(1) the **Blue Mountain Basins** in northeastern Oregon;
(2) the **Canyon Grasslands** along the Snake, Salmon, Clearwater, Grande Ronde, and Imnaha Rivers in Idaho, Oregon, and Washington;
(3) the **Channeled Scablands** of east-central Washington;
(4) the **Intermontane Valleys** of northwestern Montana; and
(5) the **Palouse Grasslands** in southeastern Washington and west-central Idaho.

40.  The LIRA project area lies entirely within the Canyon Grasslands and contains the only Spalding's catchfly populations on the Wallowa-Whitman National Forest that fall within this physiographic province.  According to FWS's Recovery Plan, the Canyon Grasslands may offer the best conservation potential for the catchfly because this habitat remains largely intact — the canyon walls are steep and do not lend themselves to agricultural or urban developments.  This steep topography also makes the Canyon Grasslands region the least surveyed area for *Silene spaldingii*.

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    12

41.  For the purposes of conservation, recovery, and delisting (to remove the species from threatened status under the ESA), the FWS's Recovery Plan determined population distribution and size goals for each of the five physiographic regions where Spalding's catchfly is found.

42.  Because a population viability analysis has not been done for *Silene spaldingii* range-wide it is unknown what constitutes a viable Spalding's catchfly population. FWS suggests utilizing the standard minimum of at least 500 reproductive individual plants to represent a minimum viable population size.

43.  Under the Recovery Plan, to be delisted, Spalding's catchfly must reach twenty-seven populations that each have a minimum viable population size of at least 500 reproducing individuals. The species also must have intact habitat at key conservation areas ("KCAs") [3] that are distributed throughout the 5 identified physiographic provinces as follows: 5 within the Blue Mountain Basins, 7 within the Canyon Grasslands, 8 within the Channeled Scablands, 4 within the Intermontane Valleys, and 3 within the Palouse Grasslands.

44.  According to the Recovery Plan, KCAs are those areas that possess the following qualities:

- Composed of intact habitat (not fragmented), preferably 40 acres in size or greater;
- Native plants comprise at least 80 percent of the canopy cover of the vegetation community;
- Adjacent habitat sufficient to support pollinating insects;
- Habitat is of the quality and quantity necessary to support at least 500 reproducing individuals of *S. spaldingii.*

45.  The protection and management of these KCAs, or areas that have the potential to serve as key conservation areas, forms the foundation of the Plan's recovery strategy for *Silene spaldingii.*

---

[3] The Forest Service's LIRA project documentation refers to key conservation areas for Spalding's catchfly as "KSAs."

46.  FWS determined that of the populations found throughout the entire Canyon Grasslands physiographic province, five met the above criteria and were accordingly selected as KCAs. Two additional KCAs must be selected for this province (for a total of seven Canyon Grasslands KCAs) to meet the Recovery Plan's delisting criteria.

47.  FWS is currently considering whether the LIRA area meets the criteria for constituting a 6th KCA for the Canyon Grasslands physiographic province.

48.  According to the Recovery Plan, habitat degradation from adverse livestock grazing and weed invasion are the two greatest current threats to the continued existence of Spalding's catchfly. FWS's 2009 5-year status review found that overall *Silene spaldnigii* populations were still not secure from these threats.

49.  The Recovery Plan also sets forth several recovery actions specific to both the Canyon Grasslands physiographic region and livestock grazing management.  For instance, Recovery Action 2.3.4.1 states: Livestock grazing should not occur within *Silene spaldingii* populations, especially at key conservation areas, when seedling germination occurs in early spring (April and May) or during plant emergence and growth (May and June).  This Recovery Action further provides that livestock grazing should not occur in *S. spaldingii* pastures where serious invasive nonnative plant populations exist.  Last, the Recovery Action cautions that if livestock grazing and *Silene spaldingii* are allowed to co-occur, careful management and monitoring is needed that includes several site visits during the growing season.

**<u>Livestock Grazing Impacts</u>**

50.  Livestock grazing by cattle, especially when inappropriately managed, can dramatically alter native ecological communities, harming both upland and riparian habitat for a multitude of wildlife, fish and plants by degrading vegetation, soils, and streams.

51.  Livestock consume large quantities of vegetation, impacting not only plant growth, but also species diversity and composition, the seral state and vigor of plants, and the prevalence of weeds. Trampling of vegetation adds to the adverse impacts of grazing when livestock crush and displace plants and damage woody shrubs.

52.  One of the primary adverse effects of livestock grazing is its alteration of plant diversity and composition. Livestock generally prefer to eat native grass and forb species. By selectively grazing these plants and eating their seed heads and flowers, livestock reduce seed production and regeneration of native plants. In turn, non-native invasive species quickly take root and spread in their place.

53.  Many rangelands in the western United States are now in poor ecological condition, because livestock grazing has eliminated the natural and healthy diversity and abundance of native grasses, forbs, and shrubs, allowing invasive species to take over. Disturbances, most frequently linked to adverse livestock grazing and trampling, have dramatically altered western arid ecosystems in a progression from native plant communities to invasive non-native annual grasslands that are then susceptible to more invasive perennial plant invasions (DiTomaso 2000).

54.  Invasive species, such as cheatgrass, Kentucky bluegrass, crested wheatgrass, scotch broom, and other exotic weeds are often of lower value to watershed health and wildlife. Furthermore, invasive plants can lead to increased use of herbicides, forest health problems, and altered fire cycles. One dramatic example is the expansion of cheatgrass across the West, which has increased wildfire frequency and intensity.

55.  Livestock grazing can also greatly impact soil conditions, significantly altering biological communities and the hydrology of watersheds. First, livestock deplete vegetation, which can leave the ground bare. The bare ground is then highly susceptible to further disturbance from cattle hooves, creating a bed ready-made for the growth of quickly-spreading

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    15

noxious weeds and other invasive species.  Livestock can carry the seeds of noxious weeds in their hooves, guts, or hair. Increased bare ground, combined with livestock disturbance and destruction of biological soil crusts, also leads to erosion when loose soil is transported by wind, or by overland water flows during rain events or snowmelt. This erosion causes rills (small rivulets in the soil), gullies (channels in the soil formed by moving water), and pedestalling of plants (soil loss around the base of plants, making them appear elevated).

56.  Further, livestock trampling compacts soils, reducing water infiltration and increasing surface water run-off that carries away the topsoil no longer protected by soil crusts. Often this topsoil ends up as sediment in streams.

57.  When less water permeates the soil due to compaction, water storage capacity is reduced, which can be particularly stressful to plants and animals in times of drought. Soils dry out faster, impairing plant productivity. Later in the summer, less groundwater is available, causing stream flows to diminish or dry up completely.

58.  Many forbs produce flowers that provide food for pollinators like hummingbirds and bees. When livestock eat these forbs, it eliminates pollinators' food source and impairs the productivity and reproduction of more forbs. As the native forbs disappear, they are replaced by plants that do not support pollinators.

**The Lower Imnaha Rangeland Analysis and Livestock Grazing Reauthorizations**

59.  The grazing of domestic livestock is allowed in the National Forests, including the HCNRA, only where authorized by permit.  Livestock grazing permits do not convey any right, title, or interest in federal lands or resources, but rather convey a privilege to use particular areas of the National Forests that the agency makes available for livestock grazing.

60.  The Forest Service issues grazing permits for individual allotments, which are the designated areas within the National Forest System that are available for livestock grazing.  The

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    16

Forest Service generally issues livestock grazing permits for a term of ten years.  Such permits authorize the specific holder of the permit (the "permittee") to seasonally graze livestock on National Forest lands under certain terms and conditions.  Typically, grazing permits specify the type and number of livestock permitted and establish the exact period of use during which livestock grazing may occur.

61.  The issuance of a permit for a National Forest livestock grazing allotment is a federal action requiring environmental analysis pursuant to NEPA and its implementing regulations.  Such analysis examines the impacts of livestock grazing on the National Forest environment, including impacts on sensitive resources, such as federally protected species, as well as vegetation, soils, streams and wetlands, water quality, and other habitat attributes. The NEPA analysis is designed to inform the Forest Service's judgment about whether livestock grazing should be permitted on a particular allotment and, if so, what, if any, constraints should be placed on such grazing to protect the environment through the addition of terms and conditions in the grazing permit.

62.  The issuance of a grazing permit constitutes implementation of the project-level NEPA-based decision that authorized the grazing use. Therefore, the terms and conditions of the grazing permit must be consistent with the project-level NEPA decision.

63.  In August 2011, the Forest Service sent out a "scoping" letter describing its proposal to reauthorize term livestock grazing permits for cattle grazing on four allotments within the lower Imnaha River corridor area, all of which lie entirely within the HCNRA.  The Rhodes Creek, Toomey, Cow Creek and Lone Pine allotments together comprise the 43,897-acre Lower Imnaha Rangeland Analysis project area (of which 2,823 acres are under private ownership).

64.  Although the Forest Service has permitted livestock grazing on the LIRA allotments since the early 1900's (though grazing occurred for many years prior to then, before the area was

established as a National Forest), the agency had not previously conducted an analysis of the environmental impacts associated with authorizing this activity pursuant to NEPA.

65. The scoping letter also identified the need to develop Allotment Management Plans ("AMPs") for all four LIRA allotments, none of which had been previously addressed in any AMPs. AMPs contain the pertinent livestock management direction from the project-level NEPA-based decision. AMPs also refine direction in the project-level NEPA based decision that the agency decision-maker deemed necessary to implement that decision. Forest Service directives provide that AMPs should be developed concurrently with the completion of the site-specific NEPA analysis and project-level decision. AMPs must also be consistent with the overarching Forest Plan, in this case the HCNRA CMP, and incorporate management direction necessary to achieve the Forest Plan's resource goals, objectives, standards and guidelines. AMPs in turn modify the grazing permit and are implemented through annual operating/grazing instructions ("AOIs").

66. The AOIs specify the annual actions that are needed to implement the management direction set forth in the project-level NEPA-based decision and incorporated into any AMPs and the term grazing permits. Management actions in the AOIs must be within the scope of the project-level decision. For instance, each allotment is split into pastures and the AOIs set forth the yearly grazing rotation schedule for moving livestock through the pastures during each allotment's specified season of use.

67. Because the LIRA allotments are grazed from November through May, the Forest Service issues AOIs to the permittee each year in October before the annual grazing season commences. The AOIs also set forth the maximum permissible grazing use authorized on the allotment for the current grazing season (*e.g.* amount of livestock, timing and duration of use)

and the amount of allowable annual forage utilization (or other standards to be applied and followed by the permittee to properly manage livestock).

68.    The largest of the LIRA grazing allotments, Rhodes Creek, currently consists of 21,646 acres of HCNRA lands.  Current management, in place since around 2005, authorizes a total of 784 cows (4,495 head months of cattle and 97 head months of horse/mule) to graze between November 1 and May 15.

69.    The Lone Pine allotment consists of 11,138 acres of HCNRA lands, nearly all of which is located in the Hells Canyon Wilderness. A total of 300 cows (1,800 head months of livestock and 33 head months of horse/mule) have been permitted to graze between December 1 and May 31.  The previous term permit was cancelled in 2010 due to non-resource related compliance problems and the allotment had been vacant (ungrazed) for nearly ten years prior to the decision challenged here.  The final LIRA ROD reauthorizes the same grazing levels and season of use that were in place with the previous term permit (before it was cancelled in 2010).

70.    The Cow Creek allotment consists of 5,824 acres of HCNRA lands.  Current management, in place since around 2005, authorizes a total of 231 cows (1,255 head months of cattle) to graze between November 1 and May 15.

71.    The Toomey allotment currently consists of 5,290 acres of HCNRA lands.  Current management, in place since around 2005, authorizes a total of 184 cows (1,000 head months of cattle) to graze between November 1 and May 15.

72.    The same permittee, McClaran Ranches, Inc., currently holds the term grazing permits for all four LIRA allotments, as well as the expansive Chesnimnus allotment that is on WWNF lands directly west of the LIRA project area (outside the HCNRA).  McClaran Ranches moves its cattle from the LIRA allotments to the Chesnimnus allotment and private land in May and then back on to the LIRA allotments from the adjacent Chesnimnus allotment and private land in

November.  Nez Perce tribal grazing can also occur alongside federally permitted livestock grazing on any of the LIRA allotments, but in recent years has only occurred on the Lone Pine allotment.

73.  The area's canyon benches and stream bottoms offer relatively level ground for livestock grazing and historically were subjected to heavy, concentrated use and cultivation by homesteaders. Depleted soil conditions and the loss of native grassland vegetation that resulted from this intensive use persists in parts of the LIRA area today.

74.  Because livestock grazing can significantly impact ecological communities and substantial uncertainty exists over the full suite of grazing impacts to many natural resources, particularly to many rare or imperiled plants and native pollinators that inhabit the LIRA area, including the threatened Spalding's catchfly, the Forest Service was required under NEPA to document its analysis of the impacts of the reauthorized grazing under a detailed EIS rather than a more concise Environmental Assessment ("EA").

75.  In March 2014, the Forest Service issued a Draft EIS for public review and comment.  The Draft EIS identified two significant issues: (1) uncertainty about the extent of cattle grazing impacts in the LIRA project area on the threatened Spalding's catchfly and habitat, and (2) uncertainty about the degree of impact on the LIRA area's deep soils on steep north-facing slopes, where catchfly typically grow, from hoof shear action by grazing cattle.

76.  The Draft EIS considered a "no grazing" alternative and four action alternatives. Each action alternative would reauthorize livestock grazing on the four LIRA allotments under the same grazing levels and season of use as previously permitted since around 2005. Specifically, Alternatives B, C, D, and E, would continue to allow a combined total of up to 2,783 cows or 8,680 Head Months ("HM") on the LIRA allotments between early November and mid to late May.

77.    Alternative C (identified as the "Proposed Action") differed only slightly from current management (Alternative B).  Alternative C would continue current management (same grazing levels and annual seasons of use that were in place under the previous term permit) but add some "adaptive management" measures for the Toomey allotment. Such measures included splitting one of the Toomey allotment's pastures into two, redeveloping and adding some new water sources for cattle, and implementing a rest-rotation schedule in two out of six pastures. If future monitoring data at selected sites indicated those areas were not improving at the expected rate, the agency might impose some additional management changes within this one allotment.

78.    Alternative D would also continue current management but allow some pastures to be rested for all or part of the grazing season once every three years. The previously vacant Lone Pine allotment would be incorporated into the Cow Creek, Rhodes Creek, and Toomey Allotment pasture rotations so the current permittee, McClaran Ranches, Inc., would be able to move its cattle onto the Lone Pine allotment while periodically deferring some pastures from grazing on the other LIRA allotments.  Specifically, rest would occur on the Toomey allotment once every three years; on 2 out of 17 pastures in the Rhodes Creek allotment once every three years; on 2 out of 10 pastures in the Cow Creek allotment once every three years; and on the Lone Pine allotment once every three years.

79.    Alternative E is the same as current grazing management (Alternative B) except that the Lone Pine allotment would be available to multiple different permittees under temporary grazing permits (to offset forage lost due to wildfire or voluntary resource protection on other allotments) rather than to a single permittee under a standard ten-year term grazing permit.

80.    On May 12, 2014, GHCC submitted timely comments on the Draft EIS.  GHCC's comments focused on the Forest Service's obligation to consider an alternative that would provide adequate protection for the HCNRA's unique resources and ensure the recovery of the

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                         21

threatened Spalding's catchfly.  GHCC's comments also asserted that the Forest Service must manage these HCNRA lands in a manner compatible with the HCNRA Act's conservation objectives and that the agency's Draft EIS failed to take the requisite hard look required under NEPA at FWS's Recovery Plan recommendations for Spalding's catchfly and the importance of the LIRA area in reaching recovery goals for the species. GHCC's comments also discussed the agency's failure to demonstrate compliance with several management directives set forth in the HCNRA CMP.

81.  In March 2015, the Forest Service released its Final EIS and a draft Record of Decision.  The draft ROD stated it was the agency's decision to reauthorize term grazing permits for the four LIRA allotments as described under Alternative C.

**Livestock impacts on the LIRA allotments and Spalding's catchfly**

82.  The Forest Service conducted resource inventories as part of its LIRA decision-making process, which determined that the project area's Spalding's catchfly populations currently consist of 66 known patches (some extremely small) totaling 948 individual plants. Work is ongoing to assign them to a population/element occurrence as defined by FWS's Recovery Plan for the species. Based on Recovery Plan criteria, the Spalding's catchfly found in the LIRA project area will likely represent 3 populations/element occurrences.  According to the Forest Service's analysis, it is highly likely that these LIRA catchfly populations will constitute a 6th KSA for the Canyon Grasslands region.

83.  There is no population trend data or information on the historical occurrence of Spalding's catchfly across the LIRA area.  According to the EIS, the Forest Service has not yet implemented any current Spalding's catchfly population monitoring within the Imnaha Canyon. The numbers reported are counts and estimates from detection surveys conducted on portions of the LIRA allotments.

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    22

84. The Forest Service's EIS recognized that livestock grazing poses both direct and indirect threats to Spalding's catchfly. Direct effects include herbivory and trampling. Direct herbivory removes flowers or seeds, thereby limiting reproduction. Herbivory of leaves inhibits a plant's ability to manufacture carbohydrates necessary for seasonal growth and storage in the perennial taproot. Trampling can easily break off entire plants at the ground level and damage the root crowns from which stems emerge. Scientific studies found root crown damage is more frequently associated with early season grazing (Hill and Gray 2004).

85. The Forest Service determined that the threat of herbivory from reauthorizing cattle grazing in the LIRA allotments is low since the cows are turned off the LIRA allotments before the plant typically bolts in late spring/early summer. The agency determined that the threat of trampling, however, is substantial throughout the grazing season. While the level of risk of trampling and habitat degradation from grazing can vary with the variability in the season's moisture and temperature regime, it is generally greatest during late winter/spring when soils are expected to be moist and the plant begins its germination and growth period.

86. As the Forest Service's project analyses acknowledge, trailing and trampling impacts are of particular concern in the LIRA allotments due to the moist, steep north facing canyon slopes and deep loess soils where the catchfly is typically found. These areas are unstable and highly susceptible to soil displacement, particularly during late winter and early spring when soils are the wettest and least firm.

87. According to the Forest Service, trailing and trampling impacts from livestock are also more frequent and much more visually evident in the steep terrain of the Imnaha Canyon than what is observed along the more gentle ground where the Zumwalt Prairie and Crow Creek Spalding's catchfly populations reside (these are the closest neighboring populations that occur

approximately 11 and 15 miles away, respectively, and are considered part of the Blue Mountain Basins physiographic province).

88.  Indirect effects from grazing that are of serious concern include the introduction and spread of non-native plants that outcompete and displace the catchfly from its native habitat.  As the Forest Service's analysis states, cattle are one of the main weed spread vectors on this affected landscape.

89.  The viability of Spalding's catchfly within the HCNRA is already threatened by exotic, invasive plant species.  According to the Forest Service, documented catchfly sites within the LIRA area are clearly threatened by the spread of noxious weeds and other undesirable non-native invasive species.

90.  Botanists making field observations during 2011 summer surveys of a newly-discovered Spalding's catchfly subpopulation on the neighboring Umatilla National Forest found dense populations of exotic species effectively and completely excluded Spalding's catchfly in what would otherwise be appropriate habitat (Darrach and Frazee 2013). In general, very few native species can persist and compete long-term with aggressive non-native species such as yellowstar and Scotch thistle, which exist in several of the LIRA pastures.

91.  In 2006, the Forest Service chose to eliminate cattle grazing from two pastures of the Umatilla National Forest's Peola allotment in Garfield County, Washington to protect the Spalding's catchfly populations that occur there, particularly from cattle further spreading yellowstar thistle (an aggressive noxious weed), at least until the agency learned more about the species interactions with cattle grazing impacts.

92.  According to scientific literature cited by the Forest Service, even if individual plants can survive in a weed infested environment, recruitment of new catchfly plants is decreased or eliminated under such conditions, dooming invaded populations to eventual demise.  Because the

Spalding's catchfly is not widespread and populations tend to clump there is high risk for weed species to displace populations.

93.    Another significant concern is the impact livestock grazing may have on the pollinator community in Spalding's catchfly habitat. Scientific studies suggest that Spalding's catchfly require insect pollination to set viable seed and that a bumblebee (*Bombus fervidus*) is the plant's primary pollinator. Grazing impacts associated with trampling and soil disturbance can also degrade habitat for this ground dwelling bumblebee, reducing pollinator numbers and jeopardizing the *Silene's* ability to reproduce.

94.    The Forest Service's EIS cites the first large-scale manipulative study of the effect of grazing intensity on native bee communities in a North American grassland, which found that increases in grazing intensity showed a linear decline in bee diversity, abundance, and richness, especially with bumblebees (Kimoto 2010).  According to another study cited by the Forest Service, in the absence of open pollination, Spalding's catchfly experienced an 85 percent reduction in fecundity and a loss of fitness, due to inbreeding depression, resulting in an estimated total reduction in fitness of 99 percent (Lesica 1993). Therefore, as the Forest Service concluded, management practices that significantly reduce pollinators, especially bumblebees, could have a significant impact on the recruitment of new plants into a Spalding's catchfly population.

95.    Grazing levels relative to bee density have not been studied in the Imnaha Canyon. Therefore, it is unknown whether the pollinator communities within the LIRA area are currently stable, increasing, or declining under current grazing management.

96.    Pollinator visitation rates to the threatened catchfly have also been found to drop in the presence of flowering non-native species that compete for the attention of *Bombus fervidus* (Lesica and Heidel, 1996).

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    25

97.  A loss of genetic fitness is also a major problem for vulnerably small, fragmented populations. Where small patches of catchfly are spread miles apart, like many patches found in the LIRA area, genetic exchange is limited. As the Forest Service acknowledged, these small catchfly populations, with lowered genetic diversity, are more prone to local extinction and vulnerable to relatively minor environmental disturbances.

98.  Because there is no population monitoring or population trend data for Spalding's catchfly in the LIRA area, the Forest Service used habitat condition and trend data (for vegetation and soil conditions) as a proxy for gauging how grazing management may be impacting Spalding's catchfly on the LIRA allotments. Range condition and trend data, however, is lacking for many pastures on the LIRA allotments.  Where monitoring data does exist, some shows that grazing is negatively impacting habitat around known catchfly sites and could be compromising the plant's ability to sustain itself in those areas.

99.  All of the catchfly sites in the Toomey allotment occur on steeper slopes with deep rich soil deposits that are very susceptible to compaction, displacement, and rotational slumping when the soils are moist.  The EIS states that past grazing impacts to these slopes is quite evident and that use by heavy cattle, especially in winter and spring when soils are near saturation, continues to displace soils and deteriorate site conditions resulting in reduced productivity and species diversity. The Forest Service's botanist concluded that the threat of trampling impacts in two of the three Toomey allotment pastures with known catchfly sites should be considered moderate to high given the amount of displaced soil observed during field work and the late winter/spring use period.  Although there is limited data to assess habitat conditions for these pastures, the one soil monitoring plot in the Spring Gulch pasture indicates a moderate to extreme departure from what is expected and desired for the overall integrity of the biotic

community in this area,[4] and the one range condition plot in the Lower Spain Saddle pasture also showed that this area is in very poor condition with a declining trend. According to the Forest Service's range report, all three pastures in the Toomey allotment that contain catchfly sites (Johnsen Canyon, Lower Spain Saddle and Spring Gulch) are in "unsatisfactory" condition.

100.   The two Spalding's catchfly sites in the Lone Pine allotment are both in the Big Canyon pasture. This pasture would be used in December and again in May. There is no range condition and trend data for this pasture, but there is one soil monitoring plot that showed a moderate departure from what is expected and desired for overall biotic integrity. Except for some recent tribal grazing this allotment had been in non-use for nearly ten years.

101.   Fifty-four patches of Spalding's catchfly are found in the Rhodes Creek allotment for a total of 387 individual plants (the largest patch containing 50 plants and the smallest only one). These small patches are mostly spread far apart from each other, hindering pollination and genetic exchange, making them vulnerable to even minor levels of disturbance. All sites also occur on steep slopes with deep soils. Five pastures within this allotment are known to contain catchfly sites: North and South Roy pastures, Bull pasture, and East and West Lightening Bench pastures. There is no range or soil condition monitoring data to assess habitat conditions for either the North or South Roy pastures. There also is no range condition monitoring data for the Bull pasture, but there are a couple soil monitoring plots in this pasture that indicate a moderate to extreme departure from what is expected and desired for both biotic integrity and soil attributes of the area. Range condition and trend monitoring data indicated that range conditions

---

[4] The "Biotic Integrity attribute" measures the capacity of the biotic community to support ecological processes within the normal range of variability expected for the site, to resist a loss in the capacity to support these processes, and to recover this capacity when losses do occur. The biotic community includes plants, animals, and microorganisms occurring both above and below ground.

in the East Lightening Bench pasture were poor in 2012 and showed a moderate to extreme departure from what is expected and desired for the site's biotic integrity, with some data suggesting a downward trend. There is no range or soil condition monitoring data to indicate habitat conditions in the West Lightening Bench pasture. The large East and West Lightening Bench pastures would be used in some years during late winter and spring when there is a substantial potential to incur livestock trampling impacts to catchfly sites. According to the Forest Service's range report, the East and West Lightening Bench pastures and the Bull pasture are all in "unsatisfactory condition." These three pastures contain approximately 37% of all known catchfly plants within the LIRA area.

102. To date, no Spalding's catchfly have been found in the Cow Creek allotment. Suitable catchfly habitat exists, however, and evidence strongly suggests there could be undocumented occurrences of the plant in this allotment. The Cow Creek allotment is also grazed late winter through spring when catchfly sites and steep slope habitat are most vulnerable to disturbance from grazing.

**ESA Consultation for Livestock Grazing Impacts to Spalding's Catchfly in the LIRA Area**

103. Because the Spalding's catchfly is a federally listed species, the Forest Service was required under the ESA to prepare a Biological Assessment ("BA") addressing the potential effects to this threatened plant of its grazing proposal. The BA resulted in a finding that the proposed reauthorization of cattle grazing on the LIRA allotments was "likely to adversely affect" ("LAA") the threatened Spalding's catchfly.

104. Under the ESA, "LAA" findings trigger the action agency's obligation (in this case the Forest Service) to engage in "formal consultation" with FWS over the proposed action's anticipated adverse effects. Through this formal consultation process FWS reviews the Forest Service's BA and issues a Biological Opinion ("BiOp").

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    28

105.    FWS's BiOp concurred with the Forest Service's finding that reauthorizing cattle grazing on the LIRA allotments is "likely to adversely affect" Spalding's catchfly. This opinion was primarily based on the Forest Service's finding that there is a moderate to high probability that *direct* adverse effects from livestock trampling would occur to some catchfly sites.

106.    *Indirect* effects to this listed plant from livestock grazing are generally going to result from alterations to habitat conditions that support catchfly.  Because Spalding's catchfly relies upon quality (good condition) late-seral Idaho fescue habitat, grazing that alters plant composition (reducing species diversity and productivity), will negatively affect catchfly and/or the pollinator communities the plant requires for reproduction.  Lesser quality habitat puts more competitive pressure on this species' ability to survive.  Because the Forest Service has limited site-specific range and soil condition and trend data for the LIRA allotments, the degree to which current livestock grazing is indirectly affecting Spalding's catchfly by altering the plant's habitat is uncertain. The BiOp nevertheless concluded that the indirect effects of the proposed grazing reauthorizations would likely have a small compromising impact on the ability of Spalding's catchfly to sustain itself in the LIRA area.

107.  The BiOp also concluded that there was likely a moderate to high risk of *cumulative* effects to Spalding's catchfly in the LIRA area from the aggregate impact of grazing and the potential spread of non-native invasive plants.

108.  While the Forest Service's BA determined, and FWS's BiOp concurred, that due to these direct, indirect, and cumulative effects, the proposed grazing was likely to adversely affect Spalding's catchfly, FWS found the LIRA grazing reauthorizations were not likely to jeopardize the species continued existence (cause the species to become extinct) or appreciably reduce its recovery throughout the species' entire range.

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    29

109.  Last, the BiOp made several conservation recommendations to help avoid or minimize adverse effects to Spalding's catchfly and its habitat from the proposed grazing and to help implement the species' Recovery Plan.  For instance, FWS recommended finding a way to exclude cattle from some catchfly sites, such as through new or existing pasture fences.  The BiOp also recommended a monitoring plan for existing catchfly sites as well as suitable but non-inventoried habitat, the production of an annual LIRA accomplishment report for FWS's review, and the development of a management plan for the Imnaha Canyon's catchfly populations because they are located within a proposed KCA.

**The Forest Service's Final Decision**

110.  On May 1, 2015 GHCC filed an administrative objection to the Final EIS and draft ROD.  This objection alleged the Final EIS failed to adequately address the concerns raised in GHCC's comments on the draft EIS and that the agency failed to fulfill its legal obligations in multiple respects, particularly regarding its duty to ensure the long-term viability and recovery of Spalding's catchfly within the HCNRA.

111.  McClaran Ranches, Inc., the permittee, also filed an administrative objection to the Forest Service's proposed selection of Alternative C.  McClaran Ranches stated its opposition to a rest-rotation schedule for two pastures in the Toomey allotment because other pastures, the permittee presumed, would be expected "to bear heavier use."  McClaran Ranches stated, however, it would be willing to try a different rotation on the Toomey allotment.

112.  The Wallowa County Board of Commissioners also filed an administrative objection to the agency's proposed adoption of an "adaptive management" plan for the Toomey allotment.  Specifically, the county commissioners expressed concern that a three-year monitoring period would be too short to determine if the reauthorized livestock grazing was

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    30

allowing Spalding's catchfly to recover or whether additional grazing management changes should be considered.

113.  On June 1, 2015, the Forest Service held an informal objection resolution meeting, but was unable to resolve GHCC's concerns.

114.  On September 3, 2015 the Forest Service issued the final ROD adopting a modified version of Alternative C.  This decision reauthorized the same grazing levels and annual season of use that had been previously authorized under the prior term permits for each of the four LIRA allotments.  The modified selected action replaced the "adaptive management" plan described for the Toomey allotment in the Final EIS with a deferred rotation strategy for pastures with documented Spalding's catchfly populations.  Specifically, 6 pastures in the Toomey allotment, 4 pastures in the Rhodes Creek allotment, and 1 pasture in the Lone Pine allotment would be deferred from grazing for some portion of the annual grazing season (typically late winter/spring) once every three or four years.[5]  Pastures on the Cow Creek allotment would be consolidated from ten to four, but otherwise management would mostly stay the same for this allotment.  The Lone Pine allotment was incorporated into the term grazing permit for McClaran Ranches, Inc. to offset deferment periods for pastures in the Toomey and Rhodes Creek allotments that would periodically occur every three or four years.

115.  The Final LIRA ROD and subsequent 2015-2017 AOIs allow grazing during late winter/spring when soils on steep slopes where most catchfly sites occur are wettest and most

---

[5] The Final ROD also shifted one of the pastures from the Rhodes Creek allotment to become part of the Toomey allotment and split a portion of the Lower Spain Saddle Pasture to create another Toomey pasture ─ Big Pine pasture.  The Big Pine pasture would be grazed on a rest-rotation schedule where one year it would not be grazed and then the following year typically grazed by 140 head plus 40 bulls in December and then by 100 head again from April through May 15.

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                                    31

susceptible to grazing impacts.  Contrary to the recovery actions in the species' Recovery Plan,

the LIRA ROD and AOIs also allow grazing during the plant's seedling germination period and

the beginning of its emergence and growth period, and within pastures with serious non-native

plant invasions and where other resource concerns currently exist.

116.  Additionally, the LIRA EIS/ROD failed to discuss whether such grazing has or

would impair the ability of the LIRA area to serve as a Spalding's catchfly KCA in the Canyon

Grasslands region, thereby impairing recovery of the species.

117.  None of the BiOp's conservation recommendations appear to have been

incorporated into the Final ROD or adopted in the 2015-2017 AOIs.

118.  While the Forest Service stated in its analysis for the LIRA grazing reauthorizations

that it would prepare Allotment Management Plans ("AMPs") after signing the ROD, it appears

no such AMPs have been issued.  AMPs would establish site-specific rates of recovery to

achieve the management objectives set forth in the HCNRA CMP when determining livestock

stocking levels.  AMPs are also intended to address how the authorized grazing is compatible

with preserving the area's unique biological resources, such as rare and endemic plants, as

required under the HCNRA Act.  Pursuant to the Freedom of Information Act ("FOIA"), GHCC

requested in August 2017 the current AMPs for the LIRA allotments.  But the Forest Service's

September 2017 response did not include any current AMPs, indicating that the agency had still

not issued any such management plans for the LIRA allotments two years after signing the ROD.

119.  In its August 2017 FOIA request, GHCC also asked for copies of all survey and

monitoring data relating to the LIRA area's botanical resources from 2015-2017, such as the

survey and monitoring data outlined in the Recovery Plan and FWS's conservation

recommendations in the BiOp, but the Forest Service did not have any documents responsive to

that request either.  Therefore, it appears, that despite the species listing under the ESA seventeen

years ago and the production of its Recovery Plan over ten years ago, the Forest Service has yet to establish a monitoring program for Spalding's catchfly within the HCNRA's Imnaha Canyon even though this area represents a proposed key conservation area.

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT**

120.   Plaintiff realleges and incorporates by reference the preceding paragraphs.

121.   This first claim for relief challenges the Forest Service's violations of the National Environmental Policy Act, 43 U.S.C. § 4321 et seq., and NEPA's implementing regulations.

122.   Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

123.   The Forest Service has violated NEPA and its implementing regulation through issuance of the LIRA Final EIS/ROD.  These violations include, but are not limited to: (1) Failing to thoroughly consider and objectively evaluate an adequate range of alternatives, including alternatives that would (a) eliminate grazing in pastures or areas with Spalding's catchfly populations or (b) eliminate grazing in areas with steep north-facing slopes and deep loess soils during late winter and early spring when those soils are wettest and least firm and therefore highly susceptible to damage from cattle and when catchfly are germinating and entering their growth period; and (2) Failing to take a hard look at the full scope of probable environmental consequences, such as the action's likelihood of hindering the attainment of recovery goals set forth in the Spalding's catchfly Recovery Plan.

124.   The Forest Service's decision to implement the LIRA grazing reauthorizations without first analyzing an adequate range of alternatives and otherwise taking the requisite hard look at the action's potential environmental consequences is therefore arbitrary, capricious, and not in compliance with NEPA and must be reversed and remanded for the reasons identified above.  5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF
## VIOLATIONS OF THE NATIONAL FOREST MANAGEMENT ACT

125. Plaintiff realleges and incorporates by reference the preceding paragraphs.

126. This second claim for relief challenges the Forest Service's violations of the National Forest Management Act, 16 U.S.C. § 1600 *et seq*., and NFMA's implementing regulations, in reauthorizing cattle grazing on the LIRA allotments. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

127. Under NFMA, the Forest Service must act consistently with direction in the applicable land management plan when authorizing any project or activity. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15. The Forest Service has violated NFMA by failing to ensure compliance with and/or by acting inconsistently with direction in the Forest Plan regarding the protection and recovery of the HCNRA's biologically unique, rare, endemic and federally listed plant populations and habitat when authorizing grazing on the LIRA allotments through the LIRA ROD and 2015-2017 AOIs.

128. Accordingly, the Forest Service's Final LIRA EIS/ROD and 2015-2017 AOIs are arbitrary, capricious, an abuse of discretion, and not in accordance with NFMA, and therefore are actionable pursuant to the APA, 5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF
## VIOLATIONS OF THE HELLS CANYON NATIONAL RECREATION AREA ACT

129. Plaintiff realleges and incorporates by reference the preceding paragraphs.

130. This third claim for relief challenges the Forest Service's violations of the HCNRA Act, 16 U.S.C. § 460gg *et seq*, and its implementing regulations by authorizing grazing in the HCNRA in a manner that is incompatible with the objectives of the Act, including the preservation of biologically unique, rare and endemic plants and habitat.

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    34

131. Accordingly, the Forest Service's Final LIRA EIS/ROD and 2015-2017 AOIs are arbitrary, capricious, an abuse of discretion, and not in accordance with the HCNRA Act, and therefore are actionable pursuant to the APA, 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

A.  Adjudge and declare that the Forest Service's Final EIS/ROD violated NEPA and its implementing regulations, and that the Final EIS/ROD and 2015-2017 AOIs violated NFMA, the HCNRA Act, and those statutes' implementing regulations, and thus were arbitrary, capricious, an abuse of discretion, contrary to law, and/or issued without observance of procedure required by law under the judicial review standards of the APA, 5 U.S.C. § 706(2)(A) & (D);

B.  Vacate and set aside the LIRA EIS/ROD as unlawful and remand the matter to the agency to correct its NEPA, NFMA and/or HCNRA Act violations;

C.  Award Plaintiff its reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*; and

D.  Grant such further relief as the Court deems just and proper.


Dated this 10th day of January 2018.

/s/ *Jennifer Schwartz*___
Jennifer R. Schwartz, OSB #072978
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
jenniferroseschwartz@gmail.com

*Of Attorneys for Plaintiff*


COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    35

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2018, I electronically filed the foregoing Complaint, Civil Cover Sheet and Proposed Summonses with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Jennifer Schwartz*_____
Jennifer R. Schwartz, OSB #072978
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
jenniferroseschwartz@gmail.com

COMPLAINT FOR VACATUR AND DECLARATORY RELIEF                    36