**BILLY J. WILLIAMS, OSB # 901366**
United States Attorney
District of Oregon
**SEAN E. MARTIN, OSB # 054338**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
sean.martin@usdoj.gov
Telephone:  (503) 727-1010
      Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

|  |  |
|---|---|
| **GREATER HELLS CANYON COUNCIL,** an Oregon nonprofit corporation,<br><br>      Plaintiff,<br><br>    v.<br><br>**KRIS STEIN,** District Ranger for the HCNRA, Wallowa-Whitman National Forest, in her official capacity, and **UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture,<br><br>      Defendants. | Case No. 2:18-cv-00054-SU<br><br>**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT/IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

GLOSSARY OF ACRONYMS ............................................................. viii

MOTION ....................................................................................... 1

MEMORANDUM ............................................................................. 1

INTRODUCTION ............................................................................ 1

FACTUAL BACKGROUND ............................................................... 2

    I.      The Lower Imnaha Rangeland Analysis ("LIRA") area ..................... 2

    II.     Spalding's Catchfly ................................................................ 5

    III.    The Forest Service's public process for re-evaluating LIRA
            grazing .................................................................................. 7

    IV.    Grazing under the LIRA decision .................................................. 10

STATUTORY BACKGROUND ........................................................... 11

    I.      The National Forest Management Act ("NFMA") .......................... 11

    II.     The Hells Canyon National Recreation Area Act ("Hells Canyon
            Act" .................................................................................... 12

    III.    The National Environmental Policy Act ("NEPA") ......................... 13

STANDARD FOR JUDICIAL REVIEW .............................................. 14

SUMMARY JUDGMENT STANDARD .............................................. 15

ARGUMENT ................................................................................ 15

    I.      Plaintiff lacks standing ........................................................... 15

    II.     The LIRA decision complied with NFMA .................................... 17

A. The Forest Service rationally found that the LIRA decision was consistent with its Hells Canyon Comprehensive Management Plan ("CMP") and Wallowa-Whitman Forest Plan.................................... 17

B. Plaintiff's NFMA arguments are legally invalid and unsupported by the record................................................................................ 19

   1. Plaintiff's arguments fall short regarding CMP provisions Bio-O3, TES-G2, Gra-04, TES-S1, and TES-S2 .......................... 21

   2. Plaintiff misrepresents the law regarding NFMA viability ........ 25

   3. Plaintiff relies on inapplicable NFMA regulations..................... 28

   4. Plaintiff's arguments fail regarding CMP provisions TES-O1 and TES-O3 ................................................................................ 29

   5. Plaintiff's NFMA argument regarding FWS's recovery plan clashes with Ninth Circuit precedent........................................... 30

   6. Plaintiff fails to establish any NFMA violation regarding utilization rates................................................................................ 32

   7. Plaintiff's Allotment Management Plan argument establishes no NFMA violation........................................................................... 34

III.  Plaintiff's Hells Canyon Act claim is waived and forfeited ............. 35

IV.  The Forest Service complied with the Hells Canyon Act ................. 36

V.  The LIRA decision was not arbitrary and capricious under NEPA................................................................................................... 41

A. The Forest Service considered a reasonable range of alternatives ....................................................................................... 41

B. Plaintiff's NEPA alternatives arguments fall short ......................... 42

C. The Forest Service took the requisite hard look under NEPA at the effects of the LIRA project on catchfly .................................... 46

ii

1.   Plaintiffs fail to establish that the Forest Service's baseline
     was erroneous or arbitrary............................................................ 47

2.   The Forest Service took a hard look at catchfly viability and
     recovery ........................................................................................ 49

CONCLUSION................................................................................................ 51

# TABLE OF AUTHORITIES

## CASES

*Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105 (9th Cir. 2015) ........................................................................... 22, 29-30, 31

*Cetacean Community v. Bush*, 386 F.3d 1169 (9th Cir. 2004) ....................... 15

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ........................... 14

*Concerned Friends of the Winema v. U.S. Forest Service*, 2017 WL 5957811 (D. Or. January 18, 2017) ............................... 34

*Conservation Congress v. Finley*, 774 F.3d 611 (9th Cir. 2014) ..................... 31

*Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000 (9th Cir. 2011) ........................................................ 14

*Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004) .................................. 36

*Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089 (9th Cir. 2003) ........ 47

*Friends of the Wild Swan, Inc. v. Thorson*, 260 F. Supp. 3d 1338 (D. Or. 2017) ................................................................................. 31

*Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059 (9th Cir. 2004) ............... 25

*Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143 (9th Cir. 2010) ............... 13

*Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174 (9th Cir. 1990) ................................................................................ 42

*Hells Canyon Alliance v. U.S. Forest Service*, 227 F.3d 1170 (9th Cir. 2000) .......................................................................... 12, 38, 45

*Idaho Conservation League v. USFS*, 2016 WL 3814021 (D. Idaho July 11, 2016) .............................................................. 48

*Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) .......... 27

*In re Big Thorne Project*, 857 F.3d 968
    (9th Cir. 2017)........................................................ 2, 11, 18, 19, 21, 25, 26, 30

*Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006) .................. 14

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230
    (D. Or. 2013).................................................................................. 15

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ....................................................... 46

*Lands Council v. McNair*, 537 F.3d 987 (9th Cir. 2008) (en banc) ........... 18, 26

*Landwatch v. Connaughton*, 2014 WL 6893695 (D. Or. December 5, 2014).. 21

*Lindberg v. U.S. Forest Service*, 132 F. Supp. 3d 1255 (D. Or. 2015) ............. 36

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................. 16, 17

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067
    (9th Cir. 2011)............................................................................... 48

*Nat. Res. Def. Council v. U.S. Dep't of Transp.*, 770 F.3d 1260
    (9th Cir. 2014)............................................................................... 46

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010) ............. 27

*Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953
    (9th Cir. 2005)......................................................................... 18, 40

*Native Ecosystems Council v. Weldon*, 697 F.3d. 1043 (9th Cir. 2012)..... 14, 18

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)...................... 20, 37

*Oregon Natural Desert Ass'n v. U.S. Forest Service*, 2018 WL 1811467
    (D. Or. April 16, 2018) ............................................................. 21, 34

*Perkins v. Bergland*, 608 F.2d 803 (9th Cir. 1979).......................................... 18

*Pickern v. Pier 1 Imports (U.S.) Inc.*, 457 F.3d 963 (9th Cir. 2006) ............... 42

*Presidio Golf Club v. Nat'l Park Service*, 155 F.3d 1153 (9th Cir.1998) ........ 42

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)............... 13

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998)................ 15

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) .......................... 16, 17

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013)..................... 45

*Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989
  (9th Cir. 2006)........................................................................ 42

*Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010).......................... 17

*Woodford v. Ngo*, 548 U.S. 81 (2006) ................................................ 36

## STATUTES

5 U.S.C. § 706(2)(A) ..................................................................... 14

16 U.S.C. § 460gg(a)................................................................. 12, 39

16 U.S.C. § 460gg–4.................................................................. 13, 37

16 U.S.C. § 460gg–4(3)............................................................... 37, 39

16 U.S.C. § 460gg–4(7)................................................................... 37

16 U.S.C. § 460gg–10................................................................. 13, 38

16 U.S.C. §§ 460gg–460gg–13 ......................................................... 12

16 U.S.C. § 1604(a) ...................................................................... 11

16 U.S.C. § 1604(e)....................................................................... 11

16 U.S.C. § 1604(i) ....................................................................... 11

43 U.S.C. § 1752(d) .................................................................. 34-35

43 U.S.C. § 1752(i) ................................................................ 34-35

## REGULATIONS

36 C.F.R. § 218 ..................................................................... 9, 35

36 C.F.R. § 218(a) ..................................................................... 35

36 C.F.R. § 218.14 ..................................................................... 36

36 C.F.R. § 219.15(d) ................................................................. 28

36 C.F.R. § 219.17 ..................................................................... 28

36 C.F.R. § 219.17(b) ................................................................. 28

36 C.F.R. § 219.17(c) ................................................................. 29

36 C.F.R. § 292 ......................................................................... 35

36 C.F.R. § 292.48(a) ................................................................. 40

36 C.F.R. § 292.48(b) ................................................................. 39

# GLOSSARY OF ACRONYMS

AMP                         Allotment Management Plan

APA                         Administrative Procedure Act

AR                          Administrative Record

CMP                         Hells Canyon National Recreation Area
                            Comprehensive Management Plan

EIS                         Environmental Impact Statement

ESA                         Endangered Species Act

FWS                         U.S. Fish and Wildlife Service

KCA                         Key Conservation Area

LIRA                        Lower Imnaha Rangeland Analysis

NEPA                        National Environmental Policy Act

NFMA                        National Forest Management Act

NRA                         Hells Canyon National Recreation Area

ORV                         Outstandingly Remarkable Value

ROD                         Record of Decision

**MOTION**

Defendants file this cross-motion for summary judgment against Plaintiff's claims, as explained in the following memorandum and as supported by the administrative records and attached exhibits. Pursuant to LR 7-1(a), the parties conferred but were not able to resolve the need for this cross-motion.

**MEMORANDUM**

## INTRODUCTION

In September 2015, the Wallowa-Whitman National Forest reached its Lower Imnaha Rangeland Analysis ("LIRA") decision. The LIRA decision approved a modified grazing system for heritage rangelands that includes specific new protections for the Spalding's catchfly plant. The LIRA decision was the culmination of years of public outreach and expert analysis by the Forest Service and the U.S. Fish and Wildlife Service. It represents a rational judgment on the balancing of several competing uses in the Hells Canyon National Recreation Area.

Here, the Forest Service rationally explained the basis for its LIRA decision, and this Court should grant summary judgment to Defendants against all of Plaintiff's claims. As the Ninth Circuit recently emphasized, courts "are not well-equipped to police the substance" of the Forest Service's

judgments in its multiple-use lands management under the National Forest Management Act. *In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017). Instead, courts "apply procedural tools: In a nutshell, the agency must rationally explain why it did what it did." *Id.*

Aside from several major threshold problems, Plaintiff's case amounts to a disagreement with the Forest Service over its balance of land management for multiple objectives in this National Recreation Area under Congressional direction.

This Court should reject Plaintiff's attempt to punish the Forest Service for deciding to take proactive steps now to protect the catchfly on these lands while respecting longstanding grazing uses. Plaintiff has its own agenda and prefers a different balance. But the Forest Service's balance was neither arbitrary nor capricious.

## FACTUAL BACKGROUND

### I. The Lower Imnaha Rangeland Analysis ("LIRA") area.

The LIRA project area is located about 35 miles northeast of Enterprise, Oregon and comprises just under 44,000 acres within the Hells Canyon National Recreation Area ("NRA"). AR 11674. The LIRA area comprises four separate but adjoining winter/spring (November-May) grazing allotments administered by the Wallowa-Whitman National Forest. AR

11348, 11681, 11682 (map of allotments).

There is a rich history of more than 300 years of grazing in the LIRA area, beginning with Nez Perce tribal grazing well before the initial Lewis and Clark expedition. AR 11684, 12486, 12015, 12074. Permitted Forest Service grazing began here in the early 1900s. AR 11674. Treaty grazing by the Nez Perce still occurs in the LIRA area, and currently occurs within the Lone Pine allotment. AR 11677, 12044.

In 2004, permitted grazing in the LIRA area was reduced to the "lowest amount of livestock use in recorded history." AR 11674, 11690. *See* AR 12421 (noting 29% reduction in livestock stocking rates). This change occurred in the wake of the Forest Service's 2003 decision adopting a Comprehensive Management Plan ("CMP") for the NRA. AR 11690, 3446-513 (summary of final Environmental Impact Statement for 2003 CMP).

The LIRA area has exceptionally diverse topography, with riparian bottomlands at around 1,000 feet in elevation and ridgetops at nearly 5,500 feet in elevation. AR 11373, 11885. The area includes the lower Imnaha River, AR 11348, which is a federally-designated Wild and Scenic River. AR 2365. One of the Imnaha's Outstandingly Remarkable Values is "Traditional Value/Lifestyle Adaptation," which is to be protected and enhanced. AR 2322. This protected value comprises a lifestyle "dominated by a

ranching/farming tradition" that is "an extension of how the river corridor has been used for years." *Id*.

The four LIRA allotments together contain dozens of pastures at different elevations that are part of an inter-allotment grazing system. *See* AR 11719-25. The Cow Creek allotment is about 5,800 acres and its drainage was heavily used during the homesteading period. AR 11772. The Rhodes Creek allotment is the largest allotment at more than 21,460 acres and 17 pastures and it incurs the most grazing. AR 11811. The Toomey allotment is 5,290 acres, and the Lone Pine allotment is 11,318 acres and involves Nez Perce treaty grazing. AR 11677, 11823.

The current permittee for these four allotments, McClaran Ranch, has wintered livestock in this area since the 1920s. AR 9599. The permittee's historic McClaran Ranch is located on Cow Creek. AR 11486. *See also* ECF 18 at ¶ 8 (statement by Plaintiff's declarant that "I very much respect the McClaran family and appreciate their knowledge of the LIRA area and their efforts toward sensitive livestock grazing practices").

There is now an "overall improving trend in rangeland conditions" in the area, although some localized sites are in unsatisfactory conditions largely from homesteading and prior heavy grazing practices. *See* AR 11674.

Without livestock grazing in the LIRA area, Forest Service fire experts

predict that the area would trend towards "faster moving wildfires with greater flame lengths making fire suppression efforts more difficult." AR 12086-87.

## II.    Spalding's Catchfly.

In 2001, the U.S. Fish & Wildlife Service ("FWS") listed the catchfly as threatened under the Endangered Species Act ("ESA"). AR 3437-45. The catchfly is a regional endemic herbaceous perennial plant found mostly in grasslands and sagebrush-steppe, in eastern Washington, northeastern Oregon, west-central Idaho, western Montana, and into British Columbia. AR 5849. *See* AR 5854 (map showing rangewide distribution).

Forest Service surveys definitively documented catchfly in the LIRA area in 2004-05. AR 11381. Based on Forest Service surveys, the LIRA area contains an estimated 948 catchfly plants. AR 12504. The catchfly has been detected in the Lone Pine, Rhodes Creek, and Toomey allotments, but not the Cow Creek allotment. AR 11347. Near the LIRA area, in the privately-held Zumwalt Prairie in Wallowa County, there is a 40,000-plant population of catchfly that is the largest in the plant's entire range. *See* AR 12271, 5867, 11282 (noting that Zumwalt Prairie is near the Toomey allotment).

The LIRA area is within the Canyon Grasslands physiographic region, where FWS in 2007 identified 22 known catchfly populations and 5 potential

key conservation areas ("KCAs").  AR 5932, 5938-39.  According to FWS, the Canyon Grasslands are steep and "difficult to survey and there remain large tracts of unsurveyed intact habitat, so it is expected there may be many more populations" of catchfly found here.  AR 5938.  In 2009, FWS documented five new catchfly populations in the Canyon Grasslands and another possible KCA-eligible population therein.  AR 6374-75.

In 2007, FWS implemented a recovery plan for the catchfly with assistance from the Forest Service.  AR 5843-6045.  According to the plan, "a minimum of 20 years of monitoring will be needed to determine long term population trends."  AR 5855.  *See also* AR 5868 (noting that the plant's prolonged dormancy requires long-term data sets to monitor trends).

In the LIRA area, conditions for the catchfly may have improved from earlier historical periods that dramatically reduced catchfly habitat through heavy grazing and extensive homesteading.  AR 11860.  Nevertheless, grazing here can damage the plant through trampling.[1]  AR 11860.  At the same time, research is incomplete to determine the effects of livestock grazing.  AR 5896, SUPP AR 37.  Grazing by wild animals is also one of the

---

[1] Damage to catchfly by cattle grazing "herbivory" – the direct grazing of catchfly – is only a "small" risk in LIRA allotments, because the plant is mostly dormant during the grazing season and does not flower until later. *See* AR 11860.  Research in the nearby Zumwalt Prairie suggests that elk and deer may be the "primary consumers" of the catchfly.  AR 12286.

Page 6-    **Defendants' Cross-Motion for Summary Judgment**; *Greater Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

threats to catchfly.  In some LIRA areas, foraging elk herds "can cause as much trampling impacts as with cattle."  AR 11282.  *See also* AR 11865 (noting that elk trampling often as intensive as cattle, "especially in steeper deep soiled areas").

With the relatively new discovery of catchfly in the LIRA area, the Forest Service has not yet gauged population trends there.  AR 11865.  But elsewhere on the Wallowa-Whitman National Forest, catchfly populations "appear stable" where multiple years of inventory have occurred. All these populations are within grazing allotments.  AR 11387.

## III.   The Forest Service's public process for re-evaluating LIRA grazing.

In 2010, the Forest Service initially proposed the LIRA project to consider alternatives for re-authorizing grazing in these rangelands.  In 2011, the agency hosted a public field trip to discuss the project.  AR 12493-94.

Because of the uncertainty of grazing's effects on the catchfly, the Forest Service decided to document its environmental analysis under an Environmental Impact Statement ("EIS").  AR 11675.  In early 2014, the Forest Service then published a draft EIS for the project and invited public comments.  AR 10478-994, 12494.

In January 2015, in a detailed Biological Assessment, the Forest Service's botany expert analyzed existing catchfly conditions and the effects

of the LIRA proposal on the plant.  AR 11375-414.  The Biological Assessment noted that the vast majority of catchfly sites are within one mile of one another.  AR 11359, 11363, 11367.  This is equal to the maximum assumed pollen exchange distance of one mile, allowing genetic exchange among such catchfly sites via pollen transfer.  *See* AR 5866.

The Forest Service then considered the comments on its draft EIS and formally responded to them in March 2015, when it published a final EIS and draft Record of Decision ("ROD") for the LIRA project.  AR 11667-2238.  The final EIS comprised more than 560 pages with appendices.  *Id.*  It assessed existing conditions across a range of resources, and analyzed in detail the effects of a broad range of five decisional alternatives.  AR 11667-2238.

The final EIS studied a "no grazing" alternative for the LIRA area, and an alternative that simply continued status quo grazing management.  It also examined the agency's "proposed" alternative (Alternative C) with new protections aimed at the catchfly (*see* AR 11727-28), and two additional alternatives that would decrease or adjust grazing in various ways.  AR 11708-2110.  The final EIS included 25 pages of detailed analysis of each alternative's effects on catchfly.  AR 11857-882.  The Forest Service rated each alternative on its positive measures for the plant.  *See* AR 11737 (table 2-14).  The final EIS also analyzed each alternative's effects on resources

including soils, noxious weeds, wilderness resources, wildlife, aquatic resources, heritage resources, fire and fuel, and socioeconomics. Illustratively, the Forest Service recognized that noxious (invasive) weeds are among the threats to catchfly (*e.g.*, AR 11858, 11860), and included mitigation in the LIRA project design to reduce the risk of weed spread into catchfly sites by livestock.  AR 11711-12.

In April 2015, FWS issued a Biological Opinion regarding the LIRA project's effects on the catchfly.  The Biological Opinion concluded that the project "is not expected to appreciably reduce either the survival or recovery" of the plant.  AR 12299.  The Biological Opinion also concluded that management guidelines and conservation measures incorporated into the project "should minimize direct and indirect effects to known occurrences" of the plant.  *Id*.

After publishing the Final EIS and draft ROD, the Forest Service received three administrative objections under 36 C.F.R. § 218.  AR 12500. The objections were from the Wallowa County Board of Commissioners, the McClaran Ranch (the primary LIRA area permittee), and Plaintiff. AR 12305-07, 12312-14, 12315-27.  On June 1, 2015, The Forest Service then convened an objection resolution meeting.  AR 12385-98 (meeting notes).

On July 20, 2015, the Forest Service responded to the three objections.

AR 12416-81.  The Forest Service announced that it would incorporate
changes to the project to "further reduce" effects on the catchfly.  AR 12417,
12420, 12437.  The changes would bar late-winter/spring (February to May)
grazing in all ten pastures where catchfly is located across the allotments,
every third or fourth year.  *Id.*  The changes aim to reduce impacts from
cattle traveling on thawing or saturated soils on steep slopes, when catchfly
plants may have begun their seasonal growth.  AR 12437.  As the Forest
Service found, trampling effects are already minimized in these pastures in
the November-January period, because soils then are dry or frozen.  *Id.*

On September 3, 2015, District Ranger Kris Stein signed the final
Record of Decision for the LIRA project ("LIRA decision").  AR 12484-504.
The decision authorized the grazing deferrals in the ten pastures, described
above, along with specific new measures to rest pasturelands in the Toomey
allotment.  AR 12492.  More than two years later, Plaintiff filed this action.
ECF 1.

## IV.    Grazing under the LIRA decision.

The LIRA decision authorizes cattle grazing among 33 pastures across
the four allotments, with specified maximum head-month caps for each
allotment.  AR 12490.  Use of head-months in Lone Pine is available only
when pastures in the other three allotments are deferred from use.  *Id.*, AR

12488.  The Lone Pine allotment is incorporated into the other three

allotments' pasture rotations, reducing cattle use by about 1,800 head

months from what the Forest Service proposed in the final EIS.  *See* AR

12487, 12488, 12490, 11678, 11728.

Pursuant to the LIRA decision, two catchfly pastures were deferred

from late-winter/spring grazing for the 2016-17 season.  AR 12837.  Four

other pastures with catchfly were deferred from late-winter/spring grazing

for the 2017-18 season.  AR 12836.

## STATUTORY BACKGROUND

### I.    The National Forest Management Act ("NFMA")

Under the National Forest Management Act ("NFMA"), 16 U.S.C. §

1600, *et seq.,* the Forest Service must develop a land and resource

management plan for each unit of the National Forest System in order to

provide for multiple uses and sustained yield of the various forest resources.

16 U.S.C. §§ 1604(a), (e).  Subsequent projects must be consistent with the

forest plan. 16 U.S.C. § 1604(i); *In re Big Thorne Project*, 857 F.3d 968, 973

(9th Cir. 2017)

NFMA gives the Forest Service "flexibility" because the agency "has

many different goals—conservation, commerce, recreation, and so on."  *In re

Big Thorne*, 857 F.3d at 976.  NFMA also "reflects a congressional judgment

that balancing these goals calls for policy judgments—judgments that often require trade-offs among worthy objectives." *Id.*

## II. The Hells Canyon National Recreation Area Act ("Hells Canyon Act")

The Hells Canyon National Recreation Area Act (the "Hells Canyon Act" or "the Act") established the Hells Canyon National Recreation Area (the "Hells Canyon NRA"). 16 U.S.C. §§ 460gg–460gg–13. *See Hells Canyon Alliance v. U.S. Forest Service*, 227 F.3d 1170, 1175 (9th Cir. 2000).

Under the Act, the Hells Canyon NRA has the following purposes:

> to assure that the natural beauty and historical and archaeological values of the Hells Canyon area and the seventy-one mile segment of the Snake River between Hells Canyon Dam and the Oregon–Washington border, together with portions of certain of its tributaries and adjacent lands, are preserved for this and future generations, and [to assure] that the recreational and ecological values and public enjoyment of the area are thereby enhanced....

16 U.S.C. § 460gg(a).

The Act provides for administration of the Hells Canyon NRA "in accordance with the laws, rules, and regulations applicable to the national forests for public outdoor recreation," and "in a manner compatible with seven "objectives" that include:

> (3) preservation, especially in the area generally known as Hells Canyon, of all features and peculiarities believed to be biologically unique including, but not limited to, rare and endemic plant species . . .;

Page 12-    **Defendants' Cross-Motion for Summary Judgment**; *Greater Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

> (7) such management, utilization, and disposal of natural
> resources on federally owned lands, including . . . grazing and the
> continuation of such existing uses and developments as are
> compatible with the provisions of this subchapter.

16 U.S.C. § 460gg–4.

The Act specifically provides that ranching, grazing, and the occupation

of associated lands, as they existed when the Act was enacted, "are

recognized as traditional and valid uses of the recreation area."  16 U.S.C. §

460gg–10.  According to the legislative history for the Act, "Settlement of the

region brought the ranching and grazing which still persist as an important

part of the character of the area. The current legislative proposals include

these values among those features in need of protection."  H.R. Rep. 94-607 at

* 7, 1975 U.S.C.C.A.N. 2281, 2282.

## III.   The National Environmental Policy Act ("NEPA")

NEPA's purpose is twofold: (1) to ensure that agencies carefully

consider information about significant environmental impacts in proposing

actions, and; (2) to guarantee relevant information is available to the public.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

"NEPA does not require particular environmental standards or

mandate that agencies achieve substantive environmental results." *Greater*

*Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1150 (9th Cir. 2010).  "NEPA

merely prohibits uninformed—rather than unwise—agency action."
*Robertson*, 490 U.S. at 351.  Courts are generally "most deferential when
reviewing scientific judgments and technical analyses within the agency's
expertise under NEPA."  *Native Ecosystems Council v. Weldon*, 697 F.3d.
1043, 1051 (9th Cir. 2012) (internal quotation omitted).

## STANDARD FOR JUDICIAL REVIEW

NFMA, the Hells Canyon Act, and NEPA do not contain provisions for
judicial review, so litigants alleging violations must bring claims under the
Administrative Procedure Act ("APA").  *City of Sausalito v. O'Neill*, 386 F.3d
1186, 1205 (9th Cir. 2004).

Under the APA, a reviewing court will uphold agency action unless it
finds the action was "'arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law.'" *Ctr. for Envtl. Law and Policy v. U.S.
Bureau of Reclamation*, 655 F.3d 1000, 1005 (9th Cir. 2011), *quoting* 5 U.S.C.
§ 706(2)(A).  This standard is "'highly deferential, presuming the agency
action to be valid and [requires] affirming the agency action if a reasonable
basis exists for its decision.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d
1072, 1076 (9th Cir. 2006) (internal quotation omitted).

## SUMMARY JUDGMENT STANDARD

This case is appropriate for final resolution on cross-motions for summary judgment, because this Court may review the administrative record and determine whether the Forest Service's presumptively valid LIRA decision and subsequent Annual Operating Instructions ("AOIs") were arbitrary and capricious. *See Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1233 (D. Or. 2013).

## ARGUMENT

### I.    Plaintiff lacks standing.

To establish standing under Article III of the Constitution, a plaintiff must show that: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Cetacean Community v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). An action brought without Article III standing is not a "case or controversy," and a federal court therefore lacks jurisdiction over the action. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998).

To satisfy the injury-in-fact component – the first element of the standing analysis – an environmental plaintiff must: (1) identify a "particular

site" affected by the challenged action that it intends to visit; and (2) provide evidence of "concrete plans" to visit the site.  An environmental plaintiff bears the burden of showing the "likelihood" that it will visit the site. *Summers v. Earth Island Institute*, 555 U.S. 488, 495-96 (2009).  At the summary judgment stage, a plaintiff must set forth specific facts to establish standing and cannot rely on mere allegations. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiff lacks standing because it has not provided any evidence of an injury-in-fact.  Plaintiff's declarant Richard K. Bailey says he visited the LIRA area in the 1980s, ECF 18 at ¶ 5, and that he has met the McClaran family that is a permittee in LIRA area.  *Id.* ¶ 8.  But he states no plans whatsoever to return to the LIRA area and therefore falls short of establishing any imminent injury.  *See Summers*, 555 U.S. at 495-96.  Mr. Bailey does not identify any particular LIRA area sites that he intends to visit and does not provide evidence of any concrete plans to visit the LIRA area.

Plaintiff's other declarant, Priscilla Coe, also fails to demonstrate standing.  Ms. Coe says she has "recreated" in the LIRA area in the past, and that she "plan[s] to go back to the LIRA project area to recreate."  ECF 19 at ¶¶ 6, 7.  But this vague intent to return, without any specific or concrete

plans, falls short of establishing the imminent injury required for standing. *See Lujan*, 504 U.S. at 564 ("Such 'some day' intentions – without any description of concrete plans or indeed any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require."). *Accord Summers*, 555 U.S. at 496; *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010).

Because Plaintiff lacks standing, this Court should grant Defendants summary judgment against all Plaintiff's claims.

## II.    The LIRA decision complied with NFMA.

### A. The Forest Service rationally found that the LIRA decision was consistent with its Hells Canyon Comprehensive Management Plan ("CMP") and Wallowa-Whitman Forest Plan.

This Court should grant summary judgment to Defendants against Plaintiff's second claim for relief, brought under NFMA.  The Forest Service rationally found that the LIRA decision was consistent with the multiple-plan framework of the Wallowa-Whitman Forest Plan ("Forest Plan") and the Comprehensive Management Plan ("CMP") for the Hells Canyon NRA.  AR 12489 (noting that applicable CMP standards and guidelines were "incorporated into the project design"), 12496-97 (findings of NFMA compliance), 12425-27 & 12429-30 (discussing Plaintiff's NFMA objection).

Controlling NFMA law recognizes that Congress left the Forest Service

broad discretion to strike a rational balance in its multiple-use land management. *In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017). Multiple-use principles "breathe discretion at every pore." *Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979). Further, the Forest Service's "interpretation and implementation of its own forest plan is entitled to substantial deference." *Native Ecosystems Council*, 697 F.3d at 1056. *See also Native Ecosystems Council*, 418 F.3d 953, 960 (9th Cir. 2005) ("Agencies are entitled deference to their interpretation of their own regulations, including Forest Plans.").

Here, the LIRA decision recognized the different goals in play in the Hells Canyon NRA, and it struck a rational policy judgment requiring trade-offs among worthy objectives. *See* AR 12492-93 (noting balancing between catchfly and livestock grazing opportunities for the local community), 12495-96 (discussing reasons why other project alternatives were not selected). Under the LIRA decision, long-standing grazing will continue, but with specific new controls aimed at the protection of the catchfly.

Due to the delicate balancing of competing uses that multiple-use management requires, courts accord Forest Service management decisions a high degree of deference. *See Lands Council v. McNair*, 537 F.3d 987 (9th Cir. 2008) (en banc). The court grants the Forest Service the "latitude to

decide how best to demonstrate" that its projects will "satisfy the goals of the forest plan and NFMA. *Id.* at 992. The court "defer[s] to the Forest Service as to what evidence is, or is not, necessary to support" its analysis. *Id.*

Illustratively, the Forest Service explained how it assessed CMP standard Bio-S1 in its LIRA decisionmaking. AR 4513, 12183. In reaching the LIRA decision, the Forest Service met Bio-S1's terms by surveying and documenting the location of rare and endemic plant species, considering the effects of the LIRA project on populations of rare and endemic plants, and prescribing appropriate mitigation and protection. *E.g.* AR 4513-14, 11380-86; SUPP AR 21, 23-28 (discussing surveys), SUPP 43-85 (botanist's expert analysis of the effects of each LIRA alternative); AR 11834-82, 11713-17. The Forest Service's rational interpretation of its own CMP merits deference.

The record shows that the Forest Service undertook a thorough, detailed analysis and did not deviate from any project requirements in its CMP or Forest Plan that render its LIRA decision arbitrary and capricious.

## B. Plaintiff's NFMA arguments are legally invalid and unsupported by the record.

Plaintiff's NFMA arguments are "a potpourri of contentions that the [Forest] Service misinterpreted one thing or failed to consider another." *In re Big Thorne*, 857 F.3d at 976. But this "quibbling" does not overcome this Court's "deferential standard of review." *Id.*

Page 19-    **Defendants' Cross-Motion for Summary Judgment**; *Greater Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

Plaintiff's NFMA arguments rely on supposed violations of various specified CMP or Forest Plan provisions.  Plaintiff's Brief 15-27.  As an overarching problem, however, most of these provisions are not discrete and mandatory project-level requirements subject to judicial review.  Instead, they are either 1) discretionary, 2) general high-level objectives, or 3) NRA-wide generally planning standards that are not project-specific mandates.

The Supreme Court emphasizes that "a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 71 (2004).  A statement by a lands agency "about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit."  *Id*. Otherwise, "allowing general enforcement of plan terms would lead to pervasive interference" with a land agency's "own ordering of priorities."  *Id*. Here, the Forest Service emphasized that CMP implementation "will depend on adequate funding."  AR 5269.

This Court should carefully assess the wording and context of each of the CMP and Forest Plan provisions that Plaintiff puts at issue, to determine whether each provision is enforceable under NFMA in the context of this specific LIRA project.  This is crucial, because this Court has determined that

forest plan-wide planning standards on the Deschutes National Forest do not rise to the level of judicially reviewable discrete, project-specific requirements. *Landwatch v. Connaughton*, No. 6:13-cv-2027-AA, 2014 WL 6893695 at \* 7 (D. Or. December 5, 2014), *aff'd*, 696 Fed. App'x 816 (9th Cir. Aug. 23, 2017) (unpublished disposition).   Similarly, in a recently decided eastern Oregon grazing case, this Court determined that forest plan-wide standards on the Malheur National Forest "are not judicially enforceable against individual Forest Service actions."   Exhibit A at 16-17 (*Oregon Natural Desert Ass'n v. U.S. Forest Service*, No. 3:03-213-PK, slip. op at 16-17 (D. Or. October 3, 2017), *findings and recommendations adopted at* 2018 WL 1811467 (D. Or. April 16, 2018) (Mosman, J.).

Defendants explain these concerns in future detail below, along with the other major problems with Plaintiff's NFMA arguments.

### 1.  Plaintiff's arguments fall short regarding CMP provisions Bio-O3, TES-G2, Gra-04, TES-S1, and TES-S2.

Plaintiff's lead argument is that the LIRA decision violated a CMP provision, Bio-O3, regarding management of habitat and populations of rare and endemic plant species.  Plaintiff's Brief 15 (citing AR 4513).  But Bio-O3 is not a binding, mandatory measure that applies project-by-project. *See In re Big Thorne*, 857 F.3d at 977 n.5 (finding that the Forest Service's "obligation is to protect viability in the Tongass National Forest as a whole,

Page 21-    **Defendants' Cross-Motion for Summary Judgment**; *Greater Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

not in each individual Tongass project area"). The Bio-O3 is a broad

"objective," which describes the NRA-wide progress that is expected to meet

broad goals over a ten-year planning period. AR 3551. *See* AR 4429

(indicating that an "O" denotes an objective, an "S" denotes a standard, and a

"G" denotes a guideline); *Cascadia Wildlands v. Bureau of Indian Affairs*, 801

F.3d 1105, 1115 (9th Cir. 2015) (finding that a land management plan's

"objectives" established "general, high-level goals").[2] Further, the Forest

Service explained here how it was tracking this general goal in Bio-O3. AR

12426. Although Bio-O3 is not enforceable to the individual LIRA project,

binding standard Bio-S1 <u>does</u> apply by its plain terms, as Defendants

explained above in section II.A. of their argument.

Plaintiff's NFMA argument also fails in relying on the LIRA decision's

supposed violation of the CMP provision TES-G2. Plaintiff's Brief 16 (citing

TES-G2 at AR 4515). That is because TES-G2 is only a "discretionary"

guideline rather than a mandatory project requirement. *See* AR 3551

(defining "guideline"). In any event, the Forest Service exercised its

discretion under TES-G2 to consider closing the LIRA rangelands to grazing,

and modified the status quo grazing system to protect the catchfly. AR

---

[2] The objectives, standards, and guidelines for CMP Alternative E were
adopted in 2003 under the Forest Service's CMP Record of Decision. AR
5226.

12492.  *See* AR 12494-96 (discussing project alternatives and grazing

modifications).

Plaintiff's NFMA argument also goes nowhere in asserting that the

LIRA decision violated CMP provision Gra-O4.  Plaintiff's Brief 19 (citing

Gra-O4 at AR 4468).  Like Bio-O3, Gra-O4 is a high-level planning objective

to generally evaluate annual impacts associated with livestock grazing in

relation to established standards and thresholds.  But nothing in this

objective mandates that the Forest Service annually monitor "trend data" or

adopt any other particular methodology in assessing a particular site-specific

project.  Instead, the objective applies to general NRA-wide evaluations of

annual grazing impacts.  Plaintiff's Brief 19.  Further, Plaintiff fails to

identify any "established Forest Service standards and thresholds" that the

agency is ignoring.  Further, Plaintiff is complaining about a supposed *past*

failure to evaluate annual grazing impacts, rather than the LIRA decision's

new, enhanced framework for monitoring and evaluation of annual impacts.

*E.g.* AR 12491, 11716.  The LIRA decision is the agency action under this

Court's review, and its monitoring enhancements are not arbitrary and

capricious.

Plaintiff argues that the LIRA decision is inconsistent with TES-S1.

Plaintiff's Brief 16-17 (citing AR 4514-15).  But the Forest Service rationally

explained that it met this standard's terms, because it surveyed probable

habitat for the catchfly in evaluating LIRA grazing, and mitigated potential

conflicts by modifying LIRA grazing to ensure the protection of the plants

and its habitat.  AR 4514-15, 12426 (explaining compliance with TES-S1).

Plaintiff complains that the project modifications weren't enough, but that

flies in the face of FWS's independent Biological Opinion, which concluded

there would be no significant reductions in catchfly numbers, reproduction, or

distribution.  AR 12299.  Plaintiff's bold statement that the LIRA decision

will "substantially increase" risks to the plant, Plaintiff's Brief 17, is also

readily debunked.  In fact, the LIRA decision includes new protections for the

plant.  AR 12437.

Plaintiff also cites TES-S2 (AR 4514-15), but there is no NFMA

violation with the LIRA decision.  That is because the decision provides for

monitoring of population trends and habitat conditions for the catchfly.  AR

12426-27 (explaining compliance with TES-S2).  Further, nothing in TES-S2

establishes that it is a discrete project-by-project mandate, rather than a

broader NRA planning standard.  *See* AR 12388 (Forest Service's statement

at LIRA objection meeting that the CMP "doesn't require" trend analysis for

this project).  Nor does TES-S2 establish timing for when population trend

monitoring would occur, that it must occur in conjunction with a project-

specific decision, or the scope of such monitoring.   Therefore, Plaintiff's argument is unsupported that TES-S2 mandated that the Forest Service, prior to the LIRA decision, had to begin population trend monitoring within Imnaha Canyon.  Plaintiff's Brief 17.

### 2.  Plaintiff misrepresents the law regarding NFMA viability.

Plaintiff argues that the LIRA decision violated NFMA, because it wrongly relied on catchfly habitat as a proxy for protecting the viability of the plant itself.  Plaintiff's Brief 17-19.  Plaintiff is badly mistaken.  Nothing in the NFMA, CMP, or Forest Plan sets such a fine-grained standard for how the Forest Service assesses viability.  *See* AR 4513 (CMP viability provision Bio-03).  As emphasized in *In re Big Thorne*, 857 F.3d at 975, the Forest Service in assessing NFMA viability need only "supply a rational connection between the facts found and the conclusions made."  Here, the Forest Service supplied this connection.  *See*, *e.g.*, AR 11412-13, 11839-40, 11857-82.  In the Forest Service's expert judgment, "simple population inventories do not give an accurate representation of the existing population."  AR 12168.  Instead, "quality of habitat" is "a more reliable indicator of whether or not" the catchfly "has an opportunity to persist."  *See also* AR 12214.

Never once acknowledging *In re Big Thorne Project*, Plaintiff attempts to rely on *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1066 (9th Cir.

2004).  Plaintiff's Brief 18.  But that case did not address NFMA at all and addressed separate legal questions under an ESA challenge to a Biological Opinion.  Here, there is no ESA claim and the Biological Opinion is unchallenged.

Plaintiff argues that the LIRA decision violates NFMA because the Forest Service has not yet obtained catchfly population trend data and because Plaintiff believes the catchfly population size is too small to be viable.[3]  Plaintiff's Brief 15, 16, 18, 22.  But the Ninth Circuit flatly precludes these arguments.  "We have rejected the idea that the [Forest] Service must assess population viability in terms of actual population size" or "population trends."  *In re Big Thorne*, 857 F.3d at 975.  Neither NFMA nor the CMP specifies how the Forest Service must demonstrate that its site-specific grazing plans adequately provide for species viability.  Therefore, the Forest Service has "the latitude to decide how best to demonstrate" that grazing management will provide for species viability.  *See Lands Council v. McNair*, 537 F.3d 987, 992 (9th Cir. 2008) (en banc).  As *Lands Council* emphasized,

---

[3] Further, the LIRA area has 948 catchfly plants overall (none are within the Cow Creek allotment), well above the 250-to-500 plant suggestion in FWS's recovery plan.  *See* AR 6033, 5917 (noting that minimum viable population size is "most frequently and broadly estimated at 250 to 500 reproductive individuals").  Further, the 948-plant count is expected to easily double with future Forest Service field work.  AR 11866.

Page 26-    **Defendants' Cross-Motion for Summary Judgment**; *Greater Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

the Forest need not "improve" a species' habitat to establish it is "maintaining" viability.  *Id.* at 995.  Here, the Forest Service is improving catchfly habitat by newly resting Toomey allotment pastures and barring, every third or fourth year, late-winter/spring grazing in the pastures with catchfly.  AR 12437, 12492.  There is no NFMA violation.

Plaintiff also mischaracterizes the Forest Service's viability approach. This approach is not that discussed in *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 933 (9th Cir. 2010).  Plaintiff's Brief 17-18.   The *Tidwell* analysis is inapplicable here, because that case discussed an approach that "uses habitat as a proxy to measure a species' population and then uses that species' population as a proxy for the population of other species."  *Tidwell*, 599 F.3d at 933 (internal quotation and alterations omitted).  Similarly, the "proxy-on-proxy" approach at issue in *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) was not employed for the LIRA decision.  Instead, in sharp contrast, the Forest Service reached its catchfly viability findings after directly assessing catchfly habitat, distribution and abundance, and known sites and populations where the catchfly is actually located.  *See* AR 11405-14.  *See also* AR 12428 ("The quality of the habitat . . . and soil resource condition is well documented at existing monitoring sites."). The Forest Service did not use habitat as a proxy for another species'

population.

### 3. Plaintiff relies on inapplicable NFMA regulations.

Plaintiffs relies on inapplicable NFMA regulatory requirements for its argument. Plaintiff's Brief 15, 22 (citing the 2012-promulgated regulations at 36 C.F.R. § 219.15(d)). According to Plaintiff, the Forest Service failed under section 219.15(d) to describe how the LIRA project is consistent with applicable provisions from the CMP or Forest Plan. But Plaintiff's objection did not identify this contention. AR 12315-27. Nor do the 2012-promulgated regulations apply to the LIRA decision. In short, that is because the Wallowa-Whitman National Forest has not revised its (1990) Forest Plan under the 2012 regulations.

According to 36 C.F.R. § 219.17, entitled "Effective Dates and Transition" (a provision noticeably absent from Plaintiff's Brief), there is a temporal dividing line of May 9, 2012 for determining whether Forest Plans or revisions to such plans can be completed under previous regulations or have to instead comply with the requirements "under this part," referring to the 2012 regulations. 36 C.F.R. § 219.17(b). Then, with particular respect to the 2012 regulations' applicability to site-specific projects, the regulations provide for an explicit carve-out in declaring that "[n]one of the requirements of this part [again, the 2012 regulations] apply to projects or activities on

units with plans developed or revised under a prior planning rule until the

plan is revised under this part, except that projects or activities on such units

must comply with the consistency requirement of § 219.15 with respect to any

amendments that are developed and approved pursuant to this part." 36

C.F.R. § 219.17(c).

Thus, under this language's plain meaning, because both the 1990

Wallowa-Whitman Forest Plan and 2003 CMP were adopted under "a prior

planning rule" (more specifically, the 1982 NFMA planning regulations),

none of the requirements of the 2012 regulations apply to the LIRA decision.

Nor do the applicable (1982) NFMA regulations contain the requirements in

section 219.15(d) of the 2012 regulations.

### 4. Plaintiff's arguments fail regarding CMP provisions TES-O1 and TES-O3.

Plaintiff argues that two broad CMP objectives, TES-O1 and TES-O3,

require that the Forest Service "affirmatively recover" ESA-listed species.

Plaintiff's Brief 22 (citing these objectives at AR 4514-15).  But the broad,

general provisions in TES-O1 to "[m]anage habitat and populations" and

"[i]mplement restoration and recovery activities" are not mandatory

standards for each individual project. They do not require completion under

any specified timing and are not discrete mandates for individual projects to

re-authorize existing grazing.  *See Cascadia Wildlands v. Bureau of Indian*

Page 29-    **Defendants' Cross-Motion for Summary Judgment**; *Greater*
            *Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

*Affairs*, 801 F.3d 1105, 1115 (9th Cir. 2015) (finding that a plan's "objectives" established "general, high-level goals"). As for the project-specific aspect of TES-O1, the Forest Service did "[e]nsure" that continued LIRA grazing did not jeopardize the plant, by formally consulting with FWS under the ESA and obtaining FWS's "no jeopardy" opinion. AR 12298 (Biological Opinion). *See also* AR 12426 (Forest Service discussion of consistency with TES-O1). Regarding TES-O3, the objective to "[i]mplement recovery plans" has already been occurring, as the Wallowa-Whitman National Forest not only contributed to the development of the catchfly plan but is working to meet its long-term goals. *See*, *e.g.*, AR 6044, 11866. And the TES-O3 general objective to "carry out recommended actions" is at the discretion of the Forest Service regarding timing and substance. It does not create a discrete project-by-project mandate. Nevertheless, the LIRA project referenced and tracked the recovery plan. *See*, *e.g.*, AR 11866, 12491, 12501.

### 5. Plaintiff's NFMA argument regarding FWS's recovery plan clashes with Ninth Circuit precedent.

Plaintiff attempts to establish an NFMA violation, by claiming that the LIRA decision is inconsistent with the ESA-geared recommendations in FWS's catchfly recovery plan. Plaintiff's Brief 22-23. But this argument is foreclosed by legal precedent in multiple ways. First, "[t]he NFMA is fundamentally different from the Endangered Species Act, which has a

Page 30- **Defendants' Cross-Motion for Summary Judgment**; *Greater Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

single-minded focus on protecting species that are near extinction." *In re Big Thorne*, 857 F.3d at 975. "NFMA is about managing competing uses, none to the exclusion of others." *Id*.

Second, Plaintiff's argument that the Forest Service "must implement" the recovery plan runs headlong into Ninth Circuit precedent that FWS recovery plans are not binding on other agencies. *Conservation Congress v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014). *See Friends of the Wild Swan, Inc. v. Thorson*, 260 F. Supp. 3d 1338, 1344-45 &n.7 (D. Or. 2017) ("The cases do not support an argument that recovery plans are legally binding or that compliance with them is expected."). Third, Plaintiff fails to acknowledge Ninth Circuit precedent that rejects that even the use of the term "recovery" in a land plan requires that the land manager comply with a FWS recovery plan. *Cascadia Wildlands*, 801 F.3d at 1114 & n.8.

Here, none of the FWS recovery plan recommendations are incorporated into the Forest Service's CMP or Forest Plan. Nevertheless, as the Forest Service found, the LIRA decision is appropriately aligned with the recovery plan. AR 12430. FWS specifically reviewed the Forest Service's LIRA proposal, and predicted no significant reduction in catchfly numbers, reproduction, or distribution. AR 12299. There is no hint in the record that FWS believed that modifying grazing for the benefit of the catchfly was a

recovery plan problem.

Beyond these problems, Plaintiff also mischaracterizes the recovery plan in its reference to a fragment of recovery action 2.3.4.1. Plaintiff's Brief 23. Plaintiff fails to acknowledge that that provision also provides that livestock management "should be tailored to each individual site based on topographic features and utilization scenarios." AR 5958. Nor does Plaintiff acknowledge that the Forest Service discussed the recovery action and how the LIRA decision addressed it. AR 12430.

Nor is this case akin to *HCPC v. Connaughton*, 3:11-cv-23-PK (August 10, 2012). Plaintiff's Brief 25-26. That case involved a distinct CMP soil-crust objective that is not at issue here. Here, there is no discrete CMP provision mandating that the LIRA project "affirmatively recover[]" catchfly populations.

### 6. Plaintiff fails to establish any NFMA violation regarding utilization rates.

Nor does Plaintiff establish any NFMA violation with regard to grazing utilization rates. For those pastures in satisfactory condition that have catchfly habitat, the LIRA decision sets utilization at 50% for March, April, and May, which is "in line" with the recovery plan recommendations. AR 12501, 12436. Under the existing (pre-LIRA decision) Forest Plan, unsatisfactory-condition upland pastures are set at 35% utilization. AR 1963,

11903-04.  Plaintiff notes that annual AOIs after the LIRA decision mention

60% utilization, but there is no conflict because that reference is only a

quotation from the CMP and does not affect the 50% LIRA-decision standard

for March-May.  Indeed, the AOIs specify a maximum of 50% in the actual

allotment-by-allotment tables.  *See*, *e.g.*, AR 12758-59.  Therefore, Plaintiff is

wrong that the AOIs authorize grazing above 50% that would be damaging to

pollinators.  Plaintiff's Brief 27.[4]  Nor do the AOIs override the Forest Plan's

35% utilization standards for unsatisfactory-condition pastures.  Indeed, the

controlling permit to the McClaran Ranch specifies the unsatisfactory-

pasture standards.  AR 9429.  So whether or not the AOIs also referenced

those standards, they remain in full force and effect.  And Forest Service

monitoring shows the 35% standard is being met.  *See*, *e.g.*, AR 12783 (12%

utilization in 2017 in Spring Gulch pasture), 12781 (20% utilization in in

2017 Lower Spain pasture), 12775-79 (Johnson Canyon utilization in 2017

ranging from 8% to 35%).

Plaintiff also attempts to rely on a supposed violation of Gra-S2, but

misinterprets this provision.  Plaintiff's Brief 24 (citing AR 4469-70).  In fact,

---

[4] As for Plaintiff's reliance on the Kimoto paper (Exhibit 2 to Plaintiff's
Motion) on pollinators (Plaintiff's Brief 8, 24), the Forest Service explained
why it had limited utility, in that the paper related to summer grazing.  AR
12435.  Nevertheless, in an abundance of caution for pollinators, the Forest
Service applied the 50% standard for late-season grazing.  AR 12436.

for the few pastures the Forest Service found to be in unsatisfactory condition, the LIRA decision recognized that the existing Forest Plan limits upland grassland utilization to 35% to assist in ecological recovery. AR 11904, 11761. That is in line with Gra-S2. For even further degraded sites, less than 400 acres project-wide, the final EIS specifies that only "trail-through" livestock use would be allowed because they are not within 70% percent of the natural rate of recovery. AR 11755, 11758. That is also in line with Gra-S2. These areas are predominantly flat "benches" and are distinct from the steep terrain that comprises all known catchfly occurrences in the LIRA area. *Id.*; AR 11390.

### 7. Plaintiff's Allotment Management Plan argument establishes no NFMA violation.

Plaintiff argues that the Forest Service is violating NFMA because it has not yet issued an Allotment Management Plan ("AMP") for the LIRA allotments. Plaintiff's Brief 25. But this Court has ruled repeatedly that the timing of AMP issuance is at the Forest Service's sole discretion. *Oregon Natural Desert Ass'n v. U.S. Forest Service*, 2018 WL 1811467 *2 (D. Or. April 16, 2018); *Concerned Friends of the Winema v. U.S. Forest Service*, No. 1:14-cv-00737-CL, 2017 WL 5957811 *1 (D. Or. January 18, 2017) ("[T]he U.S. Forest Service has sole discretion to determine when to perform environmental analyses in the context of [AMPs}."). *See also* 43 U.S.C. §§

Page 34-    **Defendants' Cross-Motion for Summary Judgment**; *Greater Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

1752(d), (i).

For all these reasons, this Court should grant summary judgment to Defendants against Plaintiff's second claim for relief.

### III.    Plaintiff's Hells Canyon Act claim is waived and forfeited.

This Court must dismiss Plaintiff's Hells Canyon Act claim, its third claim for relief.  Plaintiff has waived its right to assert a Hells Canyon Act claim now because its administrative objection did not notify the Forest Service of any concerns with the Act – or with the Act's 36 C.F.R. § 292 regulations.

In its formal objection under 36 C.F.R. § 218, Plaintiff through counsel identified specific statutes and issues of concern.  AR 12315-27.  *See also* AR 12500 (noting that LIRA project was subject to the section 218 objection process).  The objection procedures allow "a full and fair opportunity for concerns to be raised and considered on a project-by-project basis."  36 C.F.R. § 218(a).

Plaintiff's objection through counsel delineated specific NEPA and NFMA concerns, but did not identify or articulate any concerns regarding compliance with the Hells Canyon Act or the Act's regulations.  This bars Plaintiff's Hells Canyon Act claim.  Groups seeking to object to a Forest Service project must "structure their participation so as to alert the local

agency officials making particular land management decisions of their positions and contentions." 36 C.F.R. § 218.14.  Plaintiff failed to give the Forest Service the chance to examine any supposed problems with Hells Canyon Act compliance, either the statute or its regulations, waiving its right to raise this claim now.  *See Lindberg v. U.S. Forest Service*, 132 F. Supp. 3d 1255, 1268 (D. Or. 2015) (holding claim waived under 36 C.F.R. 218).

Plaintiff's Hells Canyon Act claim is forfeited.  *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764–65 (2004).  Plaintiff could have, but did not, challenge the Forest Service's compliance with the Act during the objection process.  "[C]ourts should not topple over administrative decisions unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice."  *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  Accordingly, Plaintiff is not entitled to judicial review of its Hells Canyon Act claim.

For these reasons, this Court should grant Defendants summary judgment against Plaintiff's third claim for relief under the Hells Canyon Act.

## IV.    The Forest Service complied with the Hells Canyon Act.

Even if this Court considers Plaintiff's Hells Canyon Act claim on its merits, Plaintiff fails to establish the LIRA decision was arbitrary and capricious under the Act's multiple-use framework.  The LIRA decision was

rational, because it modifies grazing to enhance protections for the catchfly, while recognizing that grazing is a traditional and valid use of the NRA.

The Act clearly provides for the Forest Service to balance the multiple objectives of the NRA. The Forest Service is to manage the NRA for grazing and for preserving rare plant species, among other objectives. 16 U.S.C. § 460gg–4. And the Forest Service recognized that it needed to balance these uses and resources to the best of its expertise. AR 12490.

Plaintiff argues that the Forest Service violated the Act by allowing continued grazing, because Plaintiff believes grazing in the LIRA area is inconsistent with the provision for preservation of rare plant species under 16 U.S.C. § 460gg–4(3). But the Act's seven objectives also include managing the NRA for "grazing and the continuation of such existing uses" as is "compatible with the provisions of this subchapter." 16 U.S.C. § 460gg–4(7).

Plaintiff disagrees with the Forest Service that LIRA-area grazing is "compatible" with the Hells Canyon Act but that does not establish that the LIRA decision was arbitrary and capricious. It is an "enormously complicated task" to strike "a balance among the many competing uses to which land can be put." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). Even when a land-management statute is "mandatory as to the object to be achieved," here as in *Norton* the Act leaves "a great deal of

discretion in deciding how to achieve it." *Id*. at 66. "The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA. " *Id*. at 67.

Plaintiff's argument fails to acknowledge that the Act explicitly recognizes that longstanding grazing, such as that in the LIRA area, is a "traditional and valid use[] of the recreation area." 16 U.S.C. § 460gg–10. Plaintiff also ignores that the Imnaha River, which runs through the middle of the LIRA area, is managed to protect and enhance the Outstandingly Remarkable Value of a lifestyle "dominated by a ranching/farming tradition" that is "an extension of how the river corridor has been used for years." AR 2322.

Therefore, the Hells Canyon Act does not put a proverbial "thumb on the scales" such that absolute preservation of each catchfly plant in the NRA is required. Instead, the Forest Service under the Act has an obligation to balance the objectives of livestock grazing and maintenance and protection of unique plant life in the NRA. "[T]he Act established a recreation area, not a pure refuge or wilderness area." *Hells Canyon Alliance v. U.S. Forest Service*, 227 F.3d 1170, 1178-79 (9th Cir. 2000). "Grazing is one of the many uses allowed on NFS lands and in Hells Canyon." AR 12487. The LIRA decision

reached a rational balance among the multiple objectives. AR 12490. This is especially so in light of FWS's unchallenged Biological Opinion that concluded there would be no significant reduction in catchfly reproduction, numbers, or distribution. AR 12299.

Plaintiff's argument also fails to acknowledge that Congress established that the plant-life objective in 16 U.S.C. § 460gg–4(3) applies with less force in the LIRA allotments than in the "Hells Canyon" portion of the NRA. The plant-life objective applies "especially in the area [of the NRA] generally known as Hells Canyon." 16 U.S.C. § 460gg–4(3); AR 4779. But the LIRA allotments are predominantly in the Imnaha River drainage, not the Snake River drainage on the Idaho/Oregon border that is generally known as Hells Canyon. *See* 16 U.S.C. § 460gg(a), AR 11122-23.

Plaintiff argues that the LIRA decision violates the Act's regulations at 36 C.F.R. § 292.48(b). Plaintiff's Brief 28. Not so. The regulations provide that NRA grazing shall continue unless it is determined that it is "incompatible" with values including the maintenance of rare ecosystems. 36 C.F.R. § 292.48(b). Even in this event, the Forest Service is directed to merely "modify" the grazing in an attempt to eliminate or avoid the incompatibility. *Id*. Only in the event that the incompatibility persists after the modification, or if the modification is not feasible, is the livestock use to

be terminated.  *Id.*

Plaintiff establishes no violation of this regulation, because the record did not compel the Forest Service to make a regulatory finding that livestock grazing is incompatible with any of the values identified in section 292.48(b). *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 960 (9th Cir. 2005) ("Agencies are entitled deference to their interpretation of their own regulations.").  Further, even if the Forest Service had made such a finding, it was only obligated to modify grazing, which is exactly what the LIRA decision did.  Rather than accept the status quo, the Forest Service proactively adjusted grazing for the benefit of the catchfly.[5]  Plaintiff's opinion that the modifications are only ineffective minor adjustments is not only premature but discounts the deference that is afforded to multiple-use management. Further, even if yet further modifications might be necessary, nothing in section 292.48(b) specifies the timing for such or require that they be "bundled" in with a particular project decision.

Plaintiff further argues that the LIRA decision violates the Act's regulations at 36 C.F.R. § 292.48(a).  Plaintiff's Brief 28.  But the Forest

---

[5] Nor was the Forest Service authorizing "high levels" of cattle grazing anywhere akin to historic grazing levels.  Plaintiff's Brief 28.  As the record shows repeatedly, the LIRA decision involves moderate grazing levels.  *E.g.* AR 11761-63, 11890-91.

Service found, as the regulation requires, that the allotment lands are overall

meeting or moving towards satisfactory condition.  *See*, *e.g*, AR 12486.

For these reasons, this Court should grant Defendants summary

judgment against Plaintiff's third claim for relief under the Hells Canyon Act.

## V.   The LIRA decision was not arbitrary and capricious under NEPA.

### A. The Forest Service considered a reasonable range of alternatives.

In reaching the LIRA decision, the Forest Service studied enough

alternatives to make a reasoned choice.  The Forest Service considered a

broad range of five alternatives in detail.  *See*, *e.g*., AR 11676-79.  These

included a "no-grazing" alternative to close all four allotments to grazing, and

an alternative that would simply carry forward the status quo grazing plan.

*See* AR 11708-09. 11718-26.  The alternatives also included Alternative C

with new catchfly protections (ultimately adopted in the LIRA decision with

further catchfly protections), an alternative (Alternative D) that would reduce

grazing utilization and provide additional pasture rest and deferment, and an

alternative to set aside Lone Pine allotment as a forage reserve.  AR 11726-

37.  The Forest Service specifically assessed the effects of each of these

alternatives on the catchfly.  AR 11857, 11857-83.

Courts review an agency's range of alternatives under a "rule of reason"

standard that requires the agency to set forth "only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. Nat'l Park Service*, 155 F.3d 1153, 1160 (9th Cir.1998) (quotation marks, alteration, and citation omitted). "[A]n agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990). An agency need not discuss alternatives similar to alternatives actually considered, or alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Id.* at 1180-81 (internal citation omitted).

### B. Plaintiff's NEPA alternatives arguments fall short.

Plaintiff argues that three alternatives were ignored. *See* Plaintiff's Brief 31. But as a threshold matter, Plaintiff's motion is overbroad. Plaintiff argues that an alternative was required to "operate consistently with the [FWS] Recovery Plan." *Id.* But Plaintiff's complaint does not allege any such missed NEPA alternative. ECF 1, Complaint at ¶ 123. Therefore, Plaintiff may not obtain summary judgment on this unpleaded NEPA-alternatives claim. *See Pickern v. Pier 1 Imports (U.S.) Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second

chance to flesh out inadequate pleadings.").

Nor did Plaintiff's detailed administrative objection, signed by its counsel, identify this supposedly missed "recovery plan" alternative. AR 12315-27. For those reasons identified in Argument III, *supra*, this NEPA-alternative claim is therefore waived and forfeited.

Similarly, Plaintiff's NEPA-alternatives motion is also overbroad, because Plaintiff's objection did not claim that the Forest Service needed to consider an alternative to eliminate late winter/spring grazing in areas with steep north-facing slopes and deep soils. AR 12318 (objection); ECF 1, Complaint at ¶ 123 (new allegation). Plaintiff therefore waived and forfeited this aspect of its NEPA-alternative claim.

Aside from threshold issues, NEPA did not require consideration of a "recovery plan" alternative. This is for two key reasons. First, the Forest Service's final EIS and other analyses already discussed the non-binding, discretionary recovery plan and took it appropriately into account. AR 12131, 11840, 11858. Nor is the FWS recovery plan the appropriate guiding framework for LIRA-area grazing management, because Congress determined that the NRA should be managed for multiple objectives rather than as a pure preserve for plants, and because the Forest Service already developed a Comprehensive Management Plan ("CMP") as the framework for

managing the NRA.  Second, the Forest Service formally consulted with FWS, the very author of the recovery plan, and FWS opined that the project was consistent with the ESA and voiced zero concern that further review or alternatives were needed in light of the recovery plan.  AR 11840, 11888, 12157 (EIS); AR 11342-04 (Biological Opinion).

Nor did NEPA require consideration of additional alternatives – beyond the five already considered in detail -- to eliminate grazing in pastures with catchfly or to eliminate late-winter/spring grazing in areas with steep north-facing slopes and deep soils.  That is because both of these alternatives are similar to alternatives actually considered – including the no-grazing alternative and Alternatives C, D, and E.  AR 12419-20.  In responding to Plaintiff's objection, the Forest Service rationally found that elements of Plaintiff's suggested alternatives "were incorporated into various alternatives that were considered."  AR 12419.  Illustratively, the no-grazing alternative would eliminate all grazing in pastures with catchfly or suitable habitat.  AR 12420.  And Alternative D would continue grazing but "significantly reduce the amount of exposure to potential impacts" to catchfly.  AR 11880.  That alternative would periodically rest, for the entire grazing season, full allotments and pastures where catchfly is located.  AR 11728-29.  Further, Alternative C, as modified and adopted by the LIRA decision, would

periodically defer late-winter/spring grazing in all ten pastures with catchfly. AR 12437, 12420.  The Forest Service also rationally found infeasible the alternative of eliminating grazing in areas where catchfly occurs.  AR 12420. In part this is because carving out those areas would make it impossible to move cattle around the remaining portions of the Rhodes Creek and Toomey allotments.  *Id*.  The Forest Service's choice of five alternatives was therefore neither arbitrary nor capricious.

Plaintiff attempts to rely on *W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013), but that case is inapposite.  There, BLM eliminated no-grazing and reduced-grazing alternatives from considered without any detailed analysis.  Plaintiff's Brief 30.  Here, in sharp contrast, the Forest Service considered *in detail* a no-grazing alternative, a reduced-grazing alternative, and other alternatives to increase protections for catchfly.  These alternatives allowed the Forest Service to make a reasoned choice in its LIRA decision.  In fact, based on informed public participation, the agency adopted a modified Alternative C to enhance catchfly protections.  *See* AR 12417.

The Ninth Circuit's decision in *Hells Canyon Alliance v. U.S. Forest Service*, 227 F.3d 1170 (9th Cir. 2000) is instructive.  There, a Forest Service EIS considered seven alternatives for motorized and non-motorized boat use of the Snake River in the NRA.  The Ninth Circuit held that this range of

alternatives was sufficient. *Id.* at 1080-82.  Here too, the Forest Service's broad range of alternatives met its NEPA obligations.

### C. The Forest Service took the requisite hard look under NEPA at the effects of the LIRA project on catchfly.

The Forest Service took the requisite hard look under NEPA before reaching its LIRA decision.  It prepared a detailed final EIS numbering more than 560 pages with appendices, after first preparing a draft EIS and responding to public comments on that draft.  AR 11667-238.  It also responded in detail to the objections it received on the final EIS.  AR 12416-37.

Under NEPA, a court must "insure that the agency has taken a hard look at environmental consequences," but cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (internal quotation omitted). Judicial "review is limited to whether the EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences," *Nat. Res. Def. Council v. U.S. Dep't of Transp.*, 770 F.3d 1260, 1271 (9th Cir. 2014) (internal quotation omitted).

The effects of grazing on catchfly are not yet fully understood by researchers.  The Forest Service acknowledged that reality and made rational predictions about the effects of new protections given its experts' input.

Page 46-    **Defendants' Cross-Motion for Summary Judgment**; *Greater Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

Courts are at their "most deferential" when the agency is "making predictions, within its [area of] special expertise, at the frontiers of science." *Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1099 (9th Cir. 2003) (citations omitted).

> **1.    Plaintiffs fail to establish that the Forest Service's baseline was erroneous or arbitrary.**

Plaintiff argues that Forest Service violated NEPA, because it reached its LIRA decision without first gathering adequate "population trend monitoring" data and other information on grazing's effects on catchfly and pollinators.  Plaintiff's Brief 33-34.  But Plaintiff mischaracterizes the backdrop to the LIRA decision.

The Forest Service has availed itself of the data and information reasonably available.  It surveyed catchfly and assessed its habitat.  *E.g.* AR 5285-545, 7982-8000, 11342-426, 12785-834, SUPP AR 15-139.  Plaintiff goes too far to demand that the Forest Service already have gathered population-trend data.  The catchfly was not definitively documented here until 2004-05. AR 12276.  According to FWS, "a minimum of 20 years" population trend monitoring is needed to determine long-term trends.  AR 5855.

The Forest Service was candid about the reasonable data limitations it had on this elusive species in these vast and rugged LIRA lands.  Indeed, FWS has emphasized that data gathering is very difficult given steep and

remote terrain, AR 5938, 6038, and because the catchfly can show prolonged

dormancy and plant counts vary significantly in response to precipitation and

temperature.  AR 855.  These external factors do not establish any baseline

"failure" by the agency.

Plaintiff relies on *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,

668 F.3d 1067, 1083 (9th Cir. 2011), but that case is far afield.  That case

involved an agency decision approving construction of a 130-mile coal

railroad line.  Plaintiff's Brief 33.  Here, in stark contrast, the Forest Service

approved a new and unquestionably more protective grazing system –

bettering the status quo -- to increasingly protect catchfly, and has not failed

to reasonably gather data.

Nor is Plaintiff's argument helped by its reliance on *Idaho*

*Conservation League v. USFS*, 2016 WL 3814021 (D. Idaho July 11, 2016).

There, a new mining exploratory project was proposed and the Forest Service

recognized that baseline data on a plant needed to be re-assessed because of a

recent wildfire in prime habitat.  The Forest Service proposed to undertake

that baseline work as part of the project itself, rather than upfront.  *Id*. at *7-

*12.  Here, in contrast, the Forest Service has a workable baseline given its

surveys and other analysis and nothing has occurred that renders its baseline

obsolete or erroneous.

Page 48-    **Defendants' Cross-Motion for Summary Judgment**; *Greater
            Hells Canyon Council v. Stein, et al.*, Case No. 2:18-cv-00054-SU

Under Plaintiff's argument, the Forest Service should have simply kept the grazing status quo in place for potentially decades until there is better data. Plaintiff would "make the perfect the enemy of the good." Rather than await perfect data, the Forest Service rationally preferred to take protective steps now with the data available. As the agency stated at the objection meeting, after years of process and given its concern for the catchfly and other NRA values, "We don't have ten years to figure those things out." AR 12397. Plaintiff's does not establish that the Forest Service was arbitrary and capricious.

### 2. The Forest Service took a hard look at catchfly viability and recovery.

As explained above in Argument II, the Forest Service reached its LIRA decision in compliance with NFMA. Accordingly, Plaintiff's NFMA-derivative NEPA claim fails. Plaintiff's Brief 34-35.

Nor does the possibility that a future key conservation area ("KCA") might be designated within the LIRA area show that the Forest Service violated NEPA. Plaintiff fails to explain how the LIRA decision's choice to *increase* catchfly protections over the status quo endangers areas that were already identified as a possible KCA under the status quo *before* the new protections.

The Forest Service considered the fact that part of the LIRA area may

someday be a designated KCA.  *See, e.g.,* AR 11867, 11869, 11870.  But the

timing, location, or specifics of a possible future KCA designation are not

known.  *See* AR 12276 (Biological Opinion).  It was neither arbitrary nor

capricious for the Forest Service to refrain from further speculative and

premature analysis of a future KCA designation.  In context, nor was such an

exercise critical to NEPA's purposes.  The recovery plan's provisions are not

binding, and relate to ESA recovery, not the multiple-use framework that

directs the Forest Service's management of the NRA.  Further, FWS believes

that there are "many" populations throughout the Canyon Grasslands

province "with intact habitat."  AR 5939.  Since 2007, FWS has elsewhere

documented five new catchfly populations in the Canyon Grasslands region

and another possible KCA-eligible population therein.  AR 6374-75.  And the

largest catchfly population in its entire range is already a KCA near the

LIRA area, in the Zumwalt Prairie.  AR 6375, 11282.

Finally, Plaintiff's KCA preoccupation is also odd, because it conflicts

with Plaintiff's own characterization of the LIRA area.  A KCA should have

"intact habitat" with native plants comprising "at least 80% of the vegetation

cover" and support "an abundance of pollinating insects."  AR 5850.  But

according to Plaintiff, "detrimental soil conditions and the proliferation of

annual invasive grasses and noxious weeds [exist] throughout the LIRA

allotments." Plaintiff's Brief 21.

For these reasons, this Court should grant Defendants summary judgment against Plaintiff's first claim for relief under NEPA.

## CONCLUSION

This Court should grant summary judgment to Defendants against Plaintiff's claims.

Dated this 27th day of July, 2018.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

*/s/ Sean E. Martin*
SEAN E. MARTIN
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

The preceding document complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,999 words, including headings, footnotes, and quotations, but excluding the caption, glossary of acronyms, table of contents, table of authorities, signature block, exhibits, and any certificates of counsel.

Dated this 27th day of July, 2018.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

_/s/ Sean E. Martin_
SEAN E. MARTIN
Assistant U.S. Attorney

Page 52-  **Defendants' Cross-Motion for Summary Judgment**; _Greater Hells Canyon Council v. Stein, et al._, Case No. 2:18-cv-00054-SU