Caroline Lobdell, Ore. Bar No. 021236
Shay S. Scott, Ore. Bar No. #934214
Bryn B. Blomberg, Ore. Bar No. 175075
Western Resources Legal Center
9220 SW Barbur Blvd., Suite 327
Portland, OR 97219
Tel: (503) 768-8500
Fax: (503) 222-3255
Email: clobdell@wrlegal.org
Email: sscott@wrlegal.org
Email: bblomberg@wrlegal.org

*Counsel for Defendant-Intervenors*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL**, An Oregon nonprofit corporation | Case No. 2:18-cv-00054-SU |
| Plaintiff,<br><br>v.<br><br>**KRIS STEIN**, District Ranger for the Hells Canyon National Recreation Area, Wallowa-Whitman National Forest, in her official capacity; and **UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture<br><br>Defendants,<br><br>and<br><br>**MCCLARAN RANCH, INC.**, an Oregon Domestic Business Corporation, and **WALLOWA COUNTY**, a political subdivision of the State of Oregon<br><br>Defendant-Intervenors. | **DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY
JUDGMENT

# TABLE OF CONTENTS

I.   INTRODUCTION. ................................................................................................ 1

II.  BACKGROUND. ............................................................................................... 5

III. LEGAL STANDARD. ........................................................................................ 9

IV.  ARGUMENT. ................................................................................................... 10

    A.   The LIRA Project Complies with NFMA. .............................................. 10

        1.   NFMA consistency requirement. ................................................. 10

        2.   The Forest Service's methodology for assessing viability is rational. ....... 11

        3.   The Project is consistent with the Forest Plan and CMP. .......................... 15

            a.   Viability. ................................................................................ 15

            b.   Habitat ................................................................................... 16

            c.   Small populations .................................................................. 20

            d.   Soils ....................................................................................... 24

    B.   The Project is Compatible with the HCNRA Act. ................................ 27

    C.   The Decision Complies with NEPA. ..................................................... 29

        1.   The Forest Service was not required to analyze a reduced-grazing alternative .................................................................................. 29

        2.   The Forest Service took a hard look at environmental impacts. ............... 32

V.   CONCLUSION. ................................................................................................ 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alder v. Lewis*,
   675 F.2d 1085 (9th Cir. 1982) ...................................................................................30

*All. for Wild Rockies v. Kimbell*,
   310 F. App'x 106 (9th Cir. 2009) ...............................................................................18

*Biodiversity Legal Foundation v. Norton*,
   285 F. Supp. 2d 1 (D.D.C. 2003).................................................................................24

*Cascadia Wildlands v. Bureau of Indian Affairs*,
   801 F.3d 1105 (9th Cir. 2015) ....................................................................................12

*Cascadia Wildlands v. Thrailkill*,
   49 F. Supp. 3d 774 (D. Or. 2014) ..........................................................................23, 24

*City of Angoon v. Hodel*,
   803 F.2d 1016 (9th Cir. 1986) ....................................................................................30

*Defenders of Wildlife v. Lujan*,
   792 F. Supp. 834 (D.D.C. 1992)..................................................................................24

*Earth Island Inst. v. U.S. Forest Serv.*,
   697 F.3d 1010 (9th Cir. 2012) ......................................................................................9

*Friends of Blackwater v. Salazar*,
   691 F.3d 428 (D.C. Cir. 2012).....................................................................................24

*Friends of Southeast's Future v. Morrison*,
   153 F.3d 1059 (9th Cir. 1998) ....................................................................................30

*Fund for Animals v. Rice*,
   85 F.3d 535 (11th Cir. 1996) ......................................................................................24

*Great Basin Resource Watch v. Bureau of Land Management*,
   844 F.3d 1095 (9th Cir. 2016) ....................................................................................33

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
   593 F.3d 923 (9th Cir. 2010) ........................................................................................9

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.*,
   88 F.3d 754 (9th Cir. 1996) ........................................................................................11

*Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*,
      42 F.3d 517 (9th Cir. 1994) ...................................................................... 30

*Lands Council v. McNair*,
      537 F.3d 981 (9th Cir. 2008), *overruled on other grounds by*
      *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............................. *passim*

*People of California ex rel. Lockyer v. U.S. Dep't of Agric.*,
      No. 2:05-CV-0211-MCE-GGH, 2008 U.S. Dist. LEXIS 72817 (E.D. Cal.
      Aug. 18, 2008), *as amended* (Sept. 3, 2008), *aff'd sub nom. Sierra Forest
      Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011) ..................................... 25

*Lujan v. Defenders of Wildlife*,
      504 U.S. 555 (1992) .................................................................................... 1

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
      545 F.3d 1147 (9th Cir. 2008) .................................................................... 30

*National Wildlife Fed'n v. National Park Service*,
      669 F. Supp. 384 (D. Wyo. 1987) ............................................................... 24

*Native Ecosystems Council v. Weldon*,
      697 F.3d 1043 (9th Cir. 2012) .............................................................. 10, 11

*Native Ecosystems Council v. U.S. Forest Serv.*,
      418 F.3d 953 (9th Cir. 2005) ...................................................................... 10

*Native Ecosystems Council v. U.S. Forest Serv.*,
      428 F.3d 1233 (9th Cir. 2005) .................................................................... 30

*Nw. Coal. for Alternatives to Pesticides v. U.S. E.P.A.*,
      544 F.3d 1043 (9th Cir. 2008) .................................................................... 10

*San Luis & Delta-Mendota Water Auth. v. Locke*,
      776 F.3d 971 (9th Cir. 2014) ...................................................................... 10

*Swanson v. U.S. Forest Serv.*,
      87 F.3d 339 (9th Cir. 1996) ........................................................................ 32

*Trout Unlimited v. Morton*,
      509 F.2d 1276 (9th Cir. 1974) .................................................................... 30

**Statutes**

5 U.S.C. § 706(2)(A) ............................................................................................ 9

16 U.S.C. § 460gg(a) ........................................................................................... 27

16 U.S.C. § 460gg-4 ............................................................................................ 27

16 U.S.C. § 460gg-5 ...................................................................................................5

16 U.S.C. § 460gg-10 ...............................................................................................27

16 U.S.C. § 1533(f)(1) ..............................................................................................23

16 U.S.C. § 1604(i) ...................................................................................................11

42 U.S.C. § 4332(2)(E) .............................................................................................30

**Other Authorities**

36 C.F.R. § 218.8(a) ..................................................................................................28

36 C.F.R. § 222.2(c) ............................................................................................5, 28

36 C.F.R. § 292.48 ....................................................................................................26

66 Fed. Reg. 51,597 (Oct. 10, 2001) ..........................................................................8

## CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to FRCP 56 and Local Rule 56-1, defendant-intervenors McClaran Ranch and Wallowa County respectfully file this Cross Motion for Summary Judgment in their favor and request dismissal of plaintiff's Complaint. Counsel for defendant-intervenors conferred with counsel for plaintiff prior to filing this cross motion, but the parties were unable to resolve the dispute. LR 7-1(a)(1).

This motion is supported by the following supporting memorandum, the Administrative Record (AR) certified by defendants on May 1, 2018 (Dkt. 11), the Supplemental Administrative Record (Supp AR) certified by defendants on June 13, 2018 (Dkt. 15), and the Court's record and pleadings on file.

## I.    INTRODUCTION.

This case challenges the U.S. Forest Service's decision to reauthorize livestock grazing on approximately 44,000 acres of the Hells Canyon National Recreation Area (HCNRA) within the Wallowa-Whitman National Forest (WWNF) due to the presence of the threatened Spalding's catchfly in the region, a perennial flowering plant. The environmental impacts of reauthorizing cattle grazing on the allotments at issue, including possible adverse impacts to Spalding's catchfly, were analyzed extensively in the Forest Service's 2015 Lower Imnaha Rangeland Analysis (LIRA) and EIS. That decision is fully supported by the record, and the grazing authorizations should be upheld.

Plaintiff's lawsuit disregards key issues that demonstrate that summary judgment is appropriate.[1] Plaintiff's interpretation of the allowable uses of the HCNRA is selectively skewed

---

[1] Defendant-intervenors respectfully join in federal-defendants' argument that plaintiff lacks standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), because declarant Richard Bailey has no plans to return to the LIRA area and has not established imminent injury,

in favor of their ultimate agenda – to eliminate grazing on federal lands.[2]  Despite plaintiff's

disdain for grazing, Congress did not designate the HCNRA as a park.  To the contrary, ranching

and grazing are preserved within the HCNRA pursuant to Sections 7 and 13 of the Hells Canyon

National Recreation Area Act.  They are recognized as traditional and valid uses of the area.

Ranching and grazing are so important that Congress grandfathered them in as "compatible" uses

under the HCNRA Act, recognizing the significant economic benefits they provide to the region

and adjacent rural communities.[3]

Grazing has occurred in this area for over 300 years.  The LIRA project area is

traditionally cattle country and historically associated with settlement and agriculture.[4]

AR 12486.  Although historic use has resulted in some sites with depleted soil conditions and

loss of native grassland vegetation, over the course of the 20th century, livestock grazing was

reduced significantly as the area was designated as part of the National Forest System, resulting

---

and declarant Priscilla Coe fails to explain concrete plans to visit and has not established injury. Defs.' Cross MSJ at 15-17; Dkt. 21.  To avoid duplication, defendant-intervenors incorporate that argument in full.

[2]  While plaintiff states that it does not oppose or seek to eliminate grazing, its actions in litigation and policy work show otherwise.  *See, e.g., Hells Canyon Preservation Council v. Cannaughton*, 3:11-CV-00023-PK (D. Or. filed Feb 22, 2013) (lawsuit attacking Forest Service's renewal of livestock grazing permits); *Idaho Wool Growers Ass'n v. Vilsack*, 1:12–CV–469–BLW (D. Id. filed Feb 21, 2013) (seeking intervention in lawsuit and restrictions to grazing); AR 12317-12318 (demanding no grazing alternatives in EIS); AR 00418 (proposing alternative prohibiting sheep grazing in HCNRA); AR 12326 (demanding that grazing authorization be withdrawn).

[3]  The McClaran Ranch has grazed livestock during the winter in this area since 1919 on what is now the Rhodes Creek Allotment.  AR 9599; McClaran Decl. ¶ 4; Dkt. 7.  They are one of the two remaining "'year round' livestock operations authorized on the Wallowa Mountains Zone.  Long standing family ranching operations contribute to the local culture and tradition of the local community they are part of, [which] holds true for the LIRA area."  AR 9599.

[4]  For a detailed history of grazing in the LIRA area, see AR 11482-489 (Rangeland Resources Report).

Page 2        DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY
               JUDGMENT

in far fewer cattle and impacts. Since 2004, permitted grazing on LIRA project area allotments has been at the lowest levels of livestock use in recorded history, with those reductions specifically designed to allow rangeland resources in the area to recover.[5] *Id.*

Plaintiff's lawsuit repeats pages of potential adverse impacts to Spalding's catchfly habitat from alleged improperly managed grazing, and then uses those acknowledged impacts as a basis for their claims. However, this information proves exactly the opposite—that the Forest Service disclosed potential impacts in adopting the LIRA decision, and it took the requisite hard look at the environmental consequences as required under NEPA. In addition, plaintiff complains that the Forest Service has failed to collect adequate habitat, population, and monitoring data, but then fails to discuss ongoing monitoring efforts or explain that the very Recovery Plan used as guidance for the LIRA management changes states that a minimum of 20 years of monitoring through 2027 is necessary "to determine long term population trends." AR 5855. Plaintiff also argues that the Forest Service's substantive obligation is to "ensure viability," yet plaintiff fails to address where this supposed-requirement originates and then overstates the duty as amounting to an enforceable standard.

This lawsuit reveals plaintiff's fundamental disagreement with the Forest Service's

---

[5] Prior to 2005, McClaran Ranch had one permit to graze its livestock on a single allotment, the Rhodes Creek Allotment. Declaration of Scott McClaran ¶ 16; Dkt. 7. In 2005, McClaran Ranch obtained Forest Service authorization to graze on the Cow Creek and Toomey Allotments. After these allotments were acquired, McClaran Ranch voluntarily agreed not to turn out the full number of cattle authorized by the permits. Since that time, McClaran Ranch has voluntarily turned out about 30% less than its permitted level of livestock, without being requested by the WWNF, to retain flexibility to manage for fire, drought, poor grass years, rare or listed plant species, and other natural events affecting the abundance and quality of available forage. McClaran Decl. ¶ 17; Dkt. 7. Plaintiff's declarant, Richard Bailey, even compliments the McClarans and their grazing management: "I very much respect the McLaran family and appreciate their knowledge of the LIRA area and their efforts toward sensitive livestock grazing practices." Bailey Decl. ¶ 8; Dkt. 18.

Page 3    DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY
            JUDGMENT

mandate to balance competing uses and honor traditional values in the HCNRA.  The LIRA

Project will help achieve the objective of protecting Spalding's catchfly—as it improves habitat

over time and, pursuant to the Recovery Plan, calls for more than $8.6 million in recovery

actions through the year 2040 in order to learn more and protect the species.  Spalding's catchfly

is a very long-lived plant, and its population trend in the area raises numerous uncertainties, all

of which were recognized and analyzed by the U.S. Fish and Wildlife Service (FWS) in three

separate consultations in 2003, 2009, and 2015.  AR 11348.  These uncertainties led FWS to

determine that grazing in the four allotments is likely to adversely affect Spalding's catchfly,

AR 11414, however, a combination of reduced grazing, rest-rotation, and managed grazing

strategies that can be adjusted will mitigate potential impacts and support the Forest Service and

FWS's opinion that grazing will not jeopardize the continued existence of the species.

AR 12487-90.

Although the Forest Service's approach may not perfectly suit plaintiff's members, it

identifies uncertainties facing Spalding's catchfly and the impacts grazing may have.  Plaintiff's

"no grazing" agenda and demand for something beyond what is legally-required is no solution at

all and ignores the agencies' analysis, multiple-use mandate, and need for time to monitor

impacts to determine the effectiveness of management changes.  The Recovery Plan, contrary to

plaintiff's efforts to enforce it to the letter, is not an enforceable document.  Recovery Plans are

aspirational only and provide guidance that can help shape discretionary management decisions

over time.

With the LIRA Project, the Forest Service is acting diligently to learn more about the

species and its habitat, consistent with unchallenged biological analyses completed by FWS.

While there remains uncertainty about the eventual recovery and timing of recovery of the

species, the Forest Service's approach is rational, supported by the record, and a step in favor of species protection, particularly while the agency continues to learn by analyzing impacts and studying recovery efforts in more detail.  The Court should reject plaintiff's demand to shut down the area's historic and traditional ranching and grazing—now at historically low levels—while recovery actions continue through 2040.  AR 5853-53.

## II.   <u>BACKGROUND.</u>

The Lower Imnaha Rangeland Analysis (LIRA) is a livestock grazing reauthorization project intended to provide a modified grazing strategy to mitigate potential impacts on sensitive soils in Spalding's catchfly habitat.  AR 12487.  The Project is located within the perimeter of four grazing allotments in the Canyon Grasslands region of Hells Canyon. AR 12265, 12269, 12275.  The 43,897-acre planning area is on the Hells Canyon National Recreation Area (HCNRA) of the Wallowa-Whitman National Forest (WWNF).  AR 12486.  The federal lands within the HCNRA are managed under the 1990 Wallowa-Whitman National Forest Land and Resource Management Plan (Forest Plan), AR 1850-2263, and HCNRA Comprehensive Management Plan (CMP), which was adopted in 2003 and amended the Forest Plan.[6]  AR 5191, 12486.  When the CMP was approved, the Forest Service recognized that ranching is a traditional and legitimate use of the HCNRA under the Hells Canyon National Recreation Area

---

[6]  The Act requires the Secretary to develop a "comprehensive management plan" (CMP) that provides for a "broad range of land uses and recreation opportunities" within the HCNRA. 16 U.S.C. § 460gg-5.  Upon establishing the HCNRA, the first CMP was developed in 1982, and it was amended in 1983 and 1984 before being incorporated into the Wallowa-Whitman Forest Plan in 1990.  AR 2268, 5197.  When the CMP was adopted, the Forest Service recognized ranching as a traditional and legitimate use of the HCNRA, 16 U.S.C. § 460gg-460gg-13, provided it is compatible with other provisions of the HCNRA Act.  AR 5229, 12487; *see also* 36 C.F.R. § 222.2(c); Forest Service Manual § 2203.1.

Act (HCNRA Act), 16 U.S.C.A. § 460gg-460gg-13, provided it is compatible with other provisions of the Act.  AR 5229, 12487.[7]

The LIRA Project was approved in a Record of Decision (ROD) dated September 3, 2015.[8]  AR 12502.  The Project involves a strategy to defer grazing every third or fourth year in ten (10) pastures with Spalding's catchfly and detrimental soil conditions, depending on site-specific conditions, as determined by the Forest Service through annual and long-term monitoring.  AR 12487-88 & Table 1 (LIRA ROD and Alternative C-Modified Description). The intent of the strategy is to reduce impacts, especially soil displacement in Spalding's catchfly habitat, from cattle travelling across wet soils on steep slopes.  *Id*.  Potential impacts are minimized when grazing occurs on dry or frozen soils (fall through winter season).  *Id*.  The allotments at issue are primarily winter grazing allotments when the plant is dormant. AR 12488-89, 11760, 11718-23.  An important part of the Project design is the incorporation of mitigation measures and site-specific monitoring.  AR 12489, 11353-355.  The Canyon Grasslands range widely in elevation, with Hells Canyon the deepest canyon in the U.S. at a depth of 7,900 feet.  AR 12269.  The steep canyon walls and dramatic range in elevation result in

---

[7]  The CMP approved active livestock grazing on 298,905 acres.  AR 5214.  In adopting the 2003 CMP, the Forest Service reviewed potential impacts on federally listed species and their habitat.  AR 5273.  The Biological Assessment concluded that implementing the CMP was not likely to adversely affect Spalding's catchfly, and the U.S. Fish and Wildlife Service (FWS) agreed in its Biological Opinion.  *Id*.

[8]  The HCNRA boundary contains 652,488 acres, approximately 28 percent of the land under the administration of the WWNF.  AR 5198.  In contrast to the 298,905 acres approved for livestock grazing within the HCNRA under the CMP, the LIRA Project involves a much smaller area of 43,897-acres.  *Id*.

marked variations in climate and vegetation. *Id.* Because of this steep remote terrain, the

Canyon Grasslands are the most under-surveyed area for Spalding's catchfly.[9] *Id.*

The Forest Service decision to proceed with the Project was based on numerous analyses

and reports: the LIRA FEIS, AR 11694-696, 11712, 11714-717, 11727-737, 11806-833, 11839-

40, 11858-882, 12138-163; the LIRA ROD, AR 12487-494; Spalding Catchfly Recovery Plan,

AR 5843-6045; the Plant Biological Assessment, AR 11342, 11375-419; the Threatened Listing,

AR 3437-445; Best Available Science Guidance, AR 5841-42; the Invasive Plants Treatment

FEIS, AR 6897-98, 6963-68, 7261; the Invasive Plants Treatment ROD, AR 12372; the Soils

Report AR 9583; the Microbiological Soil Crusts Report, AR 9850, 9856-67; and the Rangeland

Specialist Resources Report, AR 11457-58, 11527-30, 11534-41; AR 11544-52, 11555, 11573-

78. FWS agreed with the Forest Service's analysis. AR 12239-304 (Biological Opinion).

The 2007 Recovery Plan for Spalding's catchfly outlines five distinct physiographic

regions where the species resides, describes the specific habitat requirements for the species, and

identifies key conservation areas (KCAs) within each region to focus conservation efforts at

---

[9] The highest density population of the smaller 66 Spalding's catchfly populations within the LIRA Project area is located within four pastures of the Rhodes Creek Allotment, which is the most-tenured, longest running grazing permit. AR 11488, 11383-85 & Map 8 and Table 13, 11400; *see also* AR 6503. All of the sites in this allotment "fall under the steep, deep soil, north aspect setting." AR 11400. This reinforces the need for long-term analysis, because the species is apparently thriving here. This isn't surprising. The Plant Biological Assessment indicates that "some level or frequency of careful livestock management could create opportunities for seed germination resulting from that activity opening 'space' in the grassland community . . . ." AR 11389. But "[g]auging how much ground disturbance is helping verses impacting seedlings or adults is very difficult to do." *Id.* "Habitat quality is one way to evaluate that point. Range condition data, soil condition data, ecology data and professional judgment will be utilized to the degree feasible to evaluate the risks of trampling impacts directly and indirectly to Spalding's Catchfly and to the habitat quality surrounding known occurrences." *Id.*; *see also* AR 8380 ("From at least 100 years ago until 2005, this land has been grazed with more livestock than what is currently grazed. Considering the abundance of the catchfly in these allotments, is grazing really impacting the viability of this species? Could current management actually be increasing the abundance of catchfly?").

Page 7    DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY
           JUDGMENT

larger populations of at least 500 plants.  AR 5849-50, 12774.  Significantly, the two closest
KCAs to the Project area are 12 miles away on Nez Perce tribal lands, and 17 miles away along
the Snake River.  AR 12775.  Surveys within the LIRA Project area have found about 66 smaller
patches, totaling close to 948 individual plants.  AR 12276, 12278 & Fig. 8, 12415, 12501,
12504, 11355-56 & Table 3a, 11380-86 & Map 7 and Table 13.  The Plant Biological
Assessment concluded that because of the probability that trampling impacts will occur to some
individuals, the Project may affect and is likely to adversely affect Spalding's catchfly.[10]
AR 11414.  Spalding's catchfly is listed as threatened under the Endangered Species Act.
66 Fed. Reg. 51,597 (Oct. 10, 2001).  FWS agreed in its Biological Opinion.  However, in view
of the species status, the environmental baseline for the LIRA Project area, the effects of the
proposed grazing, and anticipated cumulative effects, FWS agreed with the Forest Service and
concluded that the Project is "not likely to jeopardize the continued existence of Spalding's
catchfly" for the following reasons:

- Winter grazing will avoid direct effects from livestock herbivory to known occurrences of Spalding's catchfly from project activities.

- Management guidelines and conservation measures incorporated into the project proposal should minimize direct and indirect effects to known occurrences of Spalding's catchfly from project activities.

- Management guidelines and conservation measures proposed to protect currently known sites would be applied to any new occurrences discovered.

---

[10]  Notably, plaintiffs do not raise an ESA claim.  Unlike for fish and wildlife, there is no prohibition against incidental take while conducting an otherwise legal activity for a listed plant. The only requirement is to avoid jeopardy to the entire plant population.  And there is no evidence here that the entire population of catchfly is in jeopardy as a result of livestock grazing. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1145 (9th Cir. 2016).

DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY
            JUDGMENT

AR 12298-99 ("the project is not expected to appreciably reduce either the survival or recovery of Spalding's catchfly (due to conservation measures incorporated into the project).  No significant reduction in numbers, reproduction, or distribution is expected.  No critical habitat has been designated for this species; therefore, none will be affected.").[11]

In approving the LIRA ROD, the Forest Service chose "Alternative C-modified because it provides the most complete range of options for protecting Spalding's catchfly habitat." AR 12496, 12490 (Alternative C-modified "best meets the purpose and need of the project, while providing the most balanced approach for mitigating significant issues and resource concerns, with a feasible and implementable livestock operation."), 12501 (erratum for FWS Biological Opinion finding that Alternative C-modified would still have the same determination).

## III.    LEGAL STANDARD.

A court reviews alleged violations of NFMA, the HCNRA Act, and NEPA under the Administrative Procedure Act (APA).  *See, e.g.*, *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012); *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 929 (9th Cir. 2010).  A court will set aside agency action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This is a

---

[11] In reaching this conclusion, FWS made the following discretionary recommendations in its Biological Opinion:  (1) Where feasible, fence off some known Spalding's catchfly sites that have current soil disturbance/trampling impacts associated with cattle activity; (2) Look for opportunities to eliminate adverse effects associated with grazing, such as utilizing fencing to protect sites; (3) Conduct Spalding's catchfly surveys at non-inventoried habitat within suitable habitat; (4) Revisit a subsample of 20% of the known sites in each allotment on a rotation of one allotment per year for 12-years; (5) Monitor weather conditions to help substantiate assumptions on soil moisture, timing of use, and potential trampling impacts, and adaptively manage; (6) report survey and monitoring information; (7) develop management plan; and (8) conduct outreach and education regarding Spalding's catchfly conservation.  AR 12299-300.  FWS also reviewed Alternative C-modified and found that it still would have the same determination, although impacts would be reduced under the deferred rotation grazing strategy.  AR 12501.

"narrow" standard, and the court will not substitute its judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). Instead, a court will reverse "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, [] offered an explanation that runs counter to the evidence . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Review is deferential, and the agency's action carries a "presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

The court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis*, 747 F.3d at 601 (quotation omitted). The agency must make "a rational connection between the facts found and the conclusions made." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). "[W]here the agency's reasoning, although complex, is rational, clear, and complete, [the court] must affirm." *Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. E.P.A.*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (quotation omitted).

## IV.   ARGUMENT.

### A.   The LIRA Project Complies with NFMA.

Plaintiff alleges that the LIRA Project is inconsistent with the Forest Plan and violates NFMA. Pl's Mot. for Summ. J. & Mem. Supp., Dkt. 16 (Pl's Mem.) at 15-27. For the reasons set forth below, the Court should reject this argument and uphold the decision.

#### 1.   NFMA consistency requirement.

"NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native*

*Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).  First, the Forest Service

develops a Land and Resource Management Plan (forest plan), containing "broad, long-term

plans and objectives for the entire forest."  *Id.*  It then implements the forest plan through site-

specific projects.  *Id.*  The Forest Plan for the WWNF "provides guidance through its established

goals, objectives, desired future conditions, forest-wide standards and guidelines, and specific

[management area] direction."  AR 3565.  The 1990 WWNF Forest Plan incorporated the current

CMP in 2003 through a plan amendment.  AR 5191.  "[S]ubsequent Forest Plan amendments,

and terms and conditions related to consultation [under the ESA] provide existing management

direction for the HCNRA."  *Id.*

　　"While NFMA requires that the proposed site-specific actions be consistent with the

governing [f]orest [p]lan, the Forest Service's interpretation and implementation of its own forest

plan is entitled to substantial deference."  *Weldon*, 697 F.3d at 1056; *see also* 16 U.S.C. § 1604(i)

(requiring site-specific plans to be consistent with forest plans, which in turn must be consistent

with NFMA's substantive requirements); *Inland Empire Pub. Lands Council v. U.S. Forest

Serv.*, 88 F.3d 754, 757 (9th Cir. 1996).

## 2.　　The Forest Service's methodology for assessing viability is rational.

　　Contrary to plaintiff's argument, nothing in the Forest Plan, the CMP, or NFMA

establishes detailed standards for how to assess viability.  To add confusion, plaintiff misstates

plan directives applicable to rare and endemic plant species in an effort to elevate them to

enforceable, mandatory standards.  But conflating discretionary recommendations with Forest

Plan objectives does not state a justiciable NFMA claim.

　　As explained by the *en banc* panel in *McNair*, NFMA does not specify how the Forest

Service must demonstrate that its site-specific plans adequately provide for viability.  *Lands*

*Council v. McNair*, 537 F.3d, 981, 992 (9th Cir. 2008).  Noting the "inherent flexibility of NFMA," the court in *McNair* emphasized that "we defer to the Forest Service as to what evidence is, or is not, necessary to support" viability analyses.  *Id*.  A project can degrade habitat and still provide for viability.  *Id.* at 995, 997.  A viability analysis that uses all the currently available scientific data is considered sound.  *Id*. at 998 (citing *Inland Empire*, 88 F.3d at 762).

The heart of plaintiff's NFMA claim argues that the Forest Service must "manage habitat and populations" of all Spalding's catchfly in order to guarantee or "ensure their continued existence and viability in the HCNRA."  Pl's Mem. at 15, 22.  Plaintiff cites to Appendix C for this argument.  AR 4513.  However, the language plaintiff cites is an "objective," which differs from mandatory provisions that may be enforced as substantive NFMA violations.  Objectives are neither mandatory nor independently enforceable.  *See* AR 4426 ("Objectives" are "focused statements that describe the incremental progress expected to take place to meet goals . . . over the ten-year planning period").[12]  AR 4426; *see also Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1114 (9th Cir. 2015) (rejecting argument that forest plan "objective" should be construed as a "standard and guideline" such that compliance with recovery plans is mandatory); *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 851 (9th Cir. 2013) (court will defer to Forest Service's interpretation "unless it is plainly erroneous or inconsistent").  In contrast, the "Goal" for Biologically Unique Resources is to "[e]nsure the preservation of rare and endemic plant species" and to [p]rotect and manage habitat for the perpetuation and recovery of plants, which are listed as threatened . . . ."  AR 4820.

---

[12]  Collectively, goals, objectives, standards, and guidelines are used to describe the overall management direction applicable to each management area within the HCNRA under the Forest Plan, as amended by the CMP.  AR 4425, 4807.

Page 12   DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY JUDGMENT

Spalding's catchfly was already listed as threatened when the comprehensive CMP plan amendment was adopted in July 2003. AR 4780, 5191. The forest plan "standard" for rare and endemic plant species, in turn, requires the WWNF to: (1) survey for such species "to the extent feasible"; (2) "consider the effects of proposed projects" on populations; and (3) and prescribe "mitigation and protection."[13] AR 4513. In reauthorizing livestock grazing under the LIRA Project, the Forest Service complied with these directives through surveys, analyzing potential effects on the population, and implementing mitigation measures and protection. Specifically, the LIRA Project relied upon current survey information to document smaller populations of Spalding's catchfly within the project area.[14] AR 12275-76, 12278 & Fig. 8, 11355-56 & Table

---

[13] The CMP standard for rare and endemic plant species provides: "Bio-S1: during project-level planning, *to the extent feasible, survey and document* the location of populations . . . . *Consider the effects* of proposed projects on populations . . . . Prescribe[] *mitigation* and protection." AR 4513 (emphases added). The 1990 Forest Plan contains other directives for threatened plants as well: prepare a "biological evaluation during each project to determine possible effects," *see* AR 1941, and "protect and manage habitat for the perpetuation and recovery of plants." AR 1912.

Plaintiff also fails to address the Forest Service's compliance with Threatened, Endangered, and Sensitive Plant Species standards, which similarly call for surveying and mitigation. *See* TES-S1 ("When evaluating ongoing and new actions, survey probable habitat for rare plants. Mitigate potential conflicts or modify the project to ensure the protection of rare plants and their associated habitat."). AR 4515; and TES-S2 ("Monitor population trends and habitat conditions . . . ."). *Id*.

[14] The Plant Biological Assessment explains inherent limitations in obtaining comprehensive surveying and supports the Recovery Plan recommendations for long-term surveys and monitoring:

> While it is ideal to locate all TES plant locations within a project area, across a project area as vast as LIRA and with activities being so wide spread (pasture wide grazing) it was not feasible to survey all potential habitats or confidently locate all populations of TES plants. For LIRA, the goal was to detect as many TES plant occurrences as possible to facilitate environmental analysis and determine possible effects of this project. Areas designated for surveys were selected (through the pre-field review) based on professional judgment,

3a, 11380-86 & Map 7 and Table 13.  These are not Key Conservation Areas, but *potential* KSAs.  AR 12775.  The LIRA decision also considered potential environmental effects on populations and, consistent with the Recovery Plan's long-term efforts, acknowledges a need for long term population data.  AR 11675-79, 11692-699.[15]  The decision developed mitigation measures common to all grazing alternatives, which are incorporated into grazing strategies for further protection.  AR 11713-716.  Finally, the decision requires both short-term utilization monitoring and long-term effectiveness monitoring and explicitly reserves the Forest Service's right to adjust the timing, intensity, and duration of grazing based on site conditions to ensure recovery efforts are effective and the Forest Service and permittee can flexibly respond to actual range conditions through adaptive management.  AR 11716-18; *see also* AR 5047, 4757-72 (CMP monitoring guidelines), 9417 (term grazing permit reserving Forest Service's authority to modify timing, intensity, and duration based on resource conditions).

Although plaintiff demands comprehensive population trend data now, the discretionary actions under the Recovery Plan and recommendations under the Biological Opinion acknowledge that recovery efforts are long term through 2040.  AR 5853-53, 12298-99.  By addressing forest plan standards for conducting surveys, analyzing potential impacts, designing mitigation measures, and continuing with utilization and effectiveness monitoring, the Forest

---

reconnaissance visit results, GIS & Eveg data, aerial imagery, aspect and slope data, limited habitat modeling techniques and anticipated livestock use patterns.

AR 11380.

[15] "Population surveys are needed for trends to be considered over the long term of 5-20 years." AR 12168.  Thus, "simple population inventories do not give an accurate representation of the existing population.  As a result, quality of habitat defaults as a more reliable indicator of whether or not Spalding's catchfly has an opportunity to persist at its potential given the site characteristics and other external factors." *Id*.

Service has satisfied Bio-S1 to manage for rare and endemic plants.  This includes satisfying TES-S1 by surveying habitat and mitigating potential conflicts, and TES-S2 by monitoring population and habitat conditions.  AR 4515.  The Forest Service's methodology for how to assess viability is rational and should be upheld.

### 3. The Project is consistent with the Forest Plan and CMP.

Plaintiff also criticizes the Project for failing to base its conclusions on actual population monitoring trend data, *see* Pl's Mem. at 15-17, habitat necessary for viability, *id.* at 18, adequate vegetation and soils reports, *id.* at 18, 22-23, the degree of cattle grazing impacts on pollinators, *id.* at 19, and sufficient monitoring data.  *Id.* at 19-21.  However, plaintiff's demand for specific types of data do not make the WWNF's conclusions irrational, unclear, or unsupported, nor do they make the decision arbitrary or capricious.  *McNair*, 537 F.3d at 997. ("To always require a particular type of proof that a project would maintain a species' population in a specific area would inhibit the Forest Service from conducting projects in the National Forests.").

### a. Viability.

Plaintiff contends that the LIRA Project is inconsistent with the Forest Plan because it does not ensure species viability and recovery.  Pl's Mem. at 15-27.  However, the Forest Service's analysis and reports relied upon analyze species viability and recovery extensively. *See* AR 11694-696, 11712, 11714-717, 11727-737, 11806-833, 11839-40, 11858-882, 12138-163 (LIRA FEIS); AR 12487-494 (LIRA ROD); AR 5843-6045 (Recovery Plan); AR 11342, 11375-419 (Plant Biological Assessment); AR 12239-304 (FWS Biological Opinion); AR 3437-445 (Threatened Listing); AR 5841-42 (Best Available Science Guidance); AR 6897-98, 6963-68, 7261 (Invasive Plants Treatment FEIS); AR 9583 (Soils Report); AR 9850, 9856-67 (Microbiological Soil Crusts Report); AR 11457-58, 11527-30, 11534-41; AR 11544-52, 11555,

11573-78 (Rangeland Specialist Resources Report); and AR 12372 (Invasive Plants ROD).

The analysis and reports find that any impact to Spalding's catchfly is not likely to jeopardize the continued existence of the species. AR 12298-99. The fact that there may be some habitat disturbance does not mean that the species' viability would be threatened. "That a proposed project involves some disturbance to the forest does not prohibit the Forest Service from assuming that maintaining a sufficient amount of suitable habitat will maintain a species' viability." *McNair*, 537 F.3d at 998.

### b.    Habitat.

Plaintiff also claims that the Forest Service violated NFMA because it "never described" the quantity and quality of habitat necessary for viability of Spalding's catchfly. Pl's Mem. at 18. But this argument ignores detailed habitat data contained in multiple reports.

The very intent of the LIRA Project is to "reduce impacts (especially soil displacement *in Spalding's catchfly habitat*) from cattle travelling across wet soils on steep slopes." AR 12487-88 (emphasis added). This requires knowledge of habitat characteristics. Although the Recovery Plan is not binding, it provides guidance for the management direction in the LIRA ROD. AR 5843, 12430, 12491. The goal of the Recovery Plan is eventual delisting. AR 5850. The Recovery Plan identifies several recovery actions needed: (1) Conserve, identify, develop, and expand populations and habitat in five physiographic regions where the species resides; (2) Conduct general recovery actions across the range of the species; and (3) Develop a post-delisting monitoring plan. AR 5853. These actions envision developing habitat management plans at 27 key conservation areas that provide a strategy for managing the species sufficient to ensure long-term persistence. *Id*.

Habitat requirements are discussed in detail in the Recovery Plan.[16]  AR 5849-53.  The

Recovery Plan also discusses the plant's population trends and rangewide distribution, *see*

AR 5863-68, its life history and ecology, including challenges in conducting population

estimates and monitoring, *see* AR 5869-67, and specific habitat characteristics such as climate,

soils, and vegetation habitat types.[17]  AR 5875-82.  As the court explained in *McNair* in

distinguishing *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 933 (9th Cir. 2010),

"monitoring difficulties do not render a habitat-based analysis unreasonable, so long as the

analysis uses all the scientific data currently available."  *McNair*, 629 F.3d at 1082.  Here, the

---

[16]  Spalding's catchfly is a long-lived perennial flowering plant in the pink or carnation family with a lifespan that can exceed 50-years.  AR 5849, 11858.  It is regional and found in open, moist grassland and sagebrush-steppe, and occasionally in open pine communities, in eastern Washington, northeastern Oregon, west-central Idaho, western Montana, and extending into British Columbia.  AR 5849.  The plant is found at elevations ranging from 1,200 to 5,300 feet, usually in deep, productive loess soils (fine, windblown soils).  *Id.*  Plants are generally found in swales or where soil moisture is relatively higher.  *Id.*  Spalding's catchfly is impacted by habitat loss due to development, adverse grazing practices and trampling by ungulates, and invasions of aggressive nonnative plants.  *Id*.  In addition, a loss of genetic fitness (the loss of genetic variability and effects of inbreeding) is a problem for many small, fragmented populations.  *Id*.  Other impacts include changes in fire frequency and seasonality, off-road vehicle use, and herbicide spraying and drift.  *Id.*

[17]  Within its range of distribution, Spalding's catchfly occur within the regions of the Palouse Grasslands in west-central Idaho and southeastern Washington; the Channeled Scablands in eastern Washington; the Blue Mountain Basins in northeastern Oregon; the Canyon Grasslands of the Snake River and its tributaries in Idaho, Oregon, and Washington (the Canyon Grasslands in Wallowa County, Oregon are at issue here); and the Intermontane Valleys of northwestern Montana.  AR 5863.  In Oregon, Spalding's catchfly occurs only in Wallowa County.  *Id*.  When the Recovery Plan was adopted, the Forest Service had begun to survey active grazing allotments for inventories of Spalding's catchfly.  AR 5905.  Many areas still remained to be inventoried, however.  AR 5906.  "Because the Canyon Grasslands are extremely steep and quite remote," the Recovery Plan notes that "there are still significant portions of suitable habitat to be searched, particularly on the Oregon side of the Snake River . . . ."  AR 5906; *see also* AR 5939 ("The Canyon Grasslands are extremely steep and difficult to access, which has kept the habitat relatively intact and under surveyed.  For these reasons, it is expected that there are many more populations . . . with intact habitat.").  AR 5939.

Page 17    DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY
JUDGMENT

Forest Service adopted the ROD consistent with the forest plan and in consideration of best available science.[18]  AR 11926, 12072, 12099, 12111, 12114; *see also* AR 12491 ("We will continue to follow the best available science and guidance for protecting Spalding's catchfly and continue to gather additional information from our project area so that we can contribute to the community of knowledge about this special plant.").  The fact that the Forest Service does not have perfect information on population surveys and monitoring data while further efforts to gain knowledge are underway does not make the decision arbitrary.  *See, e.g., All. for Wild Rockies v. Kimbell*, 310 F. App'x 106, 108 (9th Cir. 2009) ("Although the Forest Service has not presented perfect information, 'monitoring difficulties do not render a habitat-based analysis unreasonable'. . . ." (citing *McNair*, 537 F.3d at 998)).

The Recovery Plan "emphasizes conservation efforts for larger populations" of Spalding's catchfly "while attempting to preserve the genetic diversity within each of the five physiographic regions where the plant resides."  AR  6063, 5853.  "Estimating minimum population sizes needed to ensure long-term viability" is a challenge, and the analyses must use computer modeling to estimate populations into the future incorporating various threats under difference management scenarios.  AR 5916.  Detailed information on recruitment, growth,

---

[18]  Plaintiff asserts that the Forest Service has unlawfully failed to analyze the degree of cattle grazing impacts on pollinators, because the issue has never been studied in the LIRA area.  Pl's Mem. at 19.  However, the Forest Service included in its analysis the most-recent scientific literature "on the effect of grazing intensity on native bee communities in a North American grassland."  AR 11862-62.  The best available science indicates that forage utilizations approaching 50 percent showed "very little to zero bumblebee abundance," and the LIRA Project was designed mindful of this issue.  *Id*. at 11862 ("Therefore, management practices that significantly reduce pollinators, especially bumblebees, could have a significant impact on the recruitment of new plants."), 11874, 11389, 11413; AR 12272-73 (FWS Biological Opinion explaining that one rationale of grouping sites within one mile is that "genetic exchange via pollen transfer may be extremely rare for distances over one mile").

mortality, and age structure of the population are required to model population persistence, and "consequently many years of monitoring will be needed to acquire the data necessary to conduct a population viability analysis."[19] *Id.* "Without a population viability analysis, minimum viable population numbers for plants must be estimated utilizing data from the general literature and comparisons with similar species." *Id.* (citing scientific literature on factors and limitations influencing minimum viable population analysis).

The Recovery Plan indicates that "[u]ntil a population viability analysis has been done [for Spalding's catchfly] that models which populations are viable under various management strategies, a minimum of 500 reproducing individuals – assumed to represent the minimum viable population size – will be the default goal for all key conservation areas in each of the five physiographic regions." AR 5930 (emphasis added). Within the Canyon Grasslands of Oregon, 22 known populations and 5 *potential* KCAs were noted.[20] AR 5932 & Fig. 7; *see also* AR 5938 (three of these populations number "more than 500 individuals"; and two have lower populations – Captain John Creek has at least 223 individuals, and Billy Creek at least 220 individuals).

---

[19] *See* AR 12190 (in response to comment #62 that McClaran Ranch's "[c]urrent management has evolved since 2004, which hasn't been long enough to develop any legitimate trends," the Forest Service noted that "[d]etermining trend specifically from 2004 to present is more difficult because data was not collected in 2004-2005, but rather in 2009 and 2012 and did not capture the first 5 years of the reduction of livestock (approximately 29%) in the Cow Creek, Rhodes Creek, and Toomey allotments. . . . All the grazing alternatives (B, C, D, and E) propose monitoring to better track how grazing management changes affect resources such as soils, rangeland vegetation condition, and TES species listed plants such as Spalding's catchfly.").

[20] Under the Recovery Plan, a key conservation area has the following qualities: intact habitat (not fragmented), preferably 40 acres in size or greater; native plants comprise at least 80 percent of the canopy cover of the vegetation community; adjacent habitat sufficient to support pollinating insects; habitat is of the quality and quantity necessary to support at least 500 reproducing individuals. AR 5850, 11379-80.

Page 19      DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY
             JUDGMENT

Spalding's catchfly habitat is also discussed extensively in the Plant Biological Assessment, *see* AR 11344-388, 11405-14, and described in the Biological Opinion in connection with its listing status, *see* AR 12266, species description and taxonomy, *see* AR 12266-67, and its environment and habitat, which describes the five regions where Spalding's catchfly is found.  AR 12267-69.  Its habitat is also addressed in the portions of the Biological Opinion addressing distribution, life history and populations, *see* AR 12270-73, and conservation needs.  AR 12273-74.  In supporting the LIRA ROD, the FEIS also extensively addresses Spalding's catchfly habitat characteristics.  AR 11676, 11679, 11694-696, 11714, 11727, 11806-807, 11812-821, 11836, 11839-40, 11865.

Contrary to plaintiff's criticisms, the record abundantly describes habitat quality and quantity, as well as the locations of both smaller and larger populations.

### c.    <u>Small populations</u>.

Plaintiff further argues that the LIRA decision is unlawful because grazing will occur in areas with "vulnerably small populations that are currently below minimum viability thresholds." Pl's Mem. at 22.  Plaintiff insists that the recommendations in the Recovery Plan are mandatory and "must" be implemented.  *Id*. at 22-24.  These arguments, however, ignore that the nature of recovery efforts is a long-term process using guidance from a Recovery Plan, which contains recommendations, not mandatory measures.  Moreover, the Forest Service complied with Forest Plan standards by utilizing population survey information, considering potential impacts on the population, and by implementing mitigation measures and protection.  AR 4513.

Appendix C to the Recovery Plan "identifies the recovery actions *recommended*" to address threats and eventually, the "sufficient reduction of those threats to consider delisting."

AR 6028 (emphasis added).  To address adverse livestock grazing and trampling within the

Canyon Grasslands, FWS recommends:

(1) Conserve and work to enhance the five populations within the Canyon

Grasslands identified here as *potential* KCAs, and conduct further surveys to identify at

least two new populations and *potential* KCAs within the Canyon Grasslands with over

500 individuals.[21]  AR 5924 (emphases added), 6028, 5977, 5981;

(2) Develop general management plans to include the species where it resides.

AR 5926, 6028, 5980;

(3) Habitat management plans and recovery actions should manage for impacts

and threats to populations and habitat both at KCAs and at smaller populations.

AR 5926, 6028;

(4) Monitor and manage livestock grazing and associated management activities

to avoid impacts to populations and habitat.  AR 5927, 6028, 5983;

(5) Conduct research essential to managing livestock, wildlife, and insect

herbivory at populations.  AR 5928, 6028, 5988;

(6) Support conservation on privately owned lands.  AR 5929, 6028, 5989; and

(7) Secure funding for implementation of recovery tasks.  AR 6028.

The Recovery Plan indicates that if recovery actions are prompt and effective, delisting

might be possible in 2040.  AR 5853-53.  Anticipated recovery actions will cost more than an

estimated $8.6 million between dozens of key parties, with roughly a quarter of that amount for

---

[21]  As noted above, none of the LIRA Project area is contained within a KCA.  The closest KCA is 12 miles away.  AR 11380.  This underscores why plaintiff's NFMA claim lacks merit. Plaintiff attempts to elevate a plan objective to a mandatory standard, and then seeks to enforce discretionary recommendations as independently enforceable action items.

surveys and monitoring.  *Id*. at 5853, 5976-90.  Because the annual counts for the species vary so

much in response to climatic events (i.e., precipitation, temperature), and plants can exhibit

prolonged dormancy with all portions of the plant remaining below ground for up to three years,

the Recovery Plan acknowledges that "a minimum of 20 years of monitoring will be needed to

determine long term population trends.  The estimated recovery date accounts for this long-term

monitoring as well as the time it may take to supplement or establish new populations."

AR 5855; *see also* AR 5975 ("Continual and ongoing costs, as well as the estimated total cost,

are based on a projected 34-year timeframe.").

The Recovery Plan suggests that "properly managed livestock grazing may be

compatible" with conservation efforts, *see* AR 5899, but that "[a]dditional research is needed

relating to herbivore impacts from both domestic and wild ungulates as well as more intensive

monitoring at populations that are being grazed."[22]  *Id.*; *see also* AR 5957.  The Recovery Plan

also anticipates that grazing will occur within Spalding's catchfly habitat and that where they co-

occur, "careful management and monitoring is needed."  AR 5957.

Plaintiff contends that the Forest Service ignored scientific literature showing that small

isolated populations outside of KCAs (the entire Project area) are "vulnerable," *see* Pl's Mem. at

---

[22]  McLaran Ranch's has a solid track record of excellence in stewardship and grazing
management practices and has never been notified of overutilization or noncompliance in the
project area allotments.  AR 12190 (response to comment #61 in FEIS from Forest Service
stating: "Thank you for being responsible and complying with the McClaran Ranch Inc. Term
Grazing Permit.").  During LIRA planning, McClaran Ranch offered to install fencing, enclosure
protection, and move water troughs and salt away from known sites to help protect the species.
*Id*. at 12190-91 (Forest Service response to comment #64: "Thank you for being diligent in
managing the Allotments . . . .").

Controlled livestock grazing can also improve foraging habitat available to elk and other wild
ungulates inhabiting pastures following cattle departures.  AR 12191.  Rocky Mountain Elk and
deer are thriving in the LIRA Project area because of livestock use.  *Id*.; AR 12282.

16, but the plant's range, distribution, and grazing impacts on isolated small populations were considered and analyzed in the EIS.  AR 11832, 11858, 11868, 11901-02.  This analysis aligns with the Recovery Plan, which discusses problems associated with small, geographically isolated populations.  AR 6028, 5867, 5888 ("Most populations of *Silene spaldingii* are restricted to small, remnant patches of native habitat."), 5895, 5913-16, 5942, 5949, 5963, 5973, 6007.

Plaintiff also complains that under TES-G2, the Forest Service must "exclude" livestock grazing where it conflicts with protecting rare plants.  Pl's Mem. at 16.  However, the Forest Service's approach to mitigate impacts does exactly that.  The Recovery Plan recommended "buffers" for population sites, *see* AR 5889, 5930-35, and buffers were initially analyzed and applied as project design criteria common to all grazing alternatives analyzed.  AR 11710, 11712.  However, in lieu of initially requiring buffers, the LIRA adopted an approach to reduce impacts under a deferred rotation grazing strategy for pastures within the Rhodes Creek, Toomey, and Lone Pine allotments.  AR 12501 & Table 3.  FWS analyzed that strategy and found that Alternative C-modified would still have the same determination.  *Id.*

Recovery plans for threatened species such as Spalding's catchfly fall under Section 4(f) of the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544, which is fundamentally different from other ESA provisions such as Section 7 (consultation) and Section 9 (take).  Section 4(f) requires federal agencies "to develop and implement" recovery plans for the "conservation and survival" of threatened and endangered species.  16 U.S.C. § 1533(f)(1).  ESA Section 4(f) provides general guidance as to the substance of recovery plans and is considered *inherently discretionary*.  16 U.S.C. § 1533(f)(1).  As such, recovery plans do not have the force of law and are considered only guidelines.  *See, e.g., Cascadia Wildlands v. Thraillkill*, 49 F. Supp. 3d 774, 787 (D. Or. 2014) ("plaintiffs' argument fails because recovery plans do not have the force of

law") (citing *Friends of Blackwater v. Salazar*, 691 F.3d 428, 432–34 (D.C. Cir. 2012); *Fund for Animals v. Rice*, 85 F.3d 535, 547 (11th Cir. 1996) ("By providing general guidance as to what is required in a recovery plan, the ESA 'breathes discretion at every pore.'")), *aff'd*, 806 F.3d 1234 (9th Cir. 2015). "They are not binding on federal agencies."[23] *Thrailkill*, 49 F. Supp. 3d at 787.

In short, there is no substantive basis for plaintiff to argue that the Forest Service must follow the discretionary recommendations in the Recovery Plan to the letter in its LIRA decision by strictly implementing "key recovery actions." Plaintiff cannot combine unenforceable forest plan objectives with discretionary recommendations and create a justiciable NFMA claim.

### d.    Soils.

In adopting Alternative C-Modified, the Forest Service considered guidance from both the Recovery Plan and the Plant Biological Assessment and struck a balance in allowing continuing grazing at historically low levels using new management strategies, while providing the most "complete range of options for protecting Spalding's catchfly habitat." AR 12491. Plaintiff presents a laundry list of criticisms, such as "limited vegetation and soils data," *see* Pl's Mem. at 18, but the FEIS fully analyzed effects from grazing on soil, native plant, and biological crust conditions. AR 12492. The decision protects soils by implementing rest-rotation in the Toomey Allotment in areas with soil concerns, and by adopting deferred grazing rotations in 10

---

[23] *See also Friends of Blackwater v. Salazar*, 691 F.3d 428, 434-34 (D.C. Cir. 2012); *Defenders of Wildlife v. Lujan*, 792 F. Supp. 834 (D.D.C. 1992); *Fund for Animals v. Rice*, 85 F.3d 535, 547 (11th Cir. 1996) (Recovery Plans provide "general guidance as to what is required")(quoting *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir.1975)); *see also Biodiversity Legal Foundation v. Norton,* 285 F. Supp. 2d 1, 14 (D.D.C. 2003)(the Court agrees that the "Recovery Plan was merely a guideline, which FWS had discretion to follow"); *National Wildlife Fed'n v. National Park Service*, 669 F. Supp. 384, 388 (D. Wyo. 1987) ("Plaintiffs would urge upon this Court that the language § 1533(f) obligates the Secretary to develop and implement a recovery plan, and that, once developed, all concerned agencies must adhere to it. The language does not so say.").

pastures throughout the Rhodes Creek, Lone Pine, and Toomey allotments.[24]  AR 12492, 12501 & Table 3.  Given that these allotments are primarily used for winter grazing, "[p]astures are not grazed the same time every year when soils are most likely to be soft and most vulnerable to livestock impacts."  AR 12492.  This addresses concerns with terraces and "promotes good rangeland vegetation and soil health by increasing soil organic matter, infiltration, soil stability, and decreasing erosion."  *Id.*; *see also* AR 11518-20.  This also "[r]educes soil disturbance during the period when soils could be wet, reduces the risk of damage to biological soil crusts, and reduces the potential for invasive plant establishment."  *Id.*

Plaintiff also argues that portions of monitoring data show unsatisfactory soil conditions detrimentally impacted from livestock grazing.  *See* Pl's Mem. at 19-22.  Yet, plaintiff's selective references to soils monitoring is misleading and ignores larger monitoring and recovery efforts.  Instead of ignoring range health, the Rangeland Resources Report *discloses* quantitative monitoring and inventory information for each allotment through its Interpreting Indicators of Rangeland Health (IIRH) assessment tool.  AR 11474.  These assessments evaluate soil/site stability, hydrologic function, and biotic integrity at the site level and "can be used to provide early warnings of resource problems" so that the Forest Service can respond through mitigation, protection, and further utilization and effectiveness monitoring.  *Id.*

Although plaintiff argues that the LIRA Project is incompatible with "conservation and

---

[24] An illustrated example of Alternate C-modified's deferred/rest rotation strategy is contained in the LIRA ROD.  *See* AR 12501 & Table 3.  Pastures are deferred each third or fourth year depending on site-specific conditions.  *Id.*  The use of adaptive management in this context has been upheld where it is "adequately explained" in the EIS, and the agency has reasonably applied it to the programmatic decision.  *People of California ex rel. Lockyer v. U.S. Dep't of Agric.*, No. 2:05-CV-0211-MCE-GGH, 2008 U.S. Dist. LEXIS 72817, at *27 (E.D. Cal. Aug. 18, 2008), *as amended* (Sept. 3, 2008), *aff'd sub nom. Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011).

preservation mandates" because grazing will occur in "already degraded pastures containing catchfly sites on slope with sensitive soils," *see* Pl's Mem. at 28, the LIRA FEIS and various reports show that the Forest Service is well aware of these soil concerns.  Recent monitoring has shown an "an improvement in upland range condition as perennial native species and other desirable vegetation is increasing within the project area" with only a few upland areas within the LIRA area "in unsatisfactory range condition."  AR 11691, 12190.  "Overall, rangeland conditions within the LIRA area are satisfactory and on an upward trend."[25]  *Id*.  As for areas in unsatisfactory condition, the Forest Service may use "appropriate adaptive management and/or mitigations to address the site-specific issues."  *Id*.; *accord* 36 C.F.R. § 292.48 (if domestic livestock grazing becomes incompatible, the use may be "modified as necessary to eliminate or avoid the incompatibility"); *see also* AR 9417.

Contrary to showing that the Forest Service is managing for "extreme departures" in soil and resource conditions," *see* Pl's Mem. at 20, the IIRH assessments and ongoing monitoring provide comprehensive data to "ensure compliance" with permitted grazing and move "towards a desired condition as defined in the Forest Plan and CMP."  AR 11475, 11478; *see also* AR 11496-526 (LIRA allotment assessments); AR 5052 (range analysis studies from 1950s to present show 97 percent in "fair condition or better," indicating "the majority of vegetative communities" are in satisfactory condition and healthy and viable).

For the above reasons, the LIRA Project is consistent with the Forest Plan and CMP, and plaintiff's NFMA claim should be dismissed.

---

[25]  There are some local sites deemed unsatisfactory, but these sites already crossed a threshold by heavy historic use, "and it is not possible to return them to their [Potential Natural Community] PNC without an expensive and intensive restoration program."  AR 12190, 11808.  The Forest Service is aware of this issue and the need to prevent these sites from getting "worse than they currently are."  *Id*.

**B.**    <u>**The Project is Compatible with the HCNRA Act**</u>.

Congress established the Hells Canyon National Recreation Area (HCNRA) in 1975 by enacting the Hells Canyon National Recreation Area Act (HCNRA Act), 16 U.S.C.A. § 460gg-460gg-13.  The specified purpose of the HCNRA Act is "[t]o assure that the natural beauty, and historical and archeological values" of this area "are preserved for this and future generations, and that the recreational and ecologic values and public enjoyment of the area are thereby enhanced."  16 U.S.C. § 460gg(a).

Under Section 7 of the Act, the Secretary of Agriculture is required to administer the area "in a manner compatible" with multiple objectives, including: (1) the protection of free flowing rivers; (2) conservation of scenic, wilderness, cultural, scientific, and other values contributing to the public benefit; (3) preservation, especially in the area generally known as Hells Canyon, of features believed to be biologically unique; (4) protecting fish and wildlife habitat; (5) protecting archeological sites; (6) preserving and restoring historic sites typifying the economic and social history of the region and American West.  16 U.S.C. § 460gg-4.  Section 7 expressly provides that grazing is an existing use compatible with the HCNRA, and it should be managed for objectives that include: (7) grazing as is "compatible with the provisions of this subchapter."  *Id.* Under the HCNRA, "ranching" and "grazing . . . *as they exist on December 31, 1975*," are expressly recognized as traditional and valid uses of the recreation area.  16 U.S.C. § 460gg-10 (emphasis added).[26]

---

[26]  In preparing the CMP, the Forest Service recognized that "[l]ivestock management on NFS lands is authorized by 36 CFR 222, Subparts A and C.  Policy directs managers to issue grazing permits for areas in which grazing use helps promote local economic stability and meets the resource management objectives stated in the local land management plan (FSM 2230.1 and 2230.3).  The HCNRA Act identifies that 'management, utilization, and disposal of natural resources on federally owned lands, including . . . grazing . . . are compatible with the provisions of this Act.'"  AR 5046 (quoting 16 U.S.C. § 460gg-4 (HCNRA Section 7-7)).

Livestock grazing is compatible with conservation objectives under the Act.[27]  AR 3459.

The purpose of the Project assessed potential impacts of re-authorizing permitted livestock

grazing to Spalding's catchfly, and for consistency with the Forest Plan and CMP.  AR 12486-

87.  The LIRA ROD notes that:

> Grazing is one of the many uses allowed on NFS lands and in Hells
> Canyon. Forest Service policy is to make forage available to qualified livestock
> operators on lands suitable for grazing, provided it is consistent with land
> management plans and meets the terms of the administrative permit.  Livestock
> grazing has been permitted on these allotments since the early 1900's [sic] and
> continues to be an important contribution to the economy and rural life style of
> Wallowa County.  Grazing is also recognized as a traditional and legitimate use of
> the Hells Canyon National Recreation Area.

AR 12487 (emphasis added); *see also* AER 9590 ("Natural resource based production has and

continues to be a major staple in Wallowa County's economy."); 36 C.F.R. § 222.2(c); Forest

Service Manual § 2203.1.[28]

The LIRA decision was "[b]ased on the analysis described in the FEIS, associated project

record, and close consideration of public input received through scoping, collaboration,

comments, and the objection process," and the chosen Alternative C was "modified as a result of

input received during the objection process" following the release of the 2015 FEIS.  AR 12487.

The ROD documents how the Project *promotes* conservation of Spalding's catchfly, while also

allowing for responsible use of the area's range resources to support livestock grazing.

---

[27]  Defendant-intervenors join in federal defendants' argument that plaintiff has waived and
forfeited its third claim under the HCNRA Act for failure to make a formal objection during the
administrative process as required by 36 C.F.R. § 218.8(a).  *See* Defs.' Cross MSJ at 35-36;
Dkt. 21.  To avoid duplication, defendant-intervenors incorporate that argument in full.

[28]  Agriculture accounts for approximately 60% of Wallowa County's tax base, and federal
lands grazing is essential to the economic viability of numerous ranches and ranching families
that contribute to the economic base of the county.  Declaration of Todd Nash ¶¶ 3-4; Dkt. 8;
AR 9590-91, 9595-98.  Many other Wallowa County businesses also indirectly depend on public
lands grazing by supplying goods and services to livestock operations in the county.  *Id.*

AR 12488.  The decision recognizes that grazing "is important to the rural lifestyle and economy

of Wallowa County" and "can have impacts on sensitive resources in the Hells Canyon National

Recreation Area, but *mitigation measures and specific design features can greatly reduce those

impacts.*"[29]  AR 12490 (emphasis added).

       The selected alternative for the LIRA Project was chosen "because it provides the *most

complete range of options for protecting Spalding's catchfly habitat*[,]" and "introduces

additional management activities to protect the habitat and plants while monitoring changes to

determine the effectiveness of those management changes."  AR 12491 (emphasis added).  The

Forest Service's determination that the LIRA project is compatible with HCNRA objectives is

rational, supported by the record, and should be upheld.  AR 12487 ("Our policy in the Forest

Service is to contribute to the economic and social well-being of people by providing

opportunities for economic diversity and by promoting stability for communities that depend on

rangeland resources for their livelihood (Forest Service Manual 2202.1).").

       **C.**    **The Decision Complies with NEPA**.

            **1.**    **The Forest Service was not required to analyze a reduced-grazing alternative**.

       Plaintiff argues that the Forest Service should have examined alternatives which would

have further (1) eliminated grazing in pastures or areas with known catchfly sites (i.e. exclude

sites from pasture boundaries); (2) eliminated grazing during late winter/spring in areas where

catchfly and their habitat (slopes with deep soils) are highly susceptible to adverse grazing

---

[29]  The lower Imnaha River corridor is designated as scenic under the Wild and Scenic Rivers
Act.  AR 2318.  Unprecedented in other plans, the Management Plan for the river adopted an
Outstanding Remarkable Value called "traditional value/lifestyle adaptation," which calls for the
continuation of compatible ranching and farming.  AR 2330-32; AR 2338 ("Maintain the small
ranch/farm setting that has existed over time.").

impacts; or (3) operated consistently with the Recovery Plan. Pl's Mem. at 30-32. The Forest Service, however, is not required to include every alternative demanded by plaintiff.

NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). This provision requires the agency to give full and meaningful consideration to all reasonable alternatives. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005).

Not every potential alternative requires rigorous exploration. The discussion of alternatives is subject to a "reasonableness" standard. *Alder v. Lewis*, 675 F.2d 1085, 1097 (9th Cir. 1982). The purpose and scope of the project defines reasonableness. *See Trout Unlimited v. Morton*, 509 F.2d 1276, 1286 (9th Cir. 1974) (holding range "need not extend beyond those reasonably related to the purpose of the project."). NEPA does not compel an agency to consider alternatives that would not fulfill the objectives of the proposed project. Further, agencies have "considerable discretion to define the purpose and need of the project." *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998); *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986). Similarly, an agency need not "consider alternatives which are infeasible, ineffective, or inconsistent" with the basic policy objectives for the management of the area." *Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994).

Here, the purpose of the LIRA Project is to assess the re-authorization of livestock grazing on the four allotments in the project area, in a manner that is consistent with the Forest Plan and CMP. AR 12486. The Forest Service, in turn, analyzed five (5) alternatives which

would allow grazing in the project area to varying degrees before settling on Alternative C—

Modified because, among other things, it offers the *most protection to the Spalding Catchfly*.

AR 12491. Although plaintiff contends that the range of alternatives was inadequate, plaintiff is

wrong. In addition to a "no grazing" alternative, which is facially contrary to the HCNRA Act,

the Forest Service did analyze alternatives calling for reduced grazing.[30] AR 12495 (Alternative

D would lead to a reduction of 1,800 HM due to rest periods).

To include plaintiff's demand for further reduced grazing alternatives would be

redundant, as the alternatives already analyzed would lead to comparable results. *See* AR 12487

(Alternative C-modified leads to deferment of grazing on certain plots dependent on soil

conditions; "The intent of this approach is to reduce impacts (especially soil displacement in

Spalding's catchfly habitat) from cattle traveling across wet soils on steep slopes. Potential

impacts are minimized when grazing occurs on soils that are dry or frozen (fall through winter

season)."); AR 12491 (Grazing during winter reduces potential impacts of grazing on both

habitat and Spalding Catchfly); AR 12495 (Alternative D would have provided rest and

"deferment of pastures within all four allotments. There would be a reduction in use (1,800 HM)

due to the rest periods scheduled for each allotment"). *See also* AR 12173, 12198 (response to

comments describing reduced grazing rigorously evaluated among alternatives).

Furthermore, the Forest Service analyzed and continues to analyze reduced grazing

through its management practices, because reduced grazing is inherently included due to the

Forest Service's explicit authority to modify grazing intensity, timing, and duration under permit

conditions. As already discussed, Alternative D would have reduced grazing due to resting

---

[30] The Forest Service agreed that "eliminating" livestock grazing "would not meet the intent of Section 7(7) or Section 13 of the HCNRA Act that allows for livestock grazing as long as it is compatible with other resource objectives." AR 4420.

pastures.  Reduced grazing is also inherent in practice, because modifications and adjustments as to timing, intensity, and duration are made based upon local, site specific conditions.  For example, the Forest Service's Annual Operating Instructions (AOIs) agreed to by the permittee prior to each season are drafted to reflect on-the-ground conditions and tailored to meet and respond to site specific range conditions.  *See, e.g.*, AR 11714, 11718, 11727; *see also* AR 12506-14 (2015-2016 Annual Operating Instructions for the Cow Creek, Rhodes Creek, and Toomey Allotments).  Beyond the AOIs, if issues arise, the Forest Service will "meet with the permittee to determine if there is flexibility in the grazing schedule and/or number of cattle to reduce or rest pastures."  AR 11714.  In addition, the Forest Service is tasked with monitoring both the short- and long-term impact of grazing on Spalding's catchfly.  AR 11714.  The Forest Service uses these results to modify site-specific grazing management practices, including reducing allowable use or shortening season of use if necessary.  AR 11717.

Thus, because the Forest Service included a reasonable range of alternatives consistent with the purpose and need for the project, and reduced grazing was and continues to be analyzed, plaintiff's NEPA claim demanding "somewhere in the middle" reduced-grazing alternatives is without merit and should be dismissed.

### 2.  The Forest Service took a hard look at environmental impacts.

The Forest Service took the requisite "hard look" under NEPA.  As noted above, an agency satisfies the hard look requirement if its EIS goes beyond generalized statements about possible effects and engages in "a reasonably thorough discussion of the significant aspects of the probable environmental consequences."  *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996).  Here, plaintiff argues that the Forest Service failed to take a hard look because it lacked adequate data on the Spalding catchfly.  Pl's Mem. at 33-34.  Yet, plaintiff never states

what *would* constitute adequate data other than generally referencing "inadequate monitoring" and "viability and recovery" assumptions. *Id*.

The agency can estimate baselines using data from a similar area, computer modeling, or some other reasonable methodology as long as the baselines are based on accurate information and have defensible reasoning. *Great Basin Resource Watch v. Bureau of Land Management*, 844 F.3d 1095, 1101 (9th Cir. 2016).

Plaintiff claims that the Forest Service "mistakenly relies on future monitoring" to support its claim that the Forest Service lacks data necessary to fulfil its "hard look" obligation, and that the agency is attempting to "approve first, study later." Pl's Mem. at 33. However, the Forest Service has thoroughly evaluated habitat conditions necessary to support viable Spalding's catchfly populations, identified potential threats to those habitat conditions, and implemented grazing management strategies to mitigate impacts. While ongoing monitoring of the effects of grazing on Spalding's catchfly within the LIRA Project area is necessary to establish future population trends, the Forest Service's acknowledgement that data gathered through end-of-season monitoring will help guide grazing management in the future does not render the agency's analysis insufficient.

The Recovery Plan for Spalding's catchfly identifies habitat loss and degradation as major impacts to the species. AR 5849. The LIRA FEIS describes grazing management strategies that will help ensure protection of Spalding's catchfly sites and the habitat conditions that support the species, such as deep soils on north-facing slopes. The Recovery Plan establishes population distribution and size goals for each region where the species is found. AR 11839, 5920-21. The Forest Service states in the ROD and FEIS that "[r]ecent monitoring results from the LIRA project area indicate an overall improving trend in rangeland conditions."

AR 11674 (FEIS); AR 12486 (ROD).  These findings are based on measurement of "multiple indicators of soil, plant, hydrology, and biological crust."  AR 11674.  The Rangeland Resources report, *see* AR 11455-585, evaluates three important "indicators of rangeland health" (soil and site stability, hydrologic function, and biotic integrity) for each pasture of all allotments within the LIRA Project area.  AR 11501.  Moreover, Spalding's catchfly population trends have been analyzed on three separate occasions (2003, 2009, and 2015) through consultation between the Forest Service and FWS.  AR 11348.

The Forest Service has clearly identified the potential impacts that livestock grazing and other significant threats can have on Spalding's catchfly, and then sought to reduce those threats through mitigation measures, short-term utilization monitoring, and long-term effectiveness monitoring.  12487-90.  The mitigation actions included in the Project, as well as the use adaptive management practices to flexibly respond to actual site conditions, are a legitimate means to ensure that the grazing strategies remain consistent with recovery efforts.[31]

While the management approach adopted in the LIRA Project will be guided by the results of future monitoring efforts, current grazing management strategies were developed based on the Forest Service's *current* understanding of the habitat requirements of Spalding's catchfly as defined in the FEIS and based on the best available information.  AR 12169 (response to comment explaining that quality of habitat will serve as baseline); AR 11839-40 (describing habitat characteristics and populations of known plants within the LIRA Project area).

---

[31]  Livestock behavior is malleable and can be changed substantially through site-specific management.  "Ongoing research suggests that grazing patterns of livestock can be manipulated sufficiently to resolve most, if not all, resource concerns with grazing.  Managers have the potential to manipulate abiotic and biotic characteristics of their pastures and/or change the animals and their behavior so that habitat conditions are favorable for the livestock and so that land use objectives can be met at the same time. (Bailey, 2005)."  AR 11812

Plaintiff also contends that the Forest Service failed to take a hard look at Catchfly viability and recovery.  However, as discussed above in responding to plaintiff's NFMA viability arguments, the Forest Service did take the requisite hard look.  *See* AR 12491 (explanation in ROD regarding how Alternative C-modified addresses issues); AR 11694-95 (discussion in FEIS regarding significant issue of species); AR 11839-40 (discussion in FEIS regarding populations and habitat); AR 11857 (FEIS Table summarizing "Effects and Determinations for all Alternatives to Spalding's Catchfly"); AR 11865-66 (discussion in FEIS regarding population factors); AR 11858-59 (discussion in FEIS of Effects Common to Spalding's catchfly Across Its Range); AR 11859-82 (analysis of both direct and indirect effects).  The LIRA analysis and reports demonstrate that the Forest Service took a hard look at the effects that each alternative would have on Spalding's catchfly and carefully selected the best alternative to ensure the plant's viability and recovery.  In approving the LIRA ROD, the Forest Service complied with NEPA. Summary judgment should be granted dismissing plaintiff's NEPA claim.

## V.    <u>CONCLUSION</u>.

For the reasons set forth above, Defendant-Intervenors' Cross Motion for Summary Judgment should be granted, and Plaintiff's Motion for Summary Judgment should be denied.

Respectfully submitted this 6th day of August 2018.

<u>/s/ Caroline Lobdell</u>
Caroline Lobdell, Ore. Bar No. 021236

Shay S. Scott, Ore. Bar No. #934214
Western Resources Legal Center
9220 SW Barbur Blvd., Suite 327
Portland, OR 97219
Telephone: (503) 768-8500
Fax: (503) 222-3255
clobdell@wrlegal.org
sscott@wrlegal.org

## **CERTIFICATE OF SERVICE**

I, Caroline Lobdell, hereby certify that on August 6, 2018, I caused the foregoing to be served upon counsel of record through the Court's electronic service system.

DATED: August 6, 2018.

/s/ Caroline Lobdell
Caroline Lobdell

DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY JUDGMENT