Caroline Lobdell, Ore. Bar No. 021236
Shay S. Scott, Ore. Bar No. 934214
Western Resources Legal Center
9220 SW Barbur Blvd., Suite 327
Portland, OR 97219
Tel: (503) 768-8500
Fax: (503) 222-3255
Email: clobdell@wrlegal.org
Email: sscott@wrlegal.org

*Counsel for Defendant-Intervenors*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL**, An Oregon nonprofit corporation | Case No. 2:18-cv-00054-SU |
| Plaintiff, | **DEFENDANT-INTERVENORS' REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **KRIS STEIN**, District Ranger for the Hells Canyon National Recreation Area, Wallowa-Whitman National Forest, in her official capacity; and **UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture | |
| Defendants, | |
| and | |
| **MCCLARAN RANCH, INC.**, an Oregon Domestic Business Corporation, and **WALLOWA COUNTY**, a political subdivision of the State of Oregon | |
| Defendant-Intervenors. | |

# **TABLE OF CONTENTS**

I.     REPLY ............................................................................................................... 1

II.    ARGUMENT ..................................................................................................... 2

       A.  The LIRA Project Complies with the HCNRA Act ....................................... 2

           1.   The forest plan does not alter the Forest Service's multiple-use mandate ............ 2

           2.   CMP objectives do not change the inherently discretionary nature of recovery
                plan recommendations ........................................................................... 3

           3.   Grazing is critically important to the region and recognized as a valid,
                traditional multiple use under the HCNRA Act .......................................... 5

       B.  The LIRA Project Complies with NFMA ................................................... 7

           1.   The Forest Service has wide latitude in addressing viability .................................. 7

           2.   The Forest Service reasonably considered Spalding's catchfly habitat in
                the HCNRA, the LIRA project area, and the overall geographic reach of the
                species' habitat ..................................................................................... 8

           3.   The planning objectives plaintiff cites are not independently enforceable ........... 10

           4.   Plaintiff cannot enforce Recovery Plan recommendations indirectly as
                evidence of forest plan violations ......................................................... 11

           5.   Plaintiff's authority that forest plan objectives are enforceable is
                distinguishable ...................................................................................... 12

           6.   The LIRA decision is rational and complies with NFMA ................................... 15

           7.   Plaintiff cannot meet its burden under NFMA ................................................. 17

       C.  Plaintiff's Request for Relief is Inherently Inconsistent and Confusing .................... 19

III.   CONCLUSION .................................................................................................. 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*All. for the Wild Rockies v. United States Forest Serv.*,
　899 F.3d 970 (9th Cir. 2018) .........................................................................15, 18

*In re Big Thorne*,
　857 F.3d 968 (9th Cir. 2017) .....................................................................................11

*Cascadia Wildlands v. Bureau of Indian Affairs*,
　801 F.3d 1105 (9th Cir. 2015) ...........................................................................4, 11

*Cascadia Wildlands v. Thrailkill*,
　49 F. Supp. 3d 774 (D. Or. 2014) ......................................................................4, 12

*Concerned Friends of the Winema v. USFS*,
　2016 WL 10637010 (D. Or. Sept. 12, 2016) ...................................................12, 14

*Conservation Congr. v. Findley*,
　774 F.3d 611 (9th Cir. 2014) ......................................................................................4

*Forest Guardians v. U.S. Forest Serv.*,
　329 F.3d 1089 (9th Cir. 2003) .................................................................................14

*Friends of the Wild Swan, Inc. v. U.S. Fish and Wildlife Service*,
　No. 17- 35572 (9th Cir. filed Aug. 22, 2018) (unpublished) ....................................4

*Friends of the Wild Swan v. Weber*,
　767 F.3d 936 (9th Cir. 2014) ...................................................................................16

*Idaho Sporting Congress v. Rittenhouse*,
　305 F.3d 957 (9th. Cir. 2002) ..................................................................................16

*Kleppe v. Sierra Club*,
　427 U.S. 390 (1976)...................................................................................................16

*Lands Council v. McNair*,
　537 F.3d 981 (9th Cir. 2008) (en banc) ......................................................... *passim*

*NEC v. Tidwell*,
　599 F.3d 926 (9th Cir. 2010) ............................................................................12, 13

*Penthouse Int'l, Ltd. v. Barnes*,
　792 F.2d 943 (9th Cir. 1986) ...................................................................................19

*Selkirk Conservation Alliance v. Forsgren,*
  336 F.3d 944 (9th Cir. 2003) ............................................................... 13

*Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation,*
  143 F.3d 515 (9th Cir. 1998) ............................................................... 18

*Strickland v. Morton,*
  519 F.2d 467 (9th Cir. 1975) ................................................................. 4

*W. Watersheds Proj. v. USFS,*
  2017 WL 5571574 (D. Idaho 2017) ................................................. 12, 14

**Statutes**

16 U.S.C. § 460gg-4 ............................................................................. 5

16 U.S.C. § 460gg-10 ..................................................................... 5, 6, 7

**Other Authorities**

36 C.F.R. § 219.19 (2000) ................................................................... 13

36 CFR 219.11 (b) .............................................................................. 10

I.   **REPLY.**

Plaintiff's Response to Cross Motions for Summary Judgment (Pls.' Resp.) makes a series of arguments that ignore plaintiff's burden of proof and the proper deference owed to the Forest Service.  Dkt. 24.  With the LIRA decision, the Forest Service has struck a reasonable balance of allowing livestock grazing within the project area to continue at newly reduced levels while it monitors impacts to determine the effectiveness of management changes and engages in long-term recovery efforts for Spalding's catchfly.  Plaintiff continues to demand perfect information now about the threatened plant, its precise long-term habitat requirements and populations, and an answer as to exactly how efforts should be implemented to best guarantee viability for this plant.  Plaintiff urges the Court to set aside the LIRA ROD without perfect information now.[1]  Yet, the recommendations in the Biological Opinion and Recovery Plan for Spalding's catchfly are inherently based on uncertainty in its eventual recovery due the limited current information about the species.  That is why a minimum of 20 years of monitoring through 2027 is recommended under the Recovery Plan to learn more about the species and gather necessary information to determine long term population trends in aid of potential delisting in 2040.

Plaintiff doesn't even attempt to address that the Forest Service has struck a lawful balance of developing the LIRA project in line with recommendations under the Recovery Plan

---

[1]  Plaintiff denies a fervent agenda to remove livestock grazing from the historical HCNRA allotments, first through bighorn sheep efforts and now through Spalding's catchfly litigation. *See* Pls.' Resp. at 1.  Yet, in its response, plaintiff argues that "grazing must cease if it is not compatible" with resource protection.  Pls. Resp. at 27.  Plaintiff also indicates that grazing should not occur during seedling germination, *see* Pls.' MSJ (Dkt. 16) at 5, 10, 23, on slopes of Idaho fescue communities with deep soils, *id.* at 4-5, where noxious weeds and invasive non-natives proliferate, *id.* at 3, 6, 14, 16, 21, 23, 27, or where pollinators might decrease.  *Id.* at 1, 6-8, 14, 23, 27.  Under plaintiff's constraints, grazing would be seriously impacted.

and committing to long-term monitoring and adaptive management to promote recovery efforts. Instead, plaintiff asks the Court to set aside the LIRA ROD, urging that grazing is "incompatible" with ongoing recovery efforts. Plaintiff's position is unreasonable and fails to meet its burden of showing any violation of law at all, or the need to cease grazing. For the reasons set forth below and in defendant-intervenors' initial memorandum, summary judgment should be granted. The LIRA decision is fully supported by the record and should be upheld.[2]

## II.    ARGUMENT.

### A.    The LIRA Project Complies with the HCNRA Act.

#### 1.    The forest plan does not alter the Forest Service's multiple-use mandate.

Plaintiff goes out of its way to argue that the duty to manage for viability of Spalding's catchfly takes precedence and overrides other multiple-use objectives under the forest plan. Pls.' Resp. at 3-6 ("This may be a hard pill for intervenors to swallow, but that is what the agency has prescribed."). Citing to the 1990 FEIS for the WWNF Forest Plan, plaintiff states that "listed species take precedence." Pls.' Resp. at 4. The actual quote is from Chapter 4 of the FEIS addressing Environmental Consequences in the context of Threatened, Endangered and Sensitive Plants (TES). The language states: "[p]rotection of listed species will take precedence over other land management direction." AR 401.

Notably, this statement was not written in the context of discussing the Forest Service's multiple use mandate. It was written under the heading of Mitigation Measures for TES plants

---

[2] Defendant-intervenors incorporate and join in the sections of Federal Defendants' Reply in Support of Cross-Motion for Summary Judgment (Fed-Defs.' Reply) addressing standing, and plaintiff's NFMA arguments regarding CMP provisions TES-G2, Gra-O4, TES-S1 and TES-S2. Defendant-Intervenors also join and incorporate Federal-Defendants' Reply arguments in support of upholding the Forest Service's NEPA and HCNRA Act analysis, including waiver of any HCNRA Act claim, and in explaining that the grazing AOIs were rationally approved.

and indicates that the forest plan has other provisions that allow the Forest Service to "pursue informal or formal consultation as necessary during project design and analysis," and that importantly, "*Project-level inventories are made and projects adjusted* to assure that sensitive species are protected." *Id.* (emphasis added). This statement does not alter the Forest Service's multiple use mandate, nor could it without amending NFMA. It merely highlights the importance of mitigation measures to provide protection, conduct project level inventories and monitoring, and encourage adaptive management to mitigate impacts as site specific projects proceed. *Id.* The LIRA project incorporates all of these elements. AR 12487-90 (describing mitigation measures to avoid potential impacts), 12489, 11353-355, 12501 (incorporating mitigation and site-specific monitoring), 12275-76, 12278 & Fig. 8, 11355-56 & Table 3a, 11713-16, 11380-86 & Map 7 and Table 13 (LIRA Project relied upon current survey information, analyzed potential effects on population, and implements mitigation measures and protection), 9417, 12490 (providing for "appropriate adaptive management and/or mitigations to address the site-specific issues"), 12487-90 (reducing threats through mitigation measures, short-term utilization monitoring, and long-term effectiveness monitoring).

## 2. CMP objectives do not change the inherently discretionary nature of recovery plan recommendations.

Plaintiff also cites the 1990 Forest Plan TES Standards and Guidelines, but omits the italicized portion of the following quote: "*Cooperate with the same agencies/organizations in the development and implementation of recovery plans for threatened and endangered species*. . . . Where such plans conflict with other management direction, the recovery plans will take precedence." AR 1941 (TES Standards and Guidelines #6). Again, this quote does not modify the Forest Service's multiple use mandate, and the quoted direction is met. The LIRA decision appropriately aligns with Recovery Plan recommendations, and the Forest Service has

cooperated and is continuing to cooperate in the development and implementation of Recovery

Plan recommendations for Spalding's catchfly.  AR 12430 ("the Imnaha Project is aligned with

the Spalding's catchfly's Recovery Plan.  The Project's effects to Spalding's catchfly were

displayed adequately for the U.S. Fish and Wildlife Service to conclude that the Project is not

expected to appreciably reduce either the survival or recovery of Spalding's catchfly.").

The language plaintiff cites in the second half of the quote providing that where "such

plans conflict," the "recovery plans will take precedence" does not support the argument that

development and implementation of recovery plan recommendations displaces other multiple-

use objectives under the forest plan.  The guidance supports only that where a conflict occurs in

management direction, adopted recovery plan measures may take precedence.  AR 1941.  This

language does not mandate that every single recovery plan recommendation be adopted

verbatim, nor does it mandate that the Forest Service must implement unadopted discretionary

recommendations in a recovery plan in implementing a project.  Recovery plans do "not create

any legal rights or obligations for the Service or any third parties."  *See*, *e.g.*, *Friends of the Wild

Swan, Inc. v. U.S. Fish and Wildlife Service*, No. 17- 35572 (9th Cir. filed Aug. 22, 2018)

(unpublished) (affirming district court's dismissal of APA claims seeking to enforce recovery

plan recommendations) (citing *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105,

1114 n.8 (9th Cir. 2015); *Conservation Congr. v. Findley*, 774 F.3d 611, 614 (9th Cir. 2014)).

ESA section 1533(f) makes it plain that recovery plans are for guidance purposes only.

*See* 16 U.S.C. § 1533(f).  By providing general guidance as to what is required in a recovery

plan, the ESA "breathe[s] discretion at every pore."  *Strickland v. Morton*, 519 F.2d 467, 469

(9th Cir. 1975).  Recovery plans do not have the force of law and are considered only guidelines.

*See*, *e.g.*, *Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 787 (D. Or. 2014).  Thus,

plaintiff's argument that recommendations in a recovery plan are mandatory and enforceable through an order compelling the Forest Service to strictly implement "key recovery actions" is unsupported.  Pls.' Resp. at 20.  The CMP does not change federal case law on the inherently discretionary nature of recovery plan recommendations.

> ### 3.  Grazing is critically important to the region and recognized as a valid, traditional multiple use under the HCNRA Act.

Nor does the CMP displace the Forest Service's multiple-use mandate and signal a "shift" from resource use to preservation as some new, ultimate priority, as plaintiff contends. *See* Pls.' Resp. at 3-4.  To support this proposition, plaintiff argues that the multiple-use objectives under parts 1-6 of Section 7 of the HCNRA Act have *priority* over uses in part 7.[3]  *Id.* Plaintiff bases this argument on a 1996 Forest Service decision to eliminate domestic sheep grazing due to bighorn conflicts.  *Id.* (citing AR 4246).  In the mid-1990s, the agency decided to eliminate domestic sheep grazing as a strategic administrative decision, not because it decided to downgrade the importance of grazing under part 7 in favor of other multiple use objectives in parts 1-6.  This citation does not support plaintiff's interpretation.  In fact, the record citation supports the opposite.  As explained by the Forest Service, eliminating sheep grazing provided a "balanced approach to meeting the Section 7 objectives of the HCNRA Act while providing for

---

[3]  Under Section 7 of the Act, the Secretary of Agriculture is required to administer the area "in a manner compatible" with multiple objectives, including: (1) the protection of free flowing rivers; (2) conservation of scenic, wilderness, cultural, scientific, and other values contributing to the public benefit; (3) preservation, especially in the area generally known as Hells Canyon, of features believed to be biologically unique; (4) protecting fish and wildlife habitat; (5) protecting archeological sites; (6) preserving and restoring historic sites typifying the economic and social history of the region and American West.  16 U.S.C. § 460gg-4.  Section 7 provides that grazing is an existing use compatible with the HCNRA, and it should be managed for objectives that include: (7) "compatible with the provisions of this subchapter." *Id.*  Under the HCNRA Act, "ranching" and "grazing . . . as they exist on December 31, 1975," are expressly recognized as traditional and valid uses of the recreation area.  16 U.S.C. § 460gg-10.

DEFENDANT-INTERVENORS' REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT - 5

compatible livestock grazing to maintain traditional and valid uses in the HCNRA as specified in

Section 13." AR 5246. The Forest Service specifically noted that in eliminating allotments for

sheep grazing in the 1990s, since the allotments were not currently stocked, it would "not

directly threaten traditional and valid uses as part of the HCNRA Act." *Id.* This citation

supports that the Forest Service recognized and continues to honor the importance of balancing

uses within the HCNRA, including livestock grazing.

Plaintiff's effort to "elevate" managing for Spalding's catchfly above other multiple uses

and particularly lawfully authorized livestock grazing is wrong. The Forest Service is mindful

that ranching and grazing are expressly recognized as traditional and valid uses of the recreation

area. 16 U.S.C. § 460gg-10; AR 3459, 9590 ("resource based production has and continues to be

a major staple in Wallowa County's economy"). Further, the lower Imnaha River corridor,

designated as scenic under the Wild and Scenic Rivers Act, *see* AR 2318, adopted an

Outstanding Remarkable Value under the Management Plan for the river called "traditional

value/lifestyle adaptation," which calls for the continuation of compatible ranching and farming.

AR 2330-32, 2338 ("Maintain the small ranch/farm setting that has existed over time."). The

Forest Service recognizes a policy to "contribute to the economic and social well-being of people

by providing opportunities for economic diversity and by promoting stability for communities

that depend on rangeland resources for their livelihood (Forest Service Manual 2202.1)."). AR

12487, 9590-91, 9595-98. Because grazing is recognized as a traditional and legitimate use, the

Forest Service's determination that the LIRA project is compatible with HCNRA objectives is

consistent with its duty to manage for multiple uses. AR 3459, 5899, 12487.

The Court should therefore reject plaintiff's argument seeking to elevate viability

"objectives" above other multiple-use objectives. This argument is wrong as a matter of law and

is unnecessary to upholding the LIRA decision.  Grazing under the LIRA decision is *compatible* with the forest plan as provided under 16 U.S.C. § 460gg-10; AR 5046.  Compatibility is the standard under HCNRA Section 7-7, not some amorphous directive not found in the forest plan that, according to plaintiff, elevates certain multiple-use objectives above others.  Beyond upholding the LIRA decision and concluding that reduced livestock grazing as authorized is compatible with the Act, the Court need not reach plaintiff's policy argument and fundamental disagreement with the Forest Service's mandate to balance competing uses and honor traditional values in the HCNRA.

      **B.**      **The LIRA Project Complies with NFMA.**

           **1.**      **The Forest Service has wide latitude in addressing viability.**

Relying on TES-O1, plaintiff insists that in determining whether to reauthorize grazing in the LIRA project area, the Forest Service failed to focus its viability analysis on the HCNRA geographic area as a whole.  Pls.' Resp. at 10, 21.  TES-O1 is a forest plan objective providing for the Forest Service to: "Manage habitat and populations of federally listed threatened, endangered or proposed plant species to ensure their continued existence and enhancement of the species in the HCNRA," and "Implement activities that would facilitate removal of species from the federal threatened or endangered species list."  AR 4514.  TES-O1 does not restrict the geographic scale by which the viability of Spalding's catchfly must or can be addressed.

Neither the CMP nor NFMA specify exactly how the Forest Service must demonstrate that its site-specific grazing plans adequately provide for species viability.  TES-O1 identifies objectives to manage and enhance species' existence within the HCNRA, but it is not a mandate to use a particular methodology.  The Forest Service has "the latitude to decide how best to demonstrate" that grazing management will provide for species viability.  *See Lands Council v.*

*McNair*, 537 F.3d 981, 992 (9th Cir. 2008) (en banc). Under *McNair*, the Forest Service is not

compelled to use a "particular type of proof," or compelled to require that a project would

"maintain a species' population in a specific area." *Id.* at 997 (to require otherwise "would

inhibit the Forest Service from conducting projects in the National Forests."). Nor do monitoring

difficulties the Forest Service will encounter, such as the pronged years of underground

dormancy for Spalding's catchfly, "render a habitat-based analysis unreasonable, so long as the

analysis uses all the scientific data currently available." *Id.* at 1082. The lack of perfect

information does not render the decision arbitrary where the Forest Service is engaging in long-

term efforts to gain knowledge about the species.[4] *Id.* at 998.

### 2.    The Forest Service reasonably considered Spalding's catchfly habitat in the HCNRA, the LIRA project area, and the overall geographic reach of the species' habitat.

In insisting that habitat-based viability analysis must be addressed in view of one

geographic scale, plaintiff never explains how such a specific type of proof squares with the

holding of *McNair*, and instead simply quotes TES-O1 that species be managed to ensure their

continued existence and enhancement "*in the HCNRA*." But the objective does not say, "ensure

their continued existence and enhancement in the HCNRA *by using a viability approach only*

*considering the entire geographic reach of the HCNRA as a whole*." *Cf.* AR 4514. Here, the

Forest Service not only addressed Spalding's catchfly viability and habitat in the HCNRA, but

also within the LIRA project area, and within the context of the overall geographic reach of the

species' habitat throughout multiple western states and into British Columbia. AR 5849, 12487-

---

[4] Under the CMP, viability is defined as follows: "Viability – In general, viability means the ability of a population of a plant or animal species to persist for some specified time into the future." AR 4251. Notably, the Likely to Adversely Affect determination for effects on Spalding's catchfly was accompanied by a no jeopardy opinion from USFWS, which speaks to viability.

90, 11344-388, 11405-14, 11676, 11679, 11694-696, 11714, 11727, 11806-807, 11812-821, 11836, 11839-40, 11865, 12299, 12266-74.

In adopting the LIRA ROD, the Forest Service considered the best available science. AR 11926, 12072, 12099, 12111, 12114, 12491. Consistent with TES-O1 and TES-O3, the Forest Service is mindful in its discussion of viability both habitat-wide and region-wide because the LIRA project area falls within the Canyon Grasslands region as noted in the Recovery Plan, an area much smaller than the its greater distribution of habitat. AR 11840. Spalding's catchfly is found in eastern Washington, northeastern Oregon, west-central Idaho, western Montana, and extends slightly into British Columbia, Canada. AR 5849. As noted in the Recovery Plan, Spalding's catchfly can be found in:

> [F]ive physiographic (physical geographic) regions: the Palouse Grasslands in west-central Idaho and southeastern Washington; the Channeled Scablands in eastern Washington; the Blue Mountain Basins in northeastern Oregon; the Canyon Grasslands of the Snake River and its tributaries in Idaho, Oregon, and Washington; and the Intermontane Valleys of northwestern Montana.

AR 5849.

While the Recovery Plan is discretionary, the Forest Service nonetheless aligned the LIRA decision with Recovery Plan recommendations. AR 12430. FWS also reviewed the LIRA project and concluded that in light of grazing management changes, there would be no significant reduction regarding the numbers, reproduction, or distribution of Spalding's catchfly. AR 12299. When addressing viability of a species such as this, it follows logic to approach viability exactly as the Forest Service has – by considering the best available science and information available.

**3.      The planning objectives plaintiff cites are not independently enforceable.**

Plaintiff also ignores that objectives themselves are neither mandatory nor independently enforceable.  TES-O1 and TES-O3 are high-level planning objectives that are to be interpreted at an HCNRA-wide level.[5]  They do not rise to the level of judicially reviewable discrete, project-specific requirements that are independently binding on the LIRA decision.  The very definition of "objective" under the CMP does not support an interpretation binding the Forest Service to use a single methodology or type of proof in approaching viability, a point and definition plaintiff ignores.  Under the forest plan, "[o]bjectives" are defined as "focused statements that describe the *incremental progress* expected to take place to meet goals *over the ten-year* planning period (36 CFR 219.11 (b)) with respect to *estimated* quantities of services and *accomplishments*."  AR 4426. (emphases added).[6]  Plaintiff cannot enforce an objective any more than one can enforce an "estimate" of the "accomplishments" the Forest Service hopes to meet through over a 10-year period through "incremental progress."  Plaintiff seeks to vacate the very project the Forest Service will use to make incremental progress in furtherance of necessary monitoring and net benefits to the species.  AR 11412-13, 11839-40, 11857-82.  That is exactly

---

[5]  A project is consistent under NFMA if it conforms to the applicable "components" of the forest plan, "including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management."  *Alliance for the Wild Rockies*, 899 F.3d 974, 97 (9th Cir. 2018).  TES-O1 and TES-O3 are broad objectives that are intended to be implemented on a HCNRA-wide basis.  They are not standards, guidelines, or desired conditions which a project must comply with to be consistent.  *See id*.  They do not include a timing requirement for completion, nor are they intended to be implemented for every discrete, project-specific action.

[6]  The "Goal" for Biologically Unique Resources, including the threatened Spalding's catchfly, is to "[e]nsure the preservation of rare and endemic plant species" and to [p]rotect and manage habitat for the perpetuation and recovery of plants, which are listed as threatened . . . ."  AR 4820.

what plaintiff is attempting do to – vacate the decision calling for long term efforts to analyze

and monitor because at bottom, plaintiff wants to halt grazing.

Plaintiff also contends that the LIRA decision violates Bio-O3, which states: "Manage

habitat and populations of all rare and endemic plant species to ensure their continued existence

and viability in the HCNRA." AR 4513. However, Bio-O3 is not a mandatory measure that is

applicable and enforceable at the project level. *See In re Big Thorne*, 857 F.3d 968, 977 n.5 (9th

Cir. 2017) (Forest Service has "obligation to protect viability in the Tongass National Forest as a

whole, not in each individual Tongass Project area"); *Cascadia Wildlands v. Bureau of Indian

Affairs,* 801 F.3d 1105, 1115 (9th Cir. 2015) (forest plan "objectives" establish "general, high-

level goals"). Bio-O3 is another objective that describes broad goals over a longer, ten-year

planning period. AR 3551. The objective of managing to ensure continued existence and

viability in the HCNRA is something the Forest Service expects to make incremental progress

toward and accomplish. These CMP's objectives are overarching, discretionary targets. They

are not enforceable to the letter. Plaintiff's argument that Bio-O3 is enforceable at the project

level is an unreasonable construction of the objective. Plaintiff's reliance on Bio-O3, like its

analysis of TES-O1, is divorced from very definition of "objective" and any analysis of whether

the project will make incremental progress toward plan goals over the long term.

### 4.   Plaintiff cannot enforce Recovery Plan recommendations indirectly as evidence of forest plan violations.

Plaintiff further argues that the Forest Service violated TES-O3 by not implementing all

recommended Recovery Plan actions. Pls.' Resp. at 19. TES-O3 provides:

> Implement recovery plans for federally listed threatened, endangered or proposed
> plant species cooperatively with the USFWS. Contribute to revisions of recovery
> plans, and carry out recommended actions in recovery plans. (Forest Plan, FSM
> 2670)

AR 4514.

Plaintiff contends that the failure to implement the entire Recovery Plan verbatim, or the failure to adopt plaintiff's preferred action under the Recovery Plan, violates TES-O3, or at least evidences a violation of the objective. Pls.' Resp. at 19-20. The Forest Service, however, cannot be compelled to adopt a Recovery Plan, and it has inherent discretion in determining which measures recommended in a Recovery Plan to implement. As detailed above, recovery plans do not have the force of law and are considered guidelines only. *See, e.g., Thrailkill*, 49 F. Supp. 3d at 787. They are not binding on agencies. *Id*. As a matter of law, plaintiff cannot use the failure to follow any single recommended action under the Recovery Plan to show a violation of TES-O3 because they are discretionary and not binding.

### 5.    Plaintiff's authority that forest plan objectives are enforceable is distinguishable.

Plaintiff also argues that both Bio-O3 and TES-O1 are enforceable under the APA as held by the courts in *NEC v. Tidwell*, 599 F.3d 926, 932-36 (9th Cir. 2010); *McNair*, 537 F.3d at 992-98; *Concerned Friends of the Winema v. USFS*, 2016 WL 10637010, *6-9, 15 (D. Or. Sept. 12, 2016), adopted by 2017 WL 5957811 (D. Or. Jan. 18, 2017); and *W. Watersheds Proj. v. USFS*, 2017 WL 5571574, *12-13 (D. Idaho 2017). All of these decisions are distinguishable. None of the decisions confronted the same CMP/Forest Plan provisions. None of the cases addressed efforts to enforce recovery plan actions, and they do not provide guidance as to the enforceability of high-level planning objectives in the context of this case.

In *NEC v. Tidwell*, 599 F.3d 926, 932-36 (9th Cir. 2010), the Forest Service undertook a site-specific review of a project in the Beaverhead-Deerlodge National Forest in Montana in light of new information about sage grouse. *Tidwell*, 599 F.3d at 931. Regulations in effect at the time required the Forest Service to manage fish and wildlife habitat "to maintain viable

populations of existing . . . species" by monitoring population trends of the effects of

management on management indicator species (MIS). *Tidwell*, 599 F.3d at 932. The 2000

version of the regulation at issue applied to wildlife MIS species, 36 C.F.R. § 219.19 (2000), and

it is no longer in effect. *Id*. at 932 n.8. *Tidwell* did not involve an effort by plaintiffs to enforce

discretionary recovery plan actions, or use the failure to adopt any single recovery plan

recommendation as "evidence" of violating a plan objective. Moreover, in *Tidwell*, the sage

grouse was non-existent in the area and could not serve as a proxy for critical habitat. *Id*. at 934.

In contrast, Spalding's catchfly is a threatened plant, not subject to the repealed MIS rule, no

critical habitat has ever been designated, and catchfly populations do exist in the LIRA project

area. Supp. AR 39-40.

      *McNair* actually supports defendants' position regarding the inherent flexibility under

NFMA, and the proper deference owed to the Forest Service in considering viability. The case

does not support plaintiffs' broad arguments attempting to enforce plan "objectives." In *McNair*,

the Ninth Circuit explained that the agency had considered the viability of plant and animal

populations based on the current state of scientific knowledge, and concluded that "we defer to

the Forest Service as to what evidence is, or is not, necessary to support wildlife viability

analyses. . . . Were we to grant less deference to the agency, we would be ignoring the APA's

arbitrary and capricious standard of review." *McNair*, 537, F.3d at 992. "This approach respects

our law that requires us to defer to an agency's determination in an area involving a 'high level

of technical expertise.'" *Id*. at 993 (quoting *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d

944, 954 (9th Cir. 2003)). "We are to be 'most deferential' when the agency is 'making

predictions, within its [area of] special expertise, at the frontiers of science.'" *Id*. (quoting *Forest

Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003)). *McNair* refused to require

a particular type of proof that a project would maintain a species population in a specific area, because to do so could "frustrate[e] one or more of the other objectives the Forest Service must also try to achieve as it manages National Forest System lands." *Id*. at 997.

In *Concerned Friends of the Winema v. USFS*, 2016 WL 10637010, *6-9, 15 (D. Or. Sept. 12, 2016), the district court found that the Forest Service had a duty to modify its grazing utilization measurements in light of evidence of years of "cattle trespass."  In light of this narrow issue, the court granted summary judgment for the reason that the Forest Service had not "accurately measured grazing in the relevant areas."  Unlike in *Concerned Friends of the Winema*, the Forest Service's LIRA decision does not involve unaccounted trespassing cattle and is rationally supported.

Finally, in *W. Watersheds Proj. v. USFS*, 2017 WL 5571574 (D. Idaho 2017), plaintiffs sought to enjoin grazing of domestic sheep on two allotments in the Caribou-Targhee National Forest.  *W. Watersheds Proj.*, 2017 WL 5571574 at *3.  The case is unique in that it was not resolved on the merits but on a motion for preliminary injunction.  The district court magistrate judge expressed concern with increasing risks, noting that "bighorn sheep are highly susceptible to the pathogens the domestic sheep are known to carry." *Id.* at *14.  The court did not elaborate on or discuss the enforceability of viability objectives, nor did it specifically cite them in the decision, or provide any analysis about the objectives in the context of enforceability.  The decision does not support the proposition that high-level forest planning objectives are justiciable and is limited to a narrow interlocutory ruling.[7]

---

[7]  Finally, contrary to plaintiff's further arguments, the Forest Service met TES-G2 in adopting the LIRA decision.  *See* Pls.' Resp. at 16.  TES-G2 is a guideline that provides: "*Consider modifications to activities* such as seasonal or permanent closures for roads, trails, *exclusion of domestic livestock grazing, and modification of grazing plans* where conflicts with the protection of rare plant species are identified." AR 1415 (emphasis added).  TES-G2 is

6.     **The LIRA decision is rational and complies with NFMA.**

The LIRA ROD and FEIS include direction from both the forest plan and CMP, plus the

Biological Opinion, the Recovery Plan, and multiple specialist reports across key disciplines that

analyze species viability and recovery.  AR 11689, 12428; *see also* Def.-Intv.' Cross Motion for

Summ. J. at 15-16 (listing reports).  The FEIS and these specialist reports, in turn, extensively

address Spalding's catchfly habitat characteristics, including plant populations within the project

area.  AR 11344-388, 11405-14, 11676, 11679, 11694-696, 11714, 11727, 11806-807, 11812-

821, 11836, 11839-40, 11865, 12266-74, Supp. AR 24-28.

The reality is that many years of monitoring are needed to acquire the data necessary for

the Forest Service to conduct a population viability analysis.  Long-term monitoring is needed to

acquire information to model population persistence, such as data on recruitment, growth,

mortality, and age structure of the population.  Collecting this information will take long-term

efforts.  AR 5916, 5855, 5975 (projecting a 34-year timeframe).  Until enough information is

gathered to conduct population viability analysis that models which populations are viable under

different management strategies, a minimum of 500 reproducing individuals – assumed to

represent the minimum viable population size under the Recovery Plan – "will be the default

goal for all key conservation areas in each of the five physiographic regions."  AR 5930.  The

---

discretionary, not a mandatory project requirement.  *See* AR 3551 (defining "guideline").  "A
guideline does not impose a mandatory constraint on project planning and activity" like a plan
standard might.  *All. for the Wild Rockies v. United States Forest Serv.*, 899 F.3d 970, 978 (9th
Cir. 2018).  Guidelines are a "preferred or advisable course of action" to help maintain or restore
resource conditions or prevent resource degradation.  *Id.* at 979.  Here, the Forest Service
complied with TES-G2.  The LIRA decision adopted an approach to reduce impacts under a
deferred rotation grazing strategy for pastures within the Rhodes Creek, Toomey, and Lone Pine
allotments.  AR 12501 & Table 3.  FWS analyzed that strategy and issued the same no jeopardy
determination.  *Id.*  To the extent further management changes are needed within the allotments,
the Forest Service has the authority to use adaptive management to address and mitigate those
concerns.  AR 11716-18, 5047, 4757-72, 9417.

region at issue has three KCAs, and the LIRA project contains smaller populations, or *potential* KCA candidates.  The Court should reject plaintiff's attempt to enforce plan objectives as an indirect way to compel compliance with Recovery Plan recommendations of plaintiff's choosing.

Plaintiff's narrow view of how viability analysis must be conducted in scope and methodology is impractical and should be rejected.  Plaintiff's view has been refuted by the Ninth Circuit in explaining that "an agency has the discretion to determine the physical scope used for measuring environmental impacts."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014) (quoting *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 973 (9th. Cir. 2002)).  Further, "[i[dentifying the appropriate geographic scope 'is a task assigned to the special competency of the appropriate agenc[y].'" *Id.* (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)).  An agency's choice is not arbitrary if the agency provides a reasoned decision and support for its scope of analysis.  *Friends of the Wild Swan,* 767 F.3d at 943 (quoting *Idaho Sporting Congress*, 305 F.3d at 973).

Nor is there anything irrational about the Forest Service's methodology for addressing viability.  Its decision that using a combination of reduced grazing, rest-rotation, and managed grazing strategies that can be adjusted and will mitigate potential impacts, including with mitigation measures and adaptive management, is rational and fully supported by the record.  The decision is also supported by the Forest Service and FWS's opinions that grazing on the LIRA allotments will not jeopardize the continued existence of the species.  AR 12487-90.  Plaintiff's demand to analyze viability in the manner plaintiff suggests makes no sense in light of the need to work toward recovery across the species' entire range, given the prolonged dormancy which presents practical issues for monitoring and conducting inventories, and the need for long-term analysis in this extremely remote, rural area.  The Forest Service should be allowed to

continue this work consistent with livestock grazing under the new management changes. The Forest Service met plan objectives by ensuring that continued grazing in the LIRA project area does not jeopardize the species, by engaging in formal consultation with FWS, AR 12298, 12426, and by including discretionary recommendations from the Recovery Plan in the LIRA decision. AR 11866, 12491, 12501.

Plaintiff's demand that the Forest Service affirmatively recover Spalding's catchfly within the LIRA project area fails to account for the fact that, not only does the Forest Service have discretion in regard to timing and substance of recovery actions, but TES-O1 and TES-O3 are long-term planning objectives which can only be met by gathering data over a long period of time. The Forest Service is gathering the requisite long-term data needed for Spalding's catchfly and will meet this accomplishment. The fact the recovery efforts will take time is a consequence of the nature of the plant, the remote, rural allotments in difficult terrain and hard-to-access areas, and agency priorities. That the work is not complete now may be frustrating to plaintiff, but it is not a violation of the forest plan under these long-term planning objectives.

### 7.    Plaintiff cannot meet its burden under NFMA.

Throughout its response, plaintiff repeats alleged failings by the Forest Service, but plaintiff has not established a legal violation. Ignoring Ninth Circuit caselaw and the definition sections of the forest plan and CMP plan amendment, plaintiff contends that whether a planning directive is a guideline, standard, objective, or goal is irrelevant, and that the determining factor of whether language is enforceable is whether the directive is preceded by the word "shall" or "may." Pls.' Resp. at 7. Yet, this position flatly contradicts Ninth Circuit precedent. *See*, *e.g.*, *All. for the Wild Rockies v. United States Forest Serv.*, 899 F.3d 970, 978 (9th Cir. 2018). Plaintiff also refuses to appreciate that the Forest Service is not required to affirmatively recover

ESA-listed species or increase Spalding's catchfly populations as plaintiff attempts to argue. Pls.' Resp. at 10; *McNair*, 537 F.3d at 995, 997; *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998). Plaintiff has not asserted an ESA claim. Instead, plaintiff states that grazing within the LIRA allotments "could" harm plants, *see* Pls.' Resp. at 10, which is a point both the Forest Service in its LIRA decision and FWS fully recognize in the context of the no-jeopardy opinion.[8]

Although plaintiff argues that the real legal issue is whether the agency's decision sufficiently demonstrates that the LIRA ROD and grazing allotments are consistent with viability and recovery directives, *see* Pls.' Resp. at 11, nowhere does plaintiff attempt to meet *its* burden of establishing substantive or procedural violations of the law. Plaintiff has failed to meet its burden of proving that the Forest Service's decision to align itself with the Recovery Plan by engaging in many years of monitoring to acquire the data necessary to conduct population viability analysis is irrational or unreasonable, nor has plaintiff established that long term monitoring is not needed to acquire information to model population persistence, or that the methodology being used in the meantime is irrational. Instead, plaintiff resorts to its same theme, complaining that "the Forest Service never identifies what quantity and quality of habitat is necessary to support a viable catchfly population within the HCNRA." Pls.' Resp. at 17. This

---

[8] Plaintiff continues to argue that Spalding's catchfly occurs on the HCNRA only in the LIRA project area in vulnerably small populations. Pls.' Resp. at 1, 10, 21, 26, 29. This argument misinterprets the Forest Service process for rangeland analyses. When considering an area for analysis, inventories are completed for rangeland condition and rare plant presence. The absence of Spalding's catchfly on other allotments within the HCNRA is simply because rangeland analyses have not been initiated. Moreover, the plant's range, distribution, and grazing impacts on isolated small populations were considered and analyzed in the EIS. AR 11832, 11858, 11868, 11901-02. The Forest Service's analysis aligns with the Recovery Plan, which discusses problems associated with small, geographically isolated populations. AR 6028, 5867, 5888 ("Most populations of Silene spaldingii are restricted to small, remnant patches of native habitat."), 5895, 5913-16, 5942, 5949, 5963, 5973, 6007.

DEFENDANT-INTERVENORS' REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT - 18

is plainly wrong.  The Forest Service has cited and relies on the best science available to identify this habitat, where it is located, and the inventories and short- and long-term monitoring needed to engage in recovery efforts.  The LIRA decision and grazing allotments should be upheld.

## C.   Plaintiff's Request for Relief is Inherently Inconsistent and Confusing.

Assuming *arguendo* that plaintiff prevails on the merits on any claim, defendant-intervenors believe there should be additional proceedings on the relief, if any.  However, for the reasons set forth above, plaintiff cannot establish a violation, and the Court cannot enjoin conduct that has not been found to violate any law.  *See Penthouse Int'l, Ltd. v. Barnes*, 792 F.2d 943, 950 (9th Cir. 1986).

Plaintiff's request for relief is inherently inconsistent and makes no sense.  Plaintiff contends that it is not seeking "injunctive relief to halt or curtail current grazing," *see* Pls.' Resp. at 2, but plaintiff argues that if a legal violation is found grazing must "cease."  *Id*. at 27; *see also* Pls' MSJ at 22 (citing authority that "enjoining grazing" indefinitely is appropriate).  Plaintiff also states that it is only seeking "revised analysis" of the LIRA ROD and a "better decision" to "cure the legal violations found therein."  Pls.' Resp. at 2, 35.  Yet plaintiff argues that both the LIRA ROD and 2016-2018 AOIs are inconsistent with the CMP.  *Id*. at 13; *see also* Pls' MSJ at 2, 22 (seeking a declaration that the 2016-2018 AOIs violate NFMA and the HCNRA Act).  Further, plaintiff requests vacatur and remand of the LIRA ROD and EIS, *see* Compl. (Dkt. 1) at 2 ¶ 3, but as noted by federal-defendants, this would accordingly impose the prior grazing management system with no Spalding's catchfly-pasture deferrals.

Regardless of these contradictions, based on plaintiff's assurances that it does not seek to enjoin or curtail grazing, this Reply does not address plaintiff's inconsistencies further or the extraordinary remedy of an injunction.

III.    **CONCLUSION.**

For the reasons set forth above and in their initial supporting memorandum (Dkt. 22),

Defendant-Intervenors' Cross Motion for Summary Judgment should be granted.

Respectfully submitted this 28th day of September, 2018.

/s/ Caroline Lobdell
Caroline Lobdell, Ore. Bar No. 021236
Shay S. Scott, Ore. Bar No. 934214
Western Resources Legal Center
9220 SW Barbur Blvd., Suite 327
Portland, OR 97219
Telephone: (503) 768-8500
Fax: (503) 222-3255
clobdell@wrlegal.org
sscott@wrlegal.org

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b), because it contains 6,324 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED: September 28, 2018.


/s/ Caroline Lobdell
Caroline Lobdell

## <u>CERTIFICATE OF SERVICE</u>

I, Caroline Lobdell, hereby certify that on September 28, 2018, I caused the foregoing

Defendant-Intervenors' Reply in Support of Cross Motion For Summary Judgment to be served

upon counsel of record through the Court's electronic service system.

DATED: September 28, 2018.


                    <u>/s/ Caroline Lobdell</u>
                    Caroline Lobdell