IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

|  |  |
|---|---|
| GREATER HELLS CANYON COUNCIL, an Oregon nonprofit corporation, | Case No. 2:18-cv-00054-SU |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS** |
| v. | |
| KRIS STEIN, District Ranger for the HCNRA, Wallowa-Whitman National Forest, in her official capacity; and UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture, | |
| Defendants, | |
| and | |
| McCLARAN RANCH, INC., an Oregon Domestic Business Corporation; and WALLOWA COUNTY, a political subdivision of the State of Oregon, | |
| Defendant-Intervenors. | |

_____

SULLIVAN, United States Magistrate Judge:

Plaintiff Greater Hells Canyon Council is a regional non-profit organization whose mission is to protect wildlife resources in the greater Hells Canyon area located in northeast Oregon. Plaintiff has sued the United States Forest Service challenging its Lower Imnaha Rangeland Analysis project ("LIRA project") decision, which reauthorizes cattle grazing in the Hells Canyon National Recreation Area in the Wallowa-Whitman National Forest.  Defendants Kris Stein and Forest Service (collectively "Forest Service") issued a Final Environmental Impact Statement in March 2015 and Record of Decision in September 2015, allowing the grazing reauthorization. Intervenor defendant McClaran Ranch, Inc. ("McClaran Ranch") is the grazing permittee on the four allotments in the LIRA project area.  Intervenor defendant Wallowa County ("County") has an interest in the LIRA project as the project area lies within this northeastern Oregon County. (Docket Nos. 6-8, 13).  Plaintiff's challenge alleges harm to the Spalding's catchfly[1] ("catchfly"), a threatened plant species endemic to the region and found within the grazing allotments.

Plaintiff brings three claims for relief, for alleged violations of:

(1) the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, and the Wallowa-Whitman Forest Plan ("Forest Plan");

(2) the Hells Canyon National Recreation Area Act ("HCNRA Act"), 16 U.S.C. § 460gg *et seq.*, and the Comprehensive Management Plan ("CMP") for the HCNRA; and

(3) the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

The parties have filed cross-motions for summary judgment.  (Docket Nos. 16, 21, 22).  The Court heard oral argument on the Motions on November 13, 2018.  (Docket Nos. 30, 32).

_____

[1] The scientific name of the species is *Silene spaldingii.*

For the following reasons, the Court should GRANT defendants' and intervenors' Motions for Summary Judgment (Docket Nos. 21 & 22), and DENY plaintiff's Motion for Summary Judgment (Docket No. 16).

## PROJECT BACKGROUND

### I.    The LIRA Project.

The Wallowa-Whitman National Forest (the "Forest") lies within northeast Oregon and southeast Washington.  The Hells Canyon National Recreation Area ("HCNRA"), most of which is located within the Forest in Wallowa County, Oregon, was created by statute in 1975.  16 U.S.C. §§ 460gg(1)-(13).  The LIRA project area is within the HCNRA along the Snake and Imnaha Rivers. AR 11688, 11720, 11958-99.[2]  The LIRA project area is approximately 44,000 acres, consisting of four adjoining grazing allotments (Cow Creek, Toomey, Rhodes Creek, and Lone Pine).[3]  AR 11348, 11674, 11681-82, 11719-26.  The LIRA project decision allows grazing of approximately 1,500 cattle in the winter and spring, November through May.  *Id.*

Livestock have been grazed for centuries in the LIRA project area, beginning with the Nez Perce tribe, and grazing has been under Forest Service management since the early 1900's.  AR 11674, 11684, 11692, 12486, 12015, 12074.  Historic grazing in the LIRA project area resulted in "unsatisfactory" rangeland conditions in the 19th and 20th centuries.  AR 11678-79.  However, by 2004, grazing levels and seasons of use for the allotments were reduced to current use.  AR 11674, 11677.  By treaty, the Nez Perce still graze cattle in the LIRA project area on the Lone Pine

---

[2]  Citations are to the Administrative Record ("AR") and Supplemental Administrative Record ("SUPP AR").  (Docket Nos. 12, 15).

[3]  Grazing allotments are designated areas within a national forest which are regulated by the Forest Service through permits and management tools agreed upon by the permittee.  *See Ctr.for Biological Diversity v. Provensio,* No. CV 10-330 TUC AWT, 2012 WL 966031, *1 (D. Ariz. Jan. 23, 2012), for a more detailed explanation of grazing allotments.

allotment.  AR 11677.  "Long standing family ran [*sic*] ranching operations contribute to the local culture and tradition of the local community they are part of, [which] holds true for the LIRA area."  AR 9599.  The area has a history and lifestyle "dominated by a ranching/farming tradition" that is "an extension of how the [Imnaha and Snake] river corridor has been used for years[.]"  AR 2322.

The McClaran family has wintered livestock in the area since the 1920's and, since 2004-2005, has held all term grazing permits for the four LIRA project allotments.  AR 9414-34, 9599, 11486, 11722-23.  The McClaran family has demonstrated a commitment to stewardship of the land on which they graze.[4]  For example, since 2005, McClaran Ranch has engaged in a system of rotation of cattle in the pastures within the allotments to tailor livestock utilization to on-the-ground conditions.[5]  McClaran Decl. ¶ 17 (Docket No. 7)

Although the Forest Service has permitted grazing on the LIRA project allotments since the early 1900's, this case concerns the first time that the agency has analyzed the environmental impacts of grazing in the LIRA project area pursuant to NEPA.  In 1994, the Forest Service implemented a policy to conduct NEPA analyses for the reauthorization of grazing permits.  *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 158 (D.D.C. 2002).  Because of the number of permits that the Forest Service reissued each year, it soon became clear that many permits would expire before the NEPA analysis could be completed.  *Id*.  In response to that threat, Congress Enacted the Rescissions Act of 1995, Public Law 104-19, sections 501-04, ("Rescissions Act").  The Rescissions Act provided a temporary exemption from NEPA for those permits that

---

[4] Richard Bailey, plaintiff's former executive director, said in his Declaration, "I very much respect the McClaran family and appreciate their knowledge of the LIRA area and their efforts toward sensitive livestock grazing practices."  Bailey Decl. ¶ 8 (Docket No. 18).

[5] A similar grazing rotation has been incorporated into the grazing permits as part of the final LIRA project decision.  AR 12487-90.

were set to expire before the NEPA review for its respective allotment had been completed. Pub. L. No. 104-19, § 504(b). The Act also directed each National Forest to establish and adhere to a schedule for conducting NEPA reviews on all the grazing allotments in that Forest. *Id*. at § 504(a).

The NEPA process for the LIRA project area, which began in 2009, was conducted in accordance with the schedule that the Forest developed pursuant to the Rescissions Act. AR 12486. If the Forest Service did not complete the NEPA process for the LIRA project within the time provided in the schedule, the permits would not be re-issued upon their expiration and grazing would not be authorized on the LIRA project allotments. AR 11687. The Forest Service's NEPA process has involved extensive analysis of the LIRA project area and culminated in the issuance of a Final Environmental Impact Statement and Record of Decision in 2015, which addresses compliance with both NFMA and the HCNRA Act. AR 11674.

## II.    The Spalding's Catchfly

In 2001 the Spalding's catchfly[6] was listed as a threatened species by the U.S. Fish and Wildlife Service ("FWS") under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*. AR 5858. In 2007, the FWS issued a Recovery Plan for the species, which discussed strategies for the protection and recovery of the catchfly in all regions where it is found. AR 5843, 5858. The following information about the catchfly and its numbers and habitat is taken from the 2007 Recovery Plan, AR 5844-990, the various alternatives offered by the Forest Service in the Final Environmental Impact Statement and Record of Decision, and the Biological Opinion issued by the FWS in April 2015 after consultation with the Forest Service. AR 12239.

The catchfly is a perennial plant, a member of the pink or carnation family, that is a "regional endemic" species found in certain Pacific Northwest regions, including eastern

---

[6] The catchfly gets its common name because of sticky stems which "catch" insects.

Washington, northeastern Oregon, west-central Idaho, western Montana, and British Columbia. AR 4780, 5849, 5854. The species experienced significant habitat loss and degradation in the last century. AR 3437-45, 5890-96. This was due to agricultural conversion, livestock grazing and trampling, urbanization, and weed invasion, all of which have led to habitat fragmentation and small, genetically isolated populations. AR 3437-45, 5888-91, 11858.

The catchfly is a long-lived plant that the FWS estimates regularly reaches an age of 15 to 20 years. AR 5869, 11376. Catchfly seedlings generally sprout in spring, form rosettes the first year, and occasionally flower the second year. *Id*. Generally, flowering does not occur until the plant's third year. *Id*. Adult plant germination begins in early spring, and the plants emerge in April or May. AR 5869, 11859, 11376-79. The catchfly's growth cycle occurs from April through October. *Id.* The catchfly is mostly dormant during the grazing season at issue here and flowers in late summer, though, in the Lower Imnaha Canyon it starts to flower in early June. AR 11859. Adult plants also exhibit prolonged dormancy when conditions are unfavorable, where they remain below ground without leaves for up to 3 years. AR 11858. This prolonged dormancy can make population estimates and monitoring difficult and long-term data sets are needed to track population trends. AR 5869, 5870-72, 12271-72.

The Recovery Plan survey documented 99 populations in 2001 within the five areas identified in Oregon, Washington, Idaho, Montana and British Columbia.[7] AR 5866. In 2001, nine populations were found in Oregon but by 2007 there were 17 populations. AR 5866. In

---

[7] A "population" as referred to in the Recovery Plan is a grouping of the species numbering up to 500 plants and may comprise fewer than 100 individual plants. AR 5866. The Recovery Plan lists only 10 populations of the catchfly that number over 500 individual plants. AR 5867. Many of the populations documented occur on private land. *Id*.

Oregon, all known catchfly sites are within the County, both in the LIRA project area and on private lands.  AR 5863-69, 5881-82, 11379-86.

The Forest Service surveyed and documented the catchfly in the LIRA project area in 2004 and 2005.  AR 5905, 11381.  The FWS expects that, because the canyon grasslands where the catchfly reside in the LIRA project area are steep and difficult to survey, "there may be many more populations" of catchfly to be found there.  AR 5938.  In other parts of the Forest where inventories have been taken for multiple years, catchfly populations "appear stable," and all these populations are in grazing allotments.  AR 11387.  The Recovery Plan estimated that "a minimum of 20 years of monitoring will be needed to determine long term population trends."  AR 5855, 5868. [8]

In 2015, the FWS surveyed the distribution of the catchfly across the LIRA project allotments.  AR 12248.  All of the catchfly identified in the survey were found on steep, north facing, deep soiled terrain.  AR 11390.  The LIRA project area contained an estimated 948 catchfly plants in 70 patches, many of which consisted of only a handful of individuals.  AR 12504, 12248.  Of the four allotments at issue in the LIRA project, the catchfly patches are found in three pastures of the Toomey allotment for a total of 453 plants, four pastures of the Rhodes Creek allotment for a total of 387 plants, and one pasture of the Lone Pine allotment for a total of 108 plants.[9]  AR 12248.  No catchfly patches were located in the Cow Creek allotment.  *Id.*

---

[8] In response to questioning at oral argument about the current state of the catchfly, defendants submitted certain materials to the Court.  (Docket No. 33).  Plaintiff has objected to these submissions as improper extra-record, post-decisional materials.  (Docket No. 34).  However, the Court can and has reviewed the submissions only as background material for the purpose of explanation and clarification herein.  The Court does not consider these submissions as evidence or to be part of the Administrative Record.  The Court's Findings and Recommendations are independent of these materials and do not rely on them.

[9] Specifically, catchfly were found in the Toomey Allotment's Spring Gulch, Lower Spain Saddle, and Johnson Canyon pastures; the Rhodes Creek Allotment's South Roy, Bull Pasture,

According to the Recovery Plan, sufficient research has not been completed to determine exactly what effect livestock grazing and trampling has had on the catchfly. AR 5896. Some literature suggests that careful management of livestock grazing potentially would have no effect, or even a positive effect, on the catchfly. AR 5897. However, the Forest Service notes that the conditions of catchfly habitat and population trends in the LIRA project area indicate that livestock grazing may negatively impact habitat and could be compromising the catchfly's ability to sustain itself in those areas. AR 11387-414, 11511-26, 11865-74, 11890-901, 11931-35. The Forest Service also expressed concern for the negative effects of cattle grazing on the soils of the north facing slopes, which are susceptible to compaction, displacement, and rotational slumping when they are moist. AR 11392, 11676.

## LEGAL FRAMEWORK OVERVIEW

A review of the various statutes and regulations governing the LIRA project decision is helpful to inform the Court's discussion and analysis. As discussed, the Rescissions Act of 1995 triggered the necessity of the LIRA project reauthorization decision.

The National Forest Management Act, 16 U.S.C. § 1600 *et seq.*, requires the Forest Service to develop a land and resource management plan for each unit of the National Forest System, and to provide for multiple uses and sustained yields of various forest resources. *Id.* at §§ 1604(a), (e). Projects within a national forest must be consistent with its forest plan. *Id.* at § 1604(i); *In re Big Thorne Project*, 857 F.3d 968, 973 (9th Cir. 2017).

The Hells Canyon National Recreation Area Act established the Hells Canyon National Recreation Area. 16 U.S.C. § 460gg; *Hells Canyon Alliance v. U.S. Forest Service*, 227 F.3d 1170,

---

East Lightning Bench, and West Lightning Bench pastures; and the Lone Pine Allotment's Big Canyon pasture. AR 12248.

1175 (9th Cir. 2000).   The HCNRA Act requires the Secretary of Agriculture to develop a "Comprehensive Management Plan" ("CMP") that provides for a "broad range of land uses and recreation opportunities" within the HCNRA.  16 U.S.C. § 460gg-5.

The federal lands within the HCNRA are managed under the 1990 Wallowa-Whitman National Forest Land and Resource Management Plan ("Forest Plan") and the HCNRA CMP, which was adopted in 2003 and amended the Forest Plan.  AR 1850-2263 (Forest Plan), 5191-278 (HCNRA CMP Record of Decision).

Under the National Environmental Policy Act, agencies must prepare a "detailed statement" called an Environmental Impact Statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(c); 40 C.F.R. §§ 1502.13, 1502.14.  Such actions are approved via a Record of Decision ("ROD").  40 C.F.R. § 1505.2.

The Endangered Species Act, 16 U.S.C. §§ 1531-1544, Section 4(f), requires federal agencies to "develop and implement" recovery plans for the "conservation and survival" of listed threatened and endangered species, *id.* at § 1533(f)(1). Under Section 7 of the Act, an agency must "insure that any action authorized, funded, or carried out by" the agency is not "likely to jeopardize the continued existence of any" listed species "or result in the destruction or adverse modification" of the species' critical habitat.  *Id*. at § 1536(a)(2).  To do that, the agency must first determine whether any listed species or species proposed for listing may be present in the area of a proposed agency action.  *Id.* at § 1536(c)(1); 50 C.F.R. § 402.12(c).  If such a species may be present, the agency must prepare a Biological Assessment to determine if the proposed action may affect a listed species.  16 U.S.C. § 1536(c)(1).  If the agency determines that the action is likely to

adversely affect the listed species, Section 7 requires the agency to consult with the Fish and Wildlife Service and a Biological Opinion ("BiOp") follows.  *Id*. at § 1536(b).

## PROCEDURAL BACKGROUND

In 2009, the Forest Service began the NEPA process for the LIRA project allotments. AR 12486.  In August 2011, the Forest Service issued a scoping letter concerning its proposal to reauthorize grazing on the four LIRA project allotments.  AR 8050-56.  In March 2014, the Forest Service issued a Draft Environmental Impact Statement ("Draft EIS") regarding the proposed grazing reauthorization.  AR 10478-994.  The Draft EIS considered a "no grazing" alternative, and four action alternatives, including the proposed alternative, Alternative C.  AR 10523-52.  Each proposed action alternative reauthorized grazing on the four allotments at the same grazing levels and for the same seasons of use as permitted since 2004.  *Id.*  The major difference between the alternatives was how cattle would be allotted across the pastures over the course of a single grazing season or over a cycle of grazing seasons.  AR 10542-51.

Plaintiff submitted comments on the Draft EIS.  AR 1105-80.  In March 2015, the Forest Service issued its FEIS and a draft ROD to reauthorize term grazing permits on the four allotments under Alternative C.  AR 11667-12238, 11586-600.  Plaintiff, McClaran Ranch, and the County filed administrative objections to the FEIS and draft ROD.  AR 12305-07, 12312-14, 12315-27, 12484-504.  On July 20, 2015, following an objection resolution meeting, the Forest Service announced changes to the grazing reauthorization that would attempt to further reduce impacts on the catchfly.  AR 12385-98, 12415, 12420, 12437.

The Forest Service also prepared a Biological Assessment ("BA"), pursuant to the ESA, which determined that reauthorizing grazing was "likely to adversely affect" ("LAA") the catchfly.  AR 11342-426.  Accordingly, the Forest Service engaged in formal consultation under Section 7

of the ESA with the FWS, and, in 2015, the FWS issued a BiOp that concurred in the LAA finding. AR 12239-304.  The BiOp also concluded that the grazing reauthorization was "not expected to appreciably reduce either the survival or recovery" of the catchfly, and that the reauthorization's management guidelines and conservation measures "should minimize direct and indirect effects to known occurrences" of the catchfly.  AR 12299.

The Forest Service issued a final ROD adopting a modified version of Alternative C ("Alternative C-modified") on September 3, 2015.  AR 12484-504.  The LIRA project decision authorizes grazing on 33 pastures in the four allotments.  AR 12490.  It incorporates seasonal grazing deferrals that bar late-winter and spring grazing every third or fourth year on the pastures where the catchfly is located within the allotments.  AR 12417, 12420, 12437.  The Forest Service also issued annual operating instructions ("AOIs") for grazing from 2016 to 2018.  AR 12753-63 (2016-17 AOIs), 12835-44 (2017-18 AOIs).  The AOIs have begun to implement the grazing deferrals.[10]  AR 12755, 12837.

Plaintiff commenced this action on January 10, 2018.  (Docket No. 1).  Plaintiff requests declaratory relief that the LIRA project FEIS, final ROD, and AOIs violate NFMA, the HCNRA Act, NEPA, and implementing regulations.  Plaintiff asks the Court to vacate the LIRA project FEIS and final ROD, and to require the Forest Service to conduct further administrative

---

[10] In spring 2017, grazing was deferred in the East and West Lightning Bench pastures in the Rhodes Creek Allotment, AR 12755, and, of the pastures with catchfly, only two were grazed after the end of March – Bull Pasture (April 1 to 15) and Big Canyon (March 1 to April 1 and May 15 to 31).  AR 12756-57.  In spring 2018, grazing was deferred in the Johnson Canyon, Lower Spain Saddle, and Spring Creek pastures in the Toomey Allotment, AR 12837, and, of the pastures with catchfly, four were grazed after the end of March, Bull Pasture (February 1 to May 1), East Lightning Bench (April 1 to 15), West Lightning Bench (April 1 to 15), and Big Canyon (March 1 to April 1 and May 15 to 31).  AR 12383.  In spring 2015 and 2016, four of the pastures with catchfly were authorized for grazing after the end of March – Spring Gulch (February 15 to April 15), Johnson Canyon (February 15 to April 15), East Lightning Bench (April 1 to 30), and West Lightning Bench (April 1 to 30).  SUPP AR 142, AR 12508.

proceedings to address these violations if continued grazing is to be permitted in the LIRA project area.

On April 5, 2018, the County and McClaran Ranch filed an unopposed Motion to Intervene (Docket Nos. 6-8), which the Court granted on May 9, 2018 (Docket No. 13).

## LEGAL STANDARD

The parties have filed cross-motions for summary judgment. Because the court's review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, is generally limited to the administrative record, no facts are in dispute. However, summary judgment may be used as a vehicle for the court to conduct its review of the record. The court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir.1985).

Under the APA, a court "shall" set aside any agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quotations omitted). "As a reviewing court, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quotation omitted). "To have not acted in an arbitrary and capricious manner, the agency must present a rational connection between the facts found and the conclusions made." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (quotation omitted). "[W]here the agency's reasoning, although complex, is rational, clear, and complete, [the court] must affirm. Contrarily, where the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret, [the

court] must disapprove the agency's action." *Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. E.P.A.*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (quotation omitted). "Although [the court's] inquiry must be thorough, the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601 (quotation omitted).

Normally, agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[A]n agency's decision can be upheld only on the basis of the reasoning in that decision." *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

## ANALYSIS

### I.    Standing

Defendants first argue that plaintiff lacks standing to bring its challenge to the LIRA project grazing reauthorization.

"To establish standing, a plaintiff must show that (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (quotation omitted). An organization or association

> has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (quotation omitted). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) (quotation omitted). "[A] vague desire to return to the area without any description of concrete plans, or indeed any specification of when the some day will be does not support a finding of actual or imminent injury." *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) (quotation and emphasis omitted).

Plaintiff has adequately demonstrated standing. Specifically, the Warnock Declaration, Second Coe Declaration, and Second Bailey Declaration establish those individuals', and thus plaintiff organization's, aesthetic, recreational, and other interests in the HCNRA and the catchfly. (Docket Nos. 25-27). Deleterious effects to the catchfly in the LIRA project allotments could affect the status of the catchfly, including throughout the HCNRA, and thus harm these interests. Declarants assert specific intentions to return to the HCNRA. The prayed for remedy of vacatur and remand has the potential to redress the asserted injuries, because remand could result in a revised livestock grazing reauthorization that further protects the catchfly. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 861 (9th Cir. 2005).

Thus, plaintiff has shown standing to bring this action and these claims.[11]

---

[11] Defendant-intervenors argue that "Plaintiff's request for relief is inherently inconsistent and confusing," and charge that plaintiff, despite its arguments to the contrary, really desires to ban all grazing in the LIRA project area or throughout the HCNRA. Def.-Intervs. Reply, at 19 (Docket No. 28). The Court does not understand this to be plaintiff's position, and plaintiff's briefing does not bear out this characterization. The relief plaintiff seeks is remand so that the Forest Service may analyze the LIRA project decision in accordance with the various directives and legal obligations raised in plaintiff's arguments.

## II.     National Forest Management Act Claims

Plaintiff argues that defendants have violated NFMA, and the Forest Plan developed thereunder, because the LIRA project grazing reauthorization does not sufficiently ensure catchfly viability and recovery.

### A.     The National Forest Management Act

"The NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) (citing 16 U.S.C. § 1604). First, the Forest Service develops a Land and Resource Management Plan (a "forest plan"), containing "broad, long-term plans and objectives for the entire forest." *Id.* It then implements the forest plan through site-specific projects. *Id.* NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands" be consistent with the forest plan. 16 U.S.C. § 1604(i).

"Procedurally, all management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the NFMA." *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 (9th Cir. 2010) (quotation omitted and alterations normalized).

> Substantively, the NFMA also places a duty on the Forest Service to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area . . . ." 16 U.S.C. § 1604(g)(3)(B). In order to ensure compliance with the forest plan and the NFMA, the Forest Service must conduct an analysis of each "site specific" action, such as a timber sale, to ensure that the action is consistent with the forest plan.

*Id.* (some quotations omitted and alterations normalized). "Every project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components." 36 C.F.R. § 219.15(d). NFMA's consistency requirement applies to all site-specific actions authorizing

grazing on national forest lands, including term grazing permits and AOIs. *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1077 (9th Cir. 2010).

Land and resource management plans must "provide for multiple use and sustained yield of the products and services obtained therefrom . . . , and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness[.]" 16 U.S.C. § 1604(e). The Forest Service has broad discretion to determine how to balance these uses to "best meet the needs of the American people." *Id.* at § 531(a). NFMA gives the Forest Service "flexibility," because the agency "has many different goals—conservation, commerce, recreation, and so on." *In re Big Thorne*, 857 F.3d at 976. It also "reflects a congressional judgment that balancing these goals calls for policy judgments—judgments that often require trade-offs among worthy objectives[.]" *Id.* "While NFMA requires that the proposed site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Weldon*, 697 F.3d at 1056.

## B.    CMP Directives

Plaintiff argues that the Forest Service violated NFMA, the Forest Plan, and the HCNRA Act by failing to comply with CMP directives pertaining to catchfly viability and monitoring, catchfly recovery, and grazing utilization rates. The CMP directives modify the Forest Plan developed under NFMA pursuant to the HCNRA Act.

### 1.    Enforceability of CMP Directives

As a preliminary matter, defendants argue that the CMP directives plaintiff relies on in its NFMA and HCNRA Act claims are not subject to judicial review because they are either high-level and Forest-wide standards rather than project-specific mandates; or discretionary or aspirational, due to the language of the provisions and the nature of plan "objectives" or "goals."

Defendants' arguments, however, are contrary to well-settled law from the Ninth Circuit and this District.

First, the Ninth Circuit has repeatedly held that forest-wide provisions are enforceable at the site-specific level. "The Forest Service is bound to assess proposed actions on a 'site specific' basis for compliance with the Forest Plan and NFMA[,]" not just mandatory, site-specific standards and guidelines within the Forest Plan. *Tidwell*, 599 F.3d at 934; *see also* 16 U.S.C. § 1604(i); *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996) (explaining that both the Forest Plan and site-specific project stages must fully comply with the NFMA). In *Neighbors of Cuddy Mountain v. Alexander*, the Ninth Circuit explained that "forest-wide practices" and "forest-wide management decisions" may be challenged in the context of challenging a specific management action because

> compliance with NFMA's forest-wide species viability requirements is relevant to the lawfulness of any individual timber sale. To hold otherwise would permit the Forest Service to don blinders to the overall condition of a national forest each time it approved a sale, quite literally losing sight of the forest for the trees.

303 F.3d 1059,1067, 1069 (9th Cir. 2002).

Second, the language and labels of the directives at issue in this case do not support defendants' arguments that the directives are discretionary. In *Oregon Natural Desert Ass'n v. Sabo*, the court considered whether Forest Plan goals, objectives, standards, and guidelines could be enforced in connection with a grazing reauthorization. 854 F. Supp. 2d 889, 915 (D. Or. 2012). The provisions included directives to "[m]aintain or enhance the characteristics of riparian areas," and that habitats "will be managed to stabilize stream channels," did not contain language expressly applying them to specific projects. *Id.* at 916. The court rejected the Forest Service's argument that "'goals' and 'objectives' cannot serve as the basis for a NFMA violation" and stated that, instead of looking to the labels (such as "goal" or "objective") of directives, courts must "look

to whether language of the provision is mandatory by the use of 'shall' or 'will' or whether the language is merely suggestive, such as by the use of 'may.'" *Id.* at 916-17. Because the provisions included mandatory language, the court treated them as such and concluded that they were enforceable. *Id.* Similarly, although the directives at issue in this case, which the Court will discuss below, are referred to in the CMP as "goals," "objectives," and "guidelines," they are phrased in imperative language, such as "[m]anage habitat and populations" (Bio-O3), "[m]itigate potential conflicts or modify the project" (TES-S1), and "[i]mplement recovery plans" (TES-O3), which indicates that the directives are intended to be mandatory.

Finally, the Ninth Circuit and courts in this District have repeatedly enforced similar forest plan directives. For example, in *Tidwell*, the Ninth Circuit enforced forest plan "species diversity maintenance goals" that were expressly applied "throughout the forest" in the context of a site-specific challenge to grazing reauthorization. 599 F.3d at 932, 934. The maintenance goals provided, in part, that: "[v]iable populations of all existing wildlife species will be maintained," and "[w]ildlife indicator species have been identified and will be monitored." *Id.* at 932. Similarly, in *The Lands Council v. McNair*, the Ninth Circuit entertained a challenge to an individual timber sale, based on plaintiff's assertion that the Forest Service failed to comply with a wildlife viability forest plan directive. 537 F.3d 981, 989 (9th Cir. 2008), *overruled on other grounds, as recognized by Turtle Island Restor. Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 739 (9th Cir. 2017). In *Hells Canyon Preservation Council v. Connaughton*, the court enforced, in the context of a livestock grazing permit reauthorization, a "CMP objective." No. 3:11-cv-00023-PK, 2012 WL 13047991, at *9 (D. Or. Aug. 10, 2012), *report and recommendation adopted as modified*, 2013 WL 665134 (Feb. 22, 2013).

The cases that defendants rely on are distinguishable and inapplicable.  In *In re Big Thorne*, the Ninth Circuit found a forest plan provision not enforceable because it was phrased in discretionary language, requiring the protection of certain habitat only "where possible," which the court concluded rendered this provision "an aspiration, not an obligation."  857 F.3d at 974. By contrast, the CMP provisions cited by plaintiff in this case are not phrased in qualified language such as "where possible."  In *Cascadia Wildlands v. Bureau of Indian Affairs*, the court's analysis relied on a particular definition of "objective" found in the specific forest plan at issue there, 801 F.3d 1105, 1115 (9th Cir. 2015), which does not extend to other forest plans, such as the one here. In *Central Oregon Landwatch v. Connaughton*, the district court held that it would not enforce a specific directive because the action at issue was not a final agency action, which is an issue not argued in the present case.  No. 6:13-cv-02027-AA, 2014 WL 6893695, at *7 (D. Or. Dec. 5, 2014), *aff'd*, 696 F. App'x 816 (9th Cir. 2017).  Lastly, *Oregon Natural Desert Ass'n v. U.S. Forest Service* relied on similar reasoning that there was not a final agency action.  No. 3:03-cv-213-PK (D. Or. Oct. 3, 2017) (Docket No. 485), slip op, at 17, Fed. Defs. MSJ, Ex. 1 (Docket No. 21-1). None of these cases supports defendants' arguments that the CMP directives plaintiff cites here are not mandatory or binding or are not judicially enforceable.

Thus, the Court proceeds to consider the specific CMP provisions plaintiff cites, and to analyze whether the FEIS and ROD demonstrate compliance under APA standards.

### 2.    Application to CMP Directives

Plaintiff argues that the Forest Service failed to comply with provisions in the CMP that obligate the Forest Service to manage catchfly habitat and populations in a way that ensures the plant's viability and recovery within the HCNRA.

a)      Viability

CMP directive Bio-O3 requires the Forest Service to "[m]anage habitat and populations of all rare and endemic plant species to ensure their continued existence and viability in the HCNRA." AR 4513.   Although the Forest Service did not include a section in the FEIS and ROD that specifically performed a "viability determination," the Forest Service provided sufficient explanation throughout the FEIS and ROD to show, under APA standards, that it complied with the mandate to ensure catchfly existence and viability. *Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012) ("[e]ven when an agency explains its decision with less than ideal clarity," the Court "must uphold it if the agency's path may reasonably be discerned" (quotation omitted)).   And, in doing so, the Forest Service complied, not only with the broad mandate of Bio-O3, but also with the CMP standards on threatened, endangered, and sensitive species that require the Forest Service to "survey probable habitat for rare plants" and "[m]itigate potential conflicts" (TES-S1)[12] and to "[m]onitor population trends and habitat conditions" for threatened plant species (TES-S2).   AR 4514-15.

The Forest Service surveyed catchfly populations and habitat in the LIRA project area, analyzed potential effects on the population, and provided for mitigation measures that could be implemented under any of the alternatives to increase protections for the catchfly.   AR 11380-86 & Map 7 and Table 13 (describing catchfly surveys and summarizing occurrence data), 11754-805 (describing rangeland conditions and impacts), 11885-909 (describing soil conditions and impacts), 11856-82 (analyzing the potential impacts of each alternative on catchfly populations),

---

[12] Plaintiff initially raised TES-S1 in its brief, but clarified in its response that it was not a stand-alone violation, but rather, demonstrated that the Forest Service lacks a sufficient basis to determine that its LIRA project decision is consistent with the viability directive.   Pl. Resp., at 12-13 (Docket No. 24).

SUPP AR 38-85 (same), AR 11713-16 (describing mitigation measures aimed at improving catchfly habitat).  The LIRA project relied on current survey information to document smaller populations of the catchfly in the project area.  AR 12275-76, 12278 & Fig. 8, 11355-56 & Table 3a, 11380-86 & Map 7 and Table 13.  The LIRA project decision also considered potential effects of each alternative on catchfly populations.  AR 11856-82.  The decision developed mitigation measures aimed at improving catchfly habitats, such as increasing the use to riding and herding to distribute livestock in areas of the pastures that are not as vulnerable to hoof shear, shortening the grazing season, or decreasing stocking numbers, which are incorporated into grazing strategies for further projection.  AR 11713-16.  Finally, the LIRA project decision requires short-term utilization monitoring and long-term effectiveness monitoring and adopts an adaptive management approach by expressly reserving the Forest Service's right to adjust the timing, intensity, and duration of grazing based on site conditions to ensure recovery efforts are effective.  AR 11716-18, 5047, 4757-72 (CMP monitoring guidelines), 9417 (term grazing permit reserving FS authority to modify).

Based on its surveying and assessment, the Forest Service found that the reauthorization will reduce the risk of trampling, that catchfly populations "appear stable," and that the reauthorization will improve catchfly conditions in multiple respects.  AR 11387, 11857, 12426.  The Forest Service described conflicts between grazing and the catchfly and modified grazing from the status quo, and then again modified its proposed action by developing Alternative C-modified to mitigate those conflicts and provide additional protections for the catchfly.  AR 12487-94.  In replying to plaintiff's objections at the agency level, the Forest Service rationally concluded that, under its interpretation of Bio-O3, these findings amounted to a showing that it complied with the directive.  AR 12469-71.

Plaintiff argues that the Forest Service failed to comply with its duty to ensure the continued viability of the catchfly because the limited data shows that the catchfly and its habitat are in poor condition and that the habitat is negatively affected by grazing. Plaintiff asserts that catchfly populations in the LIRA project area are "vulnerably small" and currently below minimum viability thresholds identified by the Forest Service's botanist and the by the FWS.

Although the survey reported numbers for some of the catchfly populations that fell below the 500-plant threshold, the survey used to inventory catchfly plants across the LIRA project area was not intended to identify every plant in the area. AR 11380. Instead, it aimed to identify enough plants to facilitate an environmental analysis. *Id*. The FEIS explains that because "[b]otanists have to balance the time put into documenting," that is finding and counting, all new plant occurrences "with time put toward locating additional new occurrences" and because of dormancy issues, the numbers reported at each site likely "underrepresent the actual numbers there." AR 11865-66. The Forest Service's conclusion that the survey likely underrepresents the catchfly populations in the LIRA is based on the agency's past experiences with the species. The FEIS notes that "[a]t every other Spalding's catchfly site found on [the Forest], additional inventory and monitoring doubled (at a minimum) the number of plants reported for a given site." AR 11866.

The Forest Service also recognized that much of the catchfly's habitat is in unsatisfactory condition, with detrimental soil conditions and experiencing invasive plant proliferation, and that grazing can have a detrimental impact on the habitat. AR 11674-75, 11792, 11798, 11804, 11805 Table 23, 11806-33. However, the current state of the habitat does not mean that the Forest Service's LIRA project decision fails to ensure the viability of the catchfly. Both purposes of the LIRA project seek to improve catchfly habitat. *See* AR 11676 (the two issues the LIRA project

seeks to address are assessing and reducing the impacts of grazing on (1) the catchfly and its habitat and (2) deep soils on north facing slopes, which are the primary habitat of the LIRA catchfly). And, as explained below, the Forest Service used the best available science to determine that its decision would benefit the catchfly.

Plaintiff also argues that the Forest Service's decision lacks rational support because the Forest Service does not have sufficient data about populations and habitat conditions or trends and because the Forest Service does not have adequate methods for determining viability based on habitat.

The record demonstrates that the Forest Service used the available data on catchfly populations and habitat in the LIRA, from both project-specific and historical surveys, and considered that data, in its professional judgment, to be sufficient.   The Forest Service acknowledged that population and trend data on the catchfly was limited and explained why the LIRA project survey did not seek to detect all the catchfly plants in the LIRA project area. AR 11380 (explaining that although "it is ideal to locate all the [catchfly] plant locations within a project area, . . . it was not feasible to survey all potential habitats or confidently locate all populations" in the LIRA project area, instead "the goal was to detect as many" catchfly as possible "to facilitate environmental analysis"), 12275 (FWS BiOp concurring in that decision).  The Forest Service also explained why reliable population trend data would not be available for decades. SUPP AR 48-49 (detecting a population trend for the catchfly may take between 5 and 25 years because of its "set of challenging biological traits, its unique spatial distribution across the landscape, and annual climatic fluctuations").

The Forest Service's decision to focus its viability assessment on the effects of the grazing alternatives on catchfly habitat was rational.  AR 11824.  The Forest Service's experts found that

"simple population inventories do not give an accurate representation of the existing population." AR 12168. And they determined instead that "quality of habitat" is "a more reliable indicator of whether or not" the catchfly "has an opportunity to persist." *Id*. Similarly, the Biological Evaluation conducted by the Forest Service's botanist explains that, because "[h]abitat condition parameters are expect to respond more quickly and clearly to management actions[,] . . . trends in vegetation and soil (habitat) quality will be used as a surrogate" for assessing the effects of range management actions on the catchfly. SUPP AR 49.

The Forest Service also had adequate methods for determining catchfly viability based on habitat. Plaintiff's arguments suggest that, to be adequate or rational, the Forest Service's habitat-proxy method must by quantitative. Nothing in NFMA or the CMP dictates the methods or evidence that the Forest Service must use to assess viability. Instead, a viability determination is sufficient if it is "based on the current state of scientific knowledge." *McNair*, 537 F.3d at 992. As the agency's botanist explained, because there is "currently no feasible way to quantify effects" to the "[c]atchfly from the various factors of each alternative and cumulative activity[,]" the Forest Service's effects and viability analysis "will inherently be qualitative and based on professional judgment and professional interpretation of reported impacts . . . applied to the project area." SUPP AR 49. Applying that method, the Forest Service disclosed known catchfly sites and existing habitat conditions at those sites and explained how improved site-specific habitat conditions would benefit the catchfly. The Forest Service also explained how each of the alternatives that included additional grazing management activities would improve habitat conditions.

Ultimately, plaintiff's viability arguments boil down to (1) demands for specific types of data and (2) disagreements with the decisions that the Forest Service made in the face of uncertainty about the catchfly, its habitat, and how grazing could impact both in the specific

circumstances of the LIRA project.  However, as discussed, the Forest Service used the data and

data types that were available and explained why that data was sufficient to assess viability, given

the limited research on the catchfly.  The Forest Service's choices of how to proceed with limited

data and in the face of uncertainty were decisions within Forest Service's expertise that are entitled

to deference

In sum, the record demonstrates that the Forest Service's viability determination was based

on the current state of scientific knowledge and that the agency complied with the viability

directive.

      b)   Recovery

CMP directive TES-O1 requires the Forest Service to:

> Manage habitat and populations of federally listed threatened, endangered or
> proposed plant species to ensure their continued existence and recovery in the
> HCNRA.  Ensure that ongoing and new management actions do not jeopardize
> federally listed threatened, endangered or proposed plant species. Implement
> restoration and recovery activities that would facilitate removal of species from the
> federal threatened and endangered species list.

AR 4514.  And TES-O3 provides:

> Implement recovery plans for federally listed threatened, endangered or proposed
> plant species cooperatively with the USFWS.  Contribute to revisions of recovery
> plans, and carry out recommended actions in recovery plans.

*Id.*[13]

Plaintiff argues that the CMP imposes an affirmative obligation on the Forest Service to

recover the catchfly and its habitat, which, in turn, requires the agency to implement a recovery

plan.  Plaintiff contends that the Forest Service failed to meet this obligation by (1) failing to

---

[13] Plaintiff initially cited TES-O3 as another CMP provision imposing a recovery
obligation. Pl. Br., at 22 (Docket No. 16).  However, plaintiff clarified in its response brief that it
cited the provision to support its assertion that the Forest Services failure to follow certain
Recovery Actions evidences the agency's failure to follow TES-O1.  Pl. Resp., at 19-20 (Docket
No. 24).

mention the objective that imposes this affirmative obligation or to explain how the LIRA decision is consistent with the obligation; (2) disregarding key recovery actions in the Recovery Plan that the Forest Service developed in consultation with the FWS; (3) failing to develop Allotment Management Plans ("AMPs") for the LIRA project Allotments; and (4) failing to offer any data or analysis showing that the mitigation measures in modified Alternative C will recover the catchfly's population within the HCNRA.

First, the CMP provisions do not require the Forest Service to *affirmatively recover* protected species such as catchfly. Plaintiffs arguments suggest that the LIRA project must increase catchfly populations and improve catchfly habitat in the LIRA project area to comply with the CMP, but nothing in the language of the provisions imposes such an affirmative obligation. Moreover, plaintiff's interpretation of the provisions goes beyond what even the ESA requires a project to do for a protected species. *See Sw. Ctr. For Bio. Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998) (the ESA does not require a showing that a project will "affirmatively recover" a listed species). Instead, the Court understands TES-O1 to holistically require the Forest Service to ensure that none of its actions, including site-specific projects, impede the recovery of the catchfly in the HCNRA or jeopardize the catchfly within the meaning of the ESA. TES-O1 also requires the Forest Service to implement restoration and recovery activities for the catchfly. Accordingly, plaintiff's arguments based on its interpretation of the recovery directives are without merit.

Although the FEIS and ROD do not explicitly refer to TES-O1, the record as a whole shows compliance with the Forest Service's obligations under that provision. The agency's consultation with the FWS and the results of that consultation demonstrate that the decision will not jeopardize the catchfly or impede the species' recovery. In the BiOp, the FWS made a "no-jeopardy"

determination.  AR 12298-99.  Plaintiff is correct in noting that a "no-jeopardy" determination under the ESA is not the same as a finding that a project will help to recover a threatened or endangered species.  Pl. Resp, at 20-21 (Docket No. 24).  However, the FWS also found that, "due to conservation measures incorporated into the project," the project is "not expected to appreciably reduce either the survival or recovery of Spalding's catchfly" and "[n]o significant reduction in numbers, reproduction, or distribution is expected."  AR 12299.  In its own analysis, the Forest Service concluded that the project would provide a net benefit to the catchfly and found that the catchfly's needs are being met.  AR 12183.  The Forest Service also addressed its obligation to implement restoration and recovery activities for the catchfly by considering compliance with the Recovery Plan, by adopting specific grazing management measures to protect the catchfly, and by prescribing monitoring that would help facilitate the implementation of the recovery plan.  AR 11866, 12430, 12491, 12501.

That the Forest Service did not directly implement some of the recommend actions from the Recovery Plan does not render its decision arbitrary and capricious.  Recovery plans are not binding on other agencies.  *Conservation Congress v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014). Plaintiff argues that the Forest Service disregarded Recovery Action 2.3.4.1, which provides:

> Livestock grazing should not occur within *Silene spaldingii* populations, especially at key conservation areas, when seedling germination occurs in early spring (April and May), during plant emergence and growth (May and June), or when the plant is flowering and setting seed in late July through September.  Careful monitoring that demonstrates livestock do not generally utilize areas where *S. spaldingii* resides (*i.e.* hard to reach because of rocky areas or distant from water sources) or demonstrates that population numbers are not being deleteriously affected . . . by livestock grazing, may preclude these prescriptions.

> Effective grazing management may include the construction and maintenance of fencing, move watering troughs and/or salting areas away from *Silene spaldingii* population, allowing for rest years, and revising allotment plans, grazing schedules, and stocking levels to maintain *S. spaldingii* habitat.  Management of livestock

should be tailored to each individual site based on topographic features and utilizations scenarios.

Grazing that reduces vegetation by over 50 percent should not take place at any time because of the potential damage to pollinators, the chance for creating and exacerbating invasive nonnative plant problems, and the damages that *S. spaldingii* may incur.  Livestock grazing should not occur in *S. spaldingii* pastures where serious invasive nonnative plant populations exist unless invasive nonnative flowers have been removed.  Responsible parties should evaluate cumulative effects of herbivory in areas where both native and domestic ungulates graze.

AR 5957-58.

Plaintiff asserts that the LIRA project decision continues to allow grazing on pastures with catchfly sites that have serious invasive plant problems and in March through May, times when seedling germination and plant emergence and growth are likely to occur.  The Forest Service addressed this assertion when plaintiff raised them in its objections to the draft ROD and FEIS. AR 12429-30.  The Forest Service also found that the LIRA project decision is appropriately aligned with the recovery plan, even if it did not adopt or implement all of the recommended actions from the FWS's Recovery Plan.  AR 12430.  The Forest Service noted that the Recovery Plan stated that monitoring that demonstrates that livestock generally do not use catchfly sites or that populations numbers are not being negatively affected by grazing during those periods of catchfly germination and growth could preclude the need to eliminate grazing.  *Id*.  And the Forest Service explained that the LIRA project decision would introduce management activities to reduce the impact of grazing in April and May and monitoring to detect whether the changes are effective. *Id*.

Plaintiff also asserts that the LIRA project decision does not satisfy Recovery Action 2.3.4.1 and Gra-S2 because the Forest Service continues to issue AOIs with forage utilization

levels above 50 percent and above 35 percent in pastures in "unsatisfactory condition."[14] However, a review of the record demonstrates that the LIRA project decision sets maximum utilization at 50 percent in pastures with catchfly, in line with the recovery recommendation. AR 12501. By reducing the maximum utilization rate for late spring in "unsatisfactory" pastures to 35 percent, the LIRA project decision also complies with Gra-S2, which provides that in unsatisfactory sites "management practices will be designed to improve ecological status to a satisfactory condition." *See* AR 1916-64 (Forest Plan Standard 4.52), 4469-70 (Gra-S2), 11805 Table 23 (site-specific management changes for LIRA project area pastures in unsatisfactory condition), 12488-89 (Alternative C-modified will involve moving cattle through the pastures in Cow Creek, Rhodes Creek, and Toomey based, in part, on meeting utilization standards in key areas). Finally, the AOIs instruct McClaran Ranch to comply with the utilization standards. Under "Allowable Use," the AOIs explain that the length of time spent in each unit depends on the utilization standards set forth in tables provided in the AOIs, which are designed to comply with the requirements of the Forest Plan. AR 12508 (2015-16 AOIs), 12757 (2016-17 AOIs), 12839 (2017-18 AOIs). They further explain that, in the tables, percentage standards "have been converted to stubble height for ease of monitoring." *Id.*[15]

---

[14] The FEIS explains that the CMP and Forest Plan identify "utilization standards" to "assure continued maintenance or improvement of the vegetation and soil conditions." AR 11759. Utilization standards represent the amount of vegetation that may be grazed in a certain area over that area's season of use. For herbaceous vegetation in upland areas, utilization "is generally measured by percent removed by weight," and for herbaceous vegetation in riparian areas, utilization "is measured by amount of residual stubble height remaining, including regrowth, at the end of the grazing season." *Id.*

[15] Plaintiff observes that the only percentage that the "Allowable Use" sections expressly references is the CMP's maximum utilization standard of 60 percent for fall. However, that rate is referenced in a quote to the CMP, which also recognizes that different utilization standards apply during different times in the grazing season and does not purport to override the 50 percent standard set forth in the LIRA project decision. AR 12508, 12757, 12839. Additionally, where

Neither does the Forest Service's failure to develop Allotment Management Plans ("AMPs") for the allotments render the decision arbitrary and capricious. Plaintiff acknowledges that the lack of AMPs for the LIRA project allotments is not an independent NFMA violation. Pl. Resp., at 20 (Docket No. 24); *see also Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-00737-CL, 2017 WL 5957811 *1 (D. Or. Jan. 18, 2017) (the "Forest Service has sole discretion to determine when to perform environmental analyses in the context of" AMPs). Plaintiff is correct in noting that the Forest Service would develop site-specific rates of recovery during the AMP process. Pl. Resp., at 20 (Docket No. 24). But plaintiff argues that the Forest Service needs those rates, or comparable information, to ensure that the LIRA project will affirmatively recover the species. As noted above, that argument relies on an inaccurate understanding of the Forest Service's recovery obligations. Moreover, the Forest Service adequately demonstrated how the LIRA project would meet the requirements of TES-O1 using the data currently available.

## III.    Hells Canyon National Recreation Area Act Claim

Plaintiff argues defendants violated the HCNRA Act because the grazing reauthorization is not compatible with catchfly preservation. Defendants respond, first, that plaintiff waived its right to assert an HCNRA Act claim and, second, that the LIRA project decision complied with the Act.

---

the AOIs' tables do provide both stubble height and percentage standards, none of the utilization rates exceed 50 percent. AR 12758-59. Finally, late spring 2017 monitoring in Johnson Canyon, Spring Gulch, and Lower Spain Saddle, all pastures with catchfly and that were identified as being in unsatisfactory condition, shows utilization rates ranging from 8 percent and 35 percent. AR 12775-79 (Johnson Canyon utilization ranging from 8% to 35%), 12781 (Lower Spain Saddle utilization at 20%), 12783 (Spring Gulch utilization at 12%).

### A.    The Hells Canyon National Recreation Area Act

"The Hells Canyon National Recreation Area (HCNRA), located on Oregon's border with Idaho, was established by Congress in 1975 pursuant to the Hells Canyon National Recreation Area Act[.]"  *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 684 (9th Cir. 2005). The  HCNRA  Act  requires  the  Secretary  of  Agriculture  to  promulgate  a  Comprehensive Management Plan ("CMP") for the HCNRA, to provide for a range of land uses and recreational opportunities.  16 U.S.C. § 460gg-5(a).

Section 7 of the HCNRA Act states that the Forest Service "shall" administer the HCNRA "in a manner compatible with" various objectives, including: "preservation, especially in the area generally known as Hells Canyon, of all features and peculiarities believed to be biologically unique including . . . *rare and endemic plant species* . . . and the rare combinations of outstanding and diverse ecosystems and parts of ecosystems associated therewith[.]"  16 U.S.C. § 460gg-4(3) (italics added).   Another § 7 objective is "management, utilization, and disposal of natural resources,"  including  "grazing,"  but  only  to  the  extent  such  uses  "are  compatible  with  the provisions of this subchapter[,]" including preservation of plant species.  *Id.* § 460gg-4(7).  The Forest Service "interprets Section 7 as the primary objectives for which the HCNRA should be managed." AR 3458, 3583-84.  The HCNRA Act recognizes grazing "as [a] traditional and valid use[] of the recreation area."  16 U.S.C.A. § 460gg-10; *see Hells Canyon All.*, 227 F.3d at 1179 ("[T]he [HCNRA] Act established a recreation area, not a pure refuge or wilderness area.").

Regulations pursuant to the HCNRA Act further restrict grazing on rangeland:

(a) Grazing may be authorized only on rangeland determined by the authorized officer  to  be  suitable  for  grazing  and  meeting  or  moving  towards  satisfactory condition and meeting the conditions described in paragraph (b) of this section.

(b) Where  domestic  livestock  grazing  is  incompatible  with  the  protection, restoration, or maintenance of fish and wildlife or their habitats; public outdoor

recreation; conservation of scenic, wilderness, and scientific values; rare combinations of outstanding ecosystems . . . the livestock use shall be modified as necessary to eliminate or avoid the incompatibility. In the event an incompatibility persists after the modification or modification is not feasible, the livestock use shall be terminated.

36 C.F.R. § 292.48.

B.    **Waiver**

Defendants argue that plaintiff waived its right to assert a claim under the HCNRA Act because its formal objection did not notify the Forest Service of any concerns regarding the LIRA project's compliance with the Act.

The administrative exhaustion requirement is "interpreted broadly." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010). To satisfy the exhaustion requirement, a plaintiff must raise an issue during the administrative process "with sufficient clarity to allow the decision maker to understand and rule on the issue raised[.]" *Id.* Alerting an agency in general terms is enough to satisfy the exhaustion requirement as long as the agency has been given "a chance to bring its expertise to bear to resolve [the] claim." *Lands Council v. McNair*, 629 F.3d 1070, 1075 (9th Cir. 2010) (alteration in original); *see also Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002). There is no need to cite the relevant statute or regulation to exhaust a legal issue, nor does a plaintiff need to invoke the exact legal terms of art drawn from those statutory authorities. *Or. Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1161 (D. Or. 2011).

Plaintiff sufficiently raised the HCNRA Act at the agency level. Its comments on the Draft EIS cite the HCNRA Act, the requirement to preserve rare plants and habitats, and the provision that grazing be permitted only if compatible with the protection of habitats. AR 11055. Its objections to the FEIS also cite the HCNRA Act and "the continued existence, viability and

recovery of Spalding's Catchfly in the HCNRA[.]"  AR 12317.  In its response to plaintiff's comments, the Forest Service addressed the HCNRA Act, and thus was on notice of compatibility concerns.  AR 12172-73.

### C.    Grazing Compatibility under the HCNRA Act

Plaintiff argues that the Forest Service failed to adequately consider and analyze, under the HCNRA Act and its regulations, whether the LIRA project grazing reauthorization is compatible with preservation of the catchfly and its habitat, whether the authorized grazing areas are meeting or moving toward satisfactory conditions, whether grazing should be modified to eliminate or avoid incompatibility, and, finally, if modification cannot resolve incompatibility (or if modification is not feasible), whether grazing must be terminated.  *See* 16 U.S.C. §§ 460gg-4(3) & (7), 460gg-10; 36 C.F.R. § 292.48.

Plaintiff's arguments as to the HCNRA Act and grazing compatibility repeat and rely upon the arguments that defendant failed to comply with the CMP directives cited above.  Because defendant has shown that it sufficiently analyzed and demonstrated compliance with those directives, it also satisfied the HCNRA Act's requirements as to compatibility and modification of grazing with regard to the catchfly.

Moreover, compatibility must be viewed in light of the HCNRA Act's commitment to a multiple-use policy, *see Lands Council*, 537 F.3d at 990, and recognition that grazing is a traditional use of the HCNRA, 16 U.S.C. § 460gg-10.  The record in this case demonstrates that the Forest Service sought to balance the conservation of the catchfly with the responsible use of the area's rangeland resources to support livestock grazing.  In sum, plaintiff has not shown an HCNRA Act violation on these bases.

\*      \*      \*      \*      \*

To summarize the Court's recommendations with regard to NFMA and the HCNRA Act: The Court should GRANT defendants' and defendant-intervenors' Motions for Summary Judgment and DENY plaintiff's Motion for Summary Judgment. Although the CMP directives are judicially enforceable, defendant has adequately shown that it analyzed and demonstrated compliance with these directives. Plaintiff did not waive its HCNRA Act arguments, but, because these arguments are dependent on its CMP directive arguments, plaintiff has not shown an HCNRA Act violation.

## IV.     National Environmental Policy Act Claim

Plaintiff argues that defendants violated NEPA because they did not consider reasonable alternatives to the LIRA project decision, or take the required "hard look," in reauthorizing grazing. The Forest Service, however, did consider a sufficient range of meaningful alternatives to the project, incorporating a variety of protections for the catchfly, and did take a sufficiently "hard look" at the grazing reauthorization.

### A.     The National Environmental Policy Act

"NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing NEPA § 101, 42 U.S.C. § 4331). It is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purpose is "action-forcing":

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Robertson*, 490 U.S. at 349.  "[T]he task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action."  *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004).  "NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Robertson*, 490 U.S. at 350.  "NEPA does not require particular environmental standards or mandate that agencies achieve substantive environmental results."  *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1150 (9th Cir. 2010).  "NEPA merely prohibits uninformed—rather than unwise—agency action."  *Robertson*, 490 U.S. at 351.  Courts are generally "most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA."  *Weldon*, 697 F.3d at 1051 (quotation omitted).

### B.    Consideration of Reasonable Alternatives

Plaintiff argues that the Forest Service should have examined alternatives that would have (1) eliminated grazing in pastures or areas with known catchfly sites by, for example, excluding catchfly sites from pasture boundaries and (2) eliminated grazing during late winter/spring in areas whether catchfly and their habitat are highly susceptible to adverse grazing impacts. [16]

An EIS must consider the underlying "purpose and need" for a proposed action, and "[r]igorously explore and objectively evaluate" the environmental impacts of "all reasonable alternatives" to the action.  40 C.F.R. §§ 1502.13, 1502.14.  The alternatives analysis is "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form," allowing for fully informed decisionmaking and public

---

[16] Plaintiff previously proposed an additional alternative that would require decision compliance with the Recovery Plan, but appears to have abandoned this argument in its Reply.  In any event, the Court finds such an alternative too vaguely defined and not specifically required as an alternative that need be considered under NEPA.

participation. *Id.* at §§ 1500.1(b) & (c), 1502.14.  Courts review whether an agency has considered

a sufficient range of alternatives under a "rule of reason" standard that requires the agency to set

forth "only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. Nat'l*

*Park Service*, 155 F.3d 1153, 1160 (9th Cir. 1998) (quotations, alteration, and citation omitted).

"[A]n agency's consideration of alternatives is sufficient if it considers an appropriate range of

alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. Bureau*

*of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990).  An agency need not discuss alternatives

similar to those actually considered, or alternatives that are "infeasible, ineffective, or inconsistent

with the basic policy objectives for the management of the area." *Id.* at 1180.  Nonetheless, "[a]

viable but unexamined alternative renders the environmental impact statement inadequate."

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (quotation

omitted and alterations normalized).  "Feasible alternatives" that meet a project's purposes and

needs "should be considered in detail." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1052

(9th Cir. 2013).

The Forest Service considered five LIRA project grazing reauthorization alternatives. AR

11676-79.  It considered a "no grazing" alternative that closed all four allotments to grazing, and

Alternative B, which reauthorized grazing at the status quo.  AR 10542-43, 11708-09, 11718-26.

Three additional alternatives retained grazing on the LIRA project allotments at the same grazing

levels and same seasons of use as previously permitted, with various combinations of alterations

of the project to provide additional protection of the catchfly and its habitat.  AR 10523-52.

Alternative C retained the same grazing management for three of the allotments, with increased

catchfly protections for two pastures in the fourth allotment, the Toomey Allotment, and with the

possibility of additional management changes if future monitoring revealed a failure of resource

conditions to improve.  *Id.*  Alternative D continued current grazing levels and seasons of use, with a certain of the pastures resting for part or all of the grazing season once every three years.  AR 10543-50, 11726-37.  Alternative E was the same as Alternative C, but utilized the Lone Pine allotment as a forage reserve every three out of five years, with modified temporary grazing permits.  AR 10550-51, 11726-37.

The LIRA project decision ultimately adopted Alternative C, but with further increased protections.  AR 11726-37, 12484-504.  Alternative C-modified replaced the Toomey Allotment management plan with deferred rotations for pastures with documented catchfly populations.  *Id.* Four pastures in the Toomey Allotment, five pastures in the Rhodes Creek Allotment, and one pasture in the Lone Pine Allotment would have deferred grazing for part of the annual grazing season once every three to four years.  *Id.*  Grazing in the Cow Creek Allotment, where no catchfly have been found, would remain largely the same.  *Id.*

These constitute an adequate range of alternatives under NEPA.  The "purpose and need" for the LIRA project analysis was to consider "re-authorizing livestock grazing on the four allotments in a manner that is consistent with the direction in the" Forest Plan and CMP.  AR 11687.  The Forest Service's two stated "significant issues used to formulate alternatives" were (1) impacts of cattle grazing in the LIRA project area on the catchfly and its habitat, and (2) the impact of grazing on deep soils on steep north-facing slopes where catchfly are found.  AR 11680, 11694-95.  The Forest Service considered a maximally-protective alternative, that is, a "no grazing" option that only considered closing the entire allotment area to grazing.  It considered retaining grazing at the status quo, with prior catchfly provisions in place.  And it considered various alternatives with increased protections, and included more protections in the ultimate alternative adopted.

Page 37 – FINDINGS AND RECOMMENDATIONS

This satisfied the requirement in *W. Watersheds Project*, that NEPA mandates consideration of "a reduced- or no-grazing alternative at the site-specific level[.]"  719 F.3d at 1050.  This case is thus distinguishable from the other cases plaintiff relies on—*Muckleshoot Indian Tribe*, 177 F.3d 800; *Native Fish Society v. National Marine Fisheries Services*, 992 F. Supp. 2d 1095 (D. Or. 2014); and *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564 (D.C. Cir. 2016)—because, to the extent those cases require consideration of a "middle ground" alternative between a maximally protective one and a minimally protective one, the Forest Service here considered multiple such alternatives.

Contrary to plaintiff's assertions, the Forest Service was not required to consider an alternative that would eliminate grazing in all areas where catchfly occur by omitting catchfly sites from the pasture boundaries.  The Forest Service determined that it would be infeasible to do so, in part, because it would make it impossible to move cattle around the remaining portions of the Rhodes Creek and Toomey allotments.  AR 12420.  That decision was rational.  Nor was the Forest Service required to consider alternatives that eliminated grazing in catchfly pastures in late winter and spring because Alternatives C-modified and E are sufficiently similar and would lead to comparable results.

The Forest Service thus adequately considered a range of alternatives under NEPA.[17]

### C.    "Hard Look"

Plaintiff argues that the Forest Service failed to take a hard look at the environmental impacts of the proposed alternative compare to the impacts of the other alternatives because the

---

[17] In their Reply brief, defendants bring additional arguments related to the timing of plaintiff's objections regarding consideration of adequate alternatives.  Plaintiff adequately raised its concerns regarding NEPA alternatives, and the nature of the alternatives the Forest Service should have considered, during the administrative process, and the Forest Service was sufficiently on notice thereof.  AR 8421, 11057, 12395.

Forest Service (1) lacked adequate data on the catchfly and (2) did not adequately assess catchfly viability and recovery in the HCNRA.

"Taking a 'hard look' includes considering all foreseeable direct and indirect impacts." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012) (quotation omitted). "Direct" effects (i.e., impacts) "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). "Indirect" effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable[,]" including "effects on air and water and other natural systems, including ecosystems." *Id.* at § 1508.8(b). "Cumulative" effects include "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . [and] can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. The agency must disclose the direct, indirect, and cumulative impacts and consequences of its actions. 40 C.F.R. §§ 1502.16(a) & (b), 1508.25(c), 1508.27(b)(7). The failure to do so means that the agency has failed to take a "hard look" at environmental consequences. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 994-96. However, judicial "review is limited to whether the EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Natural Res. Def. Council v. U.S. Dep't of Transp.*, 770 F.3d 1260, 1271 (9th Cir. 2014) (quotation omitted). Courts may not "interject [themselves] within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

1.    Monitoring Data

Plaintiff argues that the Forest Service lacked sufficient data about catchfly population trends and habitat conditions to adequately assess the impacts of the grazing on the LIRA project

area catchfly and its pollinators.  As discussed above with regard to CMP viability directive, the Forest Service satisfied its obligations, under APA standards, as to sufficiency of monitoring data. For the same reasons that the FEIS and ROD comply with NFMA and the HCNRA Act, they also satisfy NEPA.  *E.g.*, *Native Ecosystems Council v. Marten*, 883 F.3d 783, 793-96 (9th Cir. 2018). The decision addresses both past and future monitoring, habitat-as-proxy for population trends, and habitat conditions, and otherwise adequately addresses the various effects of the reauthorization.  Plaintiff argues that the Forest Service lacks sufficient baseline data, but the procedural step of assessing the quality or quantity of baseline data is "not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action."  *Am. Rivers v. FERC*, 201 F.3d 1186, 1195, n.15 (9th Cir. 1999), and the Forest Service adequately addressed monitoring, on a practical level, for these reasons.

## 2.    Viability and Recovery

Plaintiff also asserts that the Forest Service failed to take the required "hard look" because it relied on "unsupported assumptions" regarding catchfly viability and recovery.  Plaintiff's arguments repeat its viability and recovery arguments made under NFMA and the HCNRA Act. Thus, as discussed above as to those Acts, because the Forest Service adequately showed compliance with CMP directives regarding viability and recovery, it also satisfied NEPA by taking a "hard look."

*            *            *            *            *

To summarize the Court's recommendations with regard to NEPA: The Court should GRANT defendants' and defendant-intervenors' Motions for Summary Judgment and DENY

plaintiff's Motion for Summary Judgment.  Defendant considered adequate alternatives to the project and took a "hard look" at monitoring data and at viability and recovery.

## RECOMMENDATIONS

For these reasons, the Court should GRANT defendant and defendant-intervenors' Motions for Summary Judgment (Docket Nos. 21 & 22) and DENY plaintiff's Motion for Summary Judgment (Docket No. 16).

## SCHEDULING ORDER

The above Findings and Recommendations will be referred to a United States District Judge for review.  Objections, if any, are due April 5, 2019.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendations will go under advisement on that date.

IT IS SO ORDERED.

DATED this 22nd day of March, 2019.

/s/ Patricia Sullivan
PATRICIA SULLIVAN
United States Magistrate Judge